# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

```
——————————————————————— x
                                      :
MASO CAPITAL INVESTMENTS              :
LIMITED, BLACKWELL PARTNERS LLC –     :
SERIES A, and CROWN MANAGED           :
ACCOUNTS SPC FOR AND ON BEHALF        :
OF CROWN/MASO SEGREGATED              :
PORTFOLIO, Individually and on Behalf of :
All Others Similarly Situated,        :
                                      :
                   Plaintiffs,        :
                                      :
         vs.                          :
                                      :
                                      :
E-HOUSE (CHINA) HOLDINGS LIMITED,     :
XIN ZHOU, NEIL NANPENG SHEN, E-       :
HOUSE HOLDINGS LTD., CHARLES          :
CHAO, BING XIANG, HONGCHAO ZHU,       :
JEFFREY ZENG, WINSTON LI, DAVID       :
JIAN SUN, CANHAO HUANG, SINA          :
CORPORATION, KANRICH HOLDINGS         :
LIMITED, ON CHANCE, INC., JUN HENG    :
INVESTMENT LIMITED, SMART CREATE      :
GROUP LIMITED, and SMART MASTER       :
INTERNATIONAL LIMITED                 :
                                      :
                   Defendants.        :
                                      :
——————————————————————— x
```

Case No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiffs Maso Capital Investments Limited ("MCIL"), Blackwell Partners LLC – Series A ("Blackwell"), and Crown Managed Accounts SPC for and on behalf of Crown/Maso Segregated Portfolio ("Crown"), individually and on behalf of all others similarly situated, allege the following based on personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by E-House (China) Holdings Limited ("E-House" or the "Company"), information that was disclosed in proceedings in *In re E-House (China) Holdings Ltd.*, No. FSD 170 of 2016 (IMJ) before the Grand Court of the Cayman Islands (the "Appraisal"), as well as conference call transcripts and media and analyst reports about the Company.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

1.      This is a securities class action brought on behalf of former owners of E-House American Depository Receipts ("ADS"), who sold their shares from April 15, 2016 until August 31, 2016 against E-House, E-House Holdings Ltd., Neil Nanpeng Shen, Charles Chao, Bing Xiang, Hongchao Zhu, Jeffrey Zeng, Xin Zhou, Winston Li, David Jian Sun, Canhao Huang, SINA Corporation, Kanrich Holdings Limited, On Chance, Inc., Jun Heng Investment Limited, Smart Create Group Limited, and Smart Master International Limited.

2.      E-House describes itself as a "leading real estate services company in China."  It listed ADS on the New York Stock Exchange ("NYSE"), and each ADS represented one common stock.

3.      In June 2015, E-House announced that it had received a proposed buyout offer, at $7.38 per ADS, from its CEO, Defendant Zhou, and another director, Defendant Shen.  Later

that month SINA Corporation ("SINA") joined them in forming a consortium (the "Buyer Group"). The Buyer Group also included entities controlled by Zhou and Shen.

4.      After several months of negotiation, on April 15, 2016, the Company executed a merger agreement with the Buyer Group and announced the Merger, where each ADS would be bought for $6.85 per ADS (the "Merger"). This publication artificially manipulated the Company's stock by failing to disclose key information about the Buyer Group's scheme.

5.      However, the deal still required shareholder approval and the Company published a preliminary proxy seeking that approval on April 25, 2016. In an attempt to persuade public ADS holders to accept the deal, the preliminary proxy contained numerous false and misleading statements and omissions. There were three main types of false and misleading statements and omissions. ***First***, statements indicating that the Merger was fair and in the best interest of those investors not affiliated with the Buyer Group (the "Unaffiliated Holders"). ***Second***, the proxies stated that there were no plans for post-Merger transactions ("Subsequent Transactions"). ***Third***, the proxies published and touted projections as the best available.

6.      In truth, the Merger was not fair, there were planned Subsequent Transactions and there were newer Undisclosed Projections.

7.      In the following months, E-House filed several amended proxies, each of which reiterated the above information, culminating in the July 1, 2016 proxy, inviting ADS holders to vote in favor of the Merger.

8.      The shareholders meeting was held on August 5, 2016. At that time the Merger could still have been blocked by the outside ADS holders if they had voted against the deal.

However, investors were defrauded by Defendants into accepting the Merger.  The Merger closed on August 12, 2016.

9.      As planned, Defendants began working on subsequent transactions and relisting transactions, which culminated in the registration of shares for listing on the Hong Kong stock exchange in July 2018.

10.     E-House relisted a portion of its business at a price reflecting a valuation far higher than the $6.85 per ADS that its whole business was taken private at through the Merger. As a result of Defendants' wrongful scheme to take E-House private at less than fair value (with the goal of relisting it at a higher valuation), shareholders outside the Buyer Group were injured to the tune of hundreds of millions if not billions of dollars.

## II.    JURISDICTION AND VENUE

11.     The claims asserted herein arise under (1) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; (2) Section 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(a); (3) Section 20A of the Exchange Act, 15 U.S.C. § 78t–1; and (4) Section 13(e) of the Exchange Act, 15 U.S.C. § 78m(e), and Rule 13e–3 promulgated thereunder, 17 C.F.R. § 240.13e–3.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  A significant portion of Defendants' actions, and the subsequent damages, took place within this District.  At all relevant times E-House ADS were traded on the NYSE. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails,

interstate telephone communications, and the facilities of the national securities markets.

14.     Each of the Defendants performed conduct within the United States or directed to the United States.  Defendants acted in furtherance of the Merger and controlled entities acting in furtherance of the Merger, which Merger was meant to privatize E-House and result in the delisting of E-House from the NYSE, among other effects.  Defendant acted to effectuate securities transactions with U.S. persons and controlled entities doing business in the United States, including where such business is the subject of this complaint.

## III.   PARTIES

15.     Plaintiffs, as set forth in the accompanying Certification, which is incorporated by reference herein, sold E-House ADS during the Class Period and were damaged as the result of Defendants' wrongdoing as alleged in this complaint.

16.      Defendant E-House was, at all relevant times, an exempted company with limited liability incorporated under the laws of the Cayman Islands and a leading real estate services company with a network covering more than 260 cities.  Its principal executive offices were located at 11/F, Yinli Building, 383 Guangyan Road, Jing'an District, Shanghai 200072.

17.     E-House ADS traded on the NYSE since August 8, 2007, under the ticker symbol "EJ."  Each ADS represented one E-House ordinary share.

18.      Defendant E-House Holdings Ltd. ("HoldCo") was, at all relevant times, an exempted company incorporated with limited liability under the laws of the Cayman Islands.  HoldCo was formed solely for the purpose of entering into the Merger agreement and the related financing agreements and consummating the transactions contemplated by such agreements.  Defendant Zhao was a director of HoldCo and signed the Merger agreement on its behalf.  HoldCo was an agent of the Consortium Defendants (defined below).

19.     E-House Merger Sub Ltd. ("Merger Sub") was, at all relevant times, an

4

exempted company with limited liability under the laws of the Cayman Islands.  Merger Sub

was formed solely for the purpose of entering into the Merger agreement and consummating the

transactions contemplated by such agreements.  Defendant Zhao was a director of Merger Sub

and signed the Merger agreement on its behalf.  Merger Sub is not named as a defendant herein,

because, as a result of the Merger, it no longer exists separately and apart from E-House—

which is responsible for any of Merger Sub's actions and liabilities.

20.     Defendant Xin Zhou ("Zhou") is one of the Company's co-founders and at all

relevant times was the co-chair of the Board.  Mr. Zhou served as the Company's CEO from

2003 to 2009 and from April 2012 through at least the end of the Class Period.  According to

the proxies, he was a permanent resident of the People's Republic of China at the time the

proxies were published.

21.     Defendant Neil Nanpeng Shen ("Shen") was, at all relevant times, a member of

the Board.  Defendant Shen was also a member of the Buyer Group.

22.     Defendant Charles Chao ("Chao") was, at all relevant times, the co-Chair of the

Board.  Defendant Shao was also the CEO of Defendant SINA.

23.     Defendant Bing Xiang ("Xiang") was, at all relevant times, a member of the

Board, and was a member of the transaction committee that was formed to review the Merger

(the "Committee").

24.     Defendant Hongchao Zhu ("Zhu") was, at all relevant times, a member of the

Board, and was a member of the Committee.

25.     Jeffrey Zhijie Zeng ("Zeng") was, at all relevant times, a member of the Board,

and was a member of the Committee.

26.     Winston Li ("Li") was, at all relevant times, a member of the Board, and was the

chair of the Committee.

27.     David Jian Sun ("Sun") was, at all relevant times, a member of the Board.

28.     Canhao Huang ("Huang") was, at all relevant times, a member of the Board.

29.     Defendants Zhou, Shen, Chao, Xiang, Zhu, Zeng, Li, Sun, and Huang are all considered the "Director Defendants."

30.     SINA Corporation ("SINA") is an exempted company with limited liability incorporated under the laws of the Cayman Islands.  It is a technology company that primarily operates in China.  Its common stock trades on the NASDAQ, a national exchange based on New York.  It participated in the Merger as a member of the Buyer Group.

31.      Kanrich Holdings Limited ("Kanrich"), a business company with limited liability incorporated under the laws of the British Virgin Islands.  It is controlled by Defendant Zhou.  It participated in the Merger as an affiliate of Defendant Zhou and by taking steps in furtherance of the Merger as a "Rollover Shareholder."

32.     On Chance, Inc. ("On Chance"), is a business company with limited liability incorporated under the laws of the British Virgin Islands.  It is controlled by Defendant Zhou.  It participated in the Merger as an affiliate of Defendant Zhou and by taking steps in furtherance of the Merger as a "Rollover Shareholder."

33.     Jun Heng Investment Limited ("Jun") is a business company with limited liability incorporated under the laws of the British Virgin Islands.  It is controlled by Defendant Zhou.  It participated in the Merger as an affiliate of Defendant Zhou and by taking steps in furtherance of the Merger as a "Rollover Shareholder."

34.     Smart Create Group Limited ("Smart Create") is a business company with limited liability incorporated under the laws of the British Virgin Islands.  It is controlled by

Defendant Shen.  It participated in the Merger as an affiliate of Defendant Shen and by taking steps in furtherance of the Merger as a "Rollover Shareholder."

35.     Smart Master International Limited ("Smart Master") is a business company with limited liability incorporated under the laws of the British Virgin Islands.  It is controlled by Defendant Shen.  It participated in the Merger as an affiliate of Defendant Shen and by taking steps in furtherance of the Merger as a "Rollover Shareholder."

36.     Defendants Zhou, Shen, SINA, Kanrich, On Chance, Jun, Smart Create, and Smart Master are all considered the "Consortium Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     BACKGROUND

37.     E-House describes itself as a "leading real estate services company in China."  It provides "real estate online services," "real estate brokerage services," "real estate information and consulting services, community value-added services," and other services.  According to E-House, its clients include "leading domestic and international real estate developers, as well as individual consumers."

38.     On June 9, 2015, E-House announced that it had received a proposed buyout offer.  The offer was made by Defendants Zhou and Shen.  The offer price was $7.38 per ADS. That day the Committee was formed to evaluate the offer.  The Committee was composed of Winston Li (as chair), Bing Xiang, Hongchao Zhu, Jeffrey Zhijie Zeng and David Jian Sun. However, on June 12, 2015, David Jian Sun resigned from the Committee over potential conflicts.

39.     On June 19, 2015 the Committee was informed that SINA had joined Zhou and Shen in forming a consortium (the "Buyer Group") interested in acquiring the Company.

40.     On June 25, 2015, the Committee retained Davis Polk and Wardwell LLP

("Davis Polk") as legal counsel and Duff & Phelps, LLC ("Duff") as financial advisors.

41.     On November 2, 2015, the Buyer Group submitted another non-binding proposal, indicating continued interest in buying the Company, but lowering its offer to $6.64. The same day, the Company issued a press release disclosing this reduced offer.  On January 18, 2016, the Committee made a counteroffer at $6.90, which the Buyer Group rejected on February 18, 2016, and then, on February 26, 2016, the Buyer Group made a counteroffer at $6.70.  On March 2, 2016, the Committee rejected the counteroffer.  On March 3, 2016, the Buyer Group increased its offer to $6.80.

42.     On March 4, 2016, the Committee told the Buyer Group they that they would preliminarily accept a price of $6.85, subject to further negotiation.  On April 14, 2016, Duff rendered a fairness opinion that the $6.85 price was fair.  The Committee and Board then approved the offer.

43.     On April 15, 2016, the Company and the Buyer Group executed a merger agreement.  E-House announced that it had agreed to be taken private by the Buyer Group, at a price of $6.85 per ADS, subject to a shareholder vote.  This publication itself artificially manipulated the Company's stock by failing to disclose key information about the Buyer Group's scheme.  It failed to disclose the plan to resell the company at a higher price and truthful information about the projected performance of the Company to assist shareholders in evaluating the Merger price.

44.     On April 25, 2016, E-House, HoldCo, Merger Sub and the Consortium Defendants filed a preliminary proxy.  The preliminary proxy stated that the Merger could not be completed without receiving approval from two-thirds of all shares voting, and that the Buyer Group controlled only about 44.9% of all possible votes, meaning that if the Unaffiliated

8

Holders opposed the deal, it would be blocked.

      **B.**      **FALSE AND MISLEADING MISSTATEMENTS AND OMISSIONS[1]**

    45.     In an attempt to persuade public ADS holders to accept the deal, the preliminary proxy contained numerous false and misleading statements and omissions:

    46.     The preliminary proxy contained false and misleading assurances that the Merger was fair.

    (a)     The preliminary proxy stated that the Committee "***determined that it was fair (both substantively and procedurally) to and in the best interests of the Company and the unaffiliated security holders, and declared it advisable, to enter into the Merger Agreement.***"

    (b)     Similarly, it stated that "***the Buyer Group believes that the Merger is substantively and procedurally fair to the unaffiliated security holders.***"

    (c)     Similarly, it stated that the Board "***determined that it was fair (both substantively and procedurally) to and in the best interests of the Company and  the unaffiliated security holders, and declared it advisable, to enter into the Merger Agreement and the transaction agreements contemplated by the Merger Agreement.***"

    47.     This was misleading because Defendants did not believe the Merger was fair or in the best interests of the Unaffiliated Holders.  They knew that legitimate projections of the Company's performance supported a much higher valuation.  They omitted to disclose legitimate projections.  They also omitted to disclose the plan to relist the Company at a much higher valuation after closing the Merger.

---

[1] Statements within this section that are alleged to be false and misleading are in ***bold and italics***.

48.     The preliminary proxy also contained assurances that the Merger was not part of an effort by the Buyer Group to acquire E-House merely to turn around and resell it at a higher price—whether through a relisting in China, restructuring, or otherwise (a "Subsequent Transaction").

49.     In a section titled "Buyer Group's Purpose and Reasons for the Merger," the preliminary proxy stated that the "***Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company.***"  It also stated that: "***The Buyer Group believes that, as a privately held company, the Company will have greater flexibility to focus on addressing the challenges to the Company's long-term profitability without the constraints caused by the public equity market's valuation of the Company and emphasis on short-term period-to-period performance***."

50.     Similarly, the preliminary proxy also contained a section titled "Plans for the Company after the Merger," which stated that after the Merger the Company would "***cease to be a publicly traded company.***"  Most importantly, it stated:

> ***The Buyer Group has advised the Company that, other than as described in this proxy statement and transactions already under consideration by the Company, it does not have any present plans or proposals that relate to or would result in any of the following: [1] an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations; [2] sale or transfer of a material amount of assets; or [3] any other material changes in the Company's business.***

51.     These statements were false and misleading because they omitted to disclose that the Buyer Group was planning to engage in a Subsequent Transaction, including relisting the

Company on a stock exchange in Asia, and was not intending to keep the Company as a privately held company as their statements indicated.

52.     The preliminary proxy also contained certain management-prepared projections that were used by the Committee negotiating the Merger on behalf of E-House, and by the financial advisor consulting on the Merger.  The preliminary proxy stated that these projections "***present[ed], to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of the Company***."  These projections, which were false and misleading, are shown below:

| EJ Core | Management Projections | | | | |
|---|---|---|---|---|---|
| | Fiscal Year Ending December 31, | | | | |
| | 2016E | 2017E | 2018E | 2019E | 2020E |
| | (in USD million except percentage) | | | | |
| Net Revenues | 456 | 481 | 504 | 537 | 566 |
| *% Growth* | *1.9%* | *5.5%* | *4.7%* | *6.5%* | *5.5%* |
| Gross Profit* | 171 | 181 | 194 | 211 | 226 |
| *% Margin* | *37.4%* | *37.7%* | *38.4%* | *39.3%* | *39.9%* |
| Operating Expenses* | 162 | 164 | 165 | 168 | 172 |
| Income from Operations | 8 | 18 | 29 | 43 | 54 |
| *% Margin* | *1.8%* | *3.7%* | *5.8%* | *8.0%* | *9.6%* |
| Net Income | (7) | 7 | 16 | 27 | 36 |
| *% Margin* | *−1.6%* | *1.4%* | *3.2%* | *5.0%* | *6.3%* |

*       Management projected gross profit and operating expenses include depreciation and amortization.

53.     The publication of these projections and affirmation that they were the best available projections was false and misleading because there were more accurate Undisclosed Projections.  Regardless of what Defendants believed about the projections, it was misleading to disclose these projections without disclosing the existence of the other projections.  Further, Defendants had an affirmative obligation to disclose all material information prior to the Merger, and failed to do so—including their failure to disclose the honest projections.

54.     In the following months, E-House, HoldCo, Merger Sub, and the Consortium Defendants filed several amended proxies, each of which reiterated the above information, culminating in the July 1, 2016 proxy (the "Final Proxy") inviting ADS holders to vote in favor

of the Merger.  Thus, by July 1, 2016, E-House was ***affirming and repeating*** that at that time they believed the Merger was fair, that there were no plans for a Subsequent Transaction, and that the projections were management's "best" estimations.  The company reiterated their statements about the projections and provided additional details about the projections:

| EJ Core | 2016 Management Projections | | | | |
| | Fiscal Year Ending December 31, | | | | |
| | 2016E | 2017E | 2018E | 2019E | 2020E |
| | (in USD million except percentage) | | | | |
| Net Revenue | | | | | |
| Real Estate Brokerage | 352 | 365 | 371 | 383 | 395 |
| *% Growth* | *-4.3%* | *3.7%* | *1.6%* | *3.1%* | *3.1%* |
| Real Estate Information & Consulting | 78 | 86 | 101 | 119 | 133 |
| *% Growth* | *33.6%* | *10.9%* | *16.3%* | *18.1%* | *11.8%* |
| Real Estate Promotional Events | 26 | 29 | 32 | 35 | 39 |
| *% Growth* | *21.6%* | *13.3%* | *9.7%* | *9.3%* | *9.3%* |
| **Net Revenues** | **456** | **481** | **504** | **537** | **566** |
| *% Growth* | *1.9%* | *5.5%* | *4.7%* | *6.5%* | *5.5%* |
| **Gross Profit\*** | **171** | **181** | **194** | **211** | **226** |
| *% Margin* | *37.4%* | *37.7%* | *38.4%* | *39.3%* | *39.9%* |
| Operating Expenses\* | 162 | 164 | 165 | 168 | 172 |
| *% Net Revenue* | *35.6%* | *34.0%* | *32.7%* | *31.3%* | *30.3%* |
| **Income from Operations** | **8** | **18** | **29** | **43** | **54** |
| *% Margin* | *1.8%* | *3.7%* | *5.8%* | *8.0%* | *9.6%* |
| **Net Income** | **(7)** | **7** | **16** | **27** | **36** |
| *% Margin* | *-1.6%* | *1.4%* | *3.2%* | *5.0%* | *6.3%* |
| **Depreciation & Amortization** | **12** | **13** | **13** | **13** | **14** |
| *% Net Revenue* | *2.6%* | *2.7%* | *2.6%* | *2.5%* | *2.4%* |
| **Capital Expenditures** | **7** | **8** | **8** | **8** | **9** |
| *% Net Revenue* | *1.6%* | *1.6%* | *1.6%* | *1.5%* | *1.5%* |
| **Net Working Capital** | **283** | **284** | **280** | **291** | **302** |
| *% Net Revenue* | *62.1%* | *58.9%* | *55.6%* | *54.2%* | *53.3%* |

\*      Management projected gross profit and operating expenses include depreciation and amortization.

### C.      The Undisclosed Truth, Close of the Merger, and Relisting

55.      In June 2016—before the Final Proxy was published—Defendants prepared a new set of projections (the "Undisclosed Projections"), implying a much higher valuation than those included in the July 1, 2016 Final Proxy.  This was clearly material information that Defendants were obligated to disclose, and in light of the Undisclosed Projections the Final Proxy was clearly misleading.

56.      In late July 2016—before the shareholder meeting on the Merger—the Undisclosed Projections were used by Defendants in pitching Subsequent Transactions to potential parties.  In fact, the Undisclosed Projections were presented to potential participants in one or more Undisclosed Transaction by July 26, 2016 (and possibly before then as well).  This

again corroborates the materiality of the Undisclosed Projections—which Defendants had an affirmative obligation to disclose—and firmly demonstrates the falsity of E-House's representation that it was not planning a Subsequent Transaction.  As part of these presentations, potential parties were privately shown that the Company had a much higher valuation than implied by the Merger price—strongly demonstrating that the Merger was not, in fact, in the best interest of public ADS holders.

57.     The shareholders meeting was held on August 5, 2016.  At that time the Merger could still have been blocked by the outside ADS holders if they voted against the deal.  However, as is now known, the public had been misled about the Merger, because: (1) there were undisclosed plans for Subsequent Transactions; and (2) the projections presented to the public and filed with the SEC were substantially lower than the real projections management had prepared in connection with Defendants' plans for a Subsequent Transaction.  Influenced by this false information, the Unaffiliated Holders voted in favor of the Merger, which subsequently closed and became effective on August 12, 2016.

58.     As a result of the Merger, Merger Sub was merged into E-House, with the survivor of that merger being E-House.  This resulted in HoldCo being the sole direct shareholder of E-House, and the Consortium Defendants indirectly owning E-House.  This also resulted in E-House purchasing all the ADS held by the Unaffiliated Holders, which also meant that Holdco and the Consortium Defendants were purchasers of those ADS, through their agents.  In the alternative, it is alleged that Merger Sub purchased the ADS, acting as agent for HoldCo and the Consortium Defendants.

59.     The undisclosed plans for a Subsequent Transaction involved an ultimate plan to relist E-House on an exchange in Asia, as well as a plan to conduct a substantial restructuring

transaction promptly after closing the Merger.  As planned, E-House began working toward a relisting, which culminated in the registration of shares for listing on the Hong Kong stock exchange in July 2018.

60.     It relisted a portion of its business at a price reflecting a valuation far higher than the $6.85 per ADS that its whole business was privatized at through the Merger.  As a result of Defendants' wrongful scheme to take E-House private at less than fair value (with the goal of relisting it at a higher valuation), shareholders outside the Buyer Group were injured to the tune of hundreds of millions if not billions of dollars.

## V.     ADDITIONAL SCIENTER ALLEGATIONS

61.     During the Class Period, as alleged herein, the Defendants acted with scienter in that the Defendants knew or recklessly disregarded whether the public documents and statements issued or disseminated in the name of E-House during the Class Period were materially false and misleading; Defendants knew or recklessly disregarded whether such statements or documents would be issued or disseminated to the investing public; and Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such false and misleading statements or documents as primary violations of the federal securities laws.

62.     The Defendants permitted E-House to release these false and misleading statements, which artificially deflated the value of the E-House ADS.

63.     As set forth herein, the Defendants, by virtue of their receipt of information reflecting the true facts regarding E-House, their control over, receipt, and/or modification of E-House's materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning E-House, participated in the fraudulent scheme alleged herein.

14

64.     The Buyer Group undoubtedly had actual knowledge of their own conduct, including the conduct of Defendants Zhou and Shen, and including the use of the Undisclosed Projections and planned Subsequent Transactions.  The persons involved in the preparation of the Undisclosed Projections were also clearly aware that they existed.

## VI.     LOSS CAUSATION/ECONOMIC LOSS

65.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the price of E-House ADS and operated a fraud or deceit on Class members by failing to disclose and misrepresenting the facts detailed herein.  This course of conduct misled the Class members and caused them— through their reliance on the misrepresentations and omissions, and on the market price of E-House's ADS during the Class Period—to sell their ADS at an artificially depressed price.  As a result of their sale of E-House ADS, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VII.    APPLICABILITY OF PRESUMPTION OF RELIANCE

66.     The requirement to plead reliance in this case is relaxed because the votes of Unaffiliated Holders were required to close the transaction, and the proxies containing false and misleading statements and omissions were essential links in the completion of the Merger.

67.     To the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972).

68.     Plaintiffs are also entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

15

    (b)    the omissions and misrepresentations were material;

    (c)    the E-House ADS traded efficiently ;

    (d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the E-House ADS; and

    (e)    Plaintiffs and other members of the Class transacted in E-House ADS between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

69.    At all relevant times, the markets for E-House ADS were efficient.

70.    The market for E-House ADS promptly digested current information regarding E-House from all publicly available sources and reflected such information in E-House ADS price.  Under these circumstances, all those who purchased or otherwise acquired E-House ADS during the Class Period suffered similar injury through sales of E-House ADS at artificially deflated prices, and the presumption of reliance applies.

**VIII.  NO SAFE HARBOR**

71.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. As a threshold matter, the statutory safe harbor does not apply to going-private transactions. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of E-House who knew that the statement was false when made.

## IX.    CLASS ACTION ALLEGATIONS

72.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class (the "Class") of all former owners of E-House ADS who sold E-House ADS, and were damaged thereby, (a) during the period from April 15, 2016, until August 31, 2016, inclusive (the "Class Period"), or (b) by way of, or as a result, of tendering their ADS as part of the Merger, regardless of when that tender occurred.  For the avoidance of doubt, "tendering" as used in the prior sentence shall be interpreted as broadly as possible to describe any transaction in which ADS were cashed-out for Merger consideration.[2]

73.    Excluded from the Class are: Defendants (as defined herein); any officers or directors of Defendants during the Class Period (the "Excluded D&Os"); members of Defendants' and the Excluded D&Os' immediate families; the subsidiaries and affiliates of the Company, including the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); any entity in which Defendants or the Excluded D&Os have or had a controlling interest; and the legal representatives, heirs, successors, or assigns of any excluded person or entity.

74.    There is a well-defined community of interest in the questions of law and fact

---

[2] The Merger closed on August 12, 2016, and that was also the last day that the ADS traded on the NYSE.  However, many parties' trading records may reflect dates sometime after that as the date on which their shares were sold as part of the Merger.  For the avoidance of doubt, there is no date limitation on Part (b) of the Class definition; parts (a) and (b) are coextensive with each other; and tendering shares constitutes a sale

involved in this case.  Questions of law and fact common to the members of the Class which

predominate over questions that may affect individual Class members include:

(a)      Whether the Exchange Act was violated by Defendants;

(b)      Whether Defendants omitted and/or misrepresented material facts;

(c)      Whether Defendants' statements omitted material facts necessary in

order to make the statements made, in light of the circumstances under which they were made,

not misleading;

(d)      Whether Defendants knew or recklessly disregarded that their statements

were false and misleading;

(e)      Whether the price of E-House ADS was artificially deflated; and

(f)      The extent of the damage sustained by Class members and the

appropriate measure of damages.

75.      Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class

sustained damages from Defendants' wrongful conduct.

76.      Plaintiffs will adequately protect the interests of the Class and have retained

counsel experienced in securities class action litigation.  Plaintiffs have no interests that conflict

with those of the Class.

77.      A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

**X.      COUNTS**

**A.      Count I: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against the Consortium Defendants and E-House, and HoldCo**

78.      Plaintiffs repeat and reallege each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

79.     During the Class Period, the Consortium Defendants, E-House, HoldCo and Merger Sub (now E-House) disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.     These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.     These Defendants omitted information they had a duty to disclose, including their duties pursuant to SEC Rule 13e-3, Cayman Law, and arising from their conduct during the Class period.

82.     Plaintiffs and the Class have suffered damages in that, as a result of these Defendants' wrongful conduct alleged herein, they sold E-House ADS at artificially deflated prices.  Plaintiffs and the Class would not have sold E-House ADS at the prices they did, if they had not been defrauded, and if they had been aware that the market prices had been artificially and falsely deflated by these Defendants' misleading statements.

83.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their sales of E-House ADS during the Class Period.

**B.     Count II: For Violation of Section 13(e) of the Exchange Act and Rule 13e-3 Promulgated Thereunder Against the Consortium Defendants, E-House, and HoldCo**

84.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

19

85.     The Merger constituted a Going Private Transaction under Rule 13e-3.  The Consortium Defendants, E-House, HoldCo and Merger Sub (now E-House) signed, filed and made the statements within the Rule 13e-3 Transaction Statement used for the Merger.  At all times this Rule 13e-3 Transaction Statement contained material omissions, misrepresentations.  Additionally, Defendants failed to update the Rule 13e-3 Transaction Statement to reflect all material facts as required under Rule 13e-3.

86.     During the Class Period, these Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     These Defendants violated Section 13(e) of the Exchange Act and Rule 13e-3 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     Plaintiffs and the Class have suffered damages in that—as a result of these Defendants' wrongful conduct alleged herein—they sold E-House ADS at artificially deflated prices.  Plaintiffs and the Class would not have sold E-House ADS at the prices they did, if they had not been defrauded and if they had been aware that the market prices had been artificially and falsely deflated by these Defendants' misleading statements.

89.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their sales of E-House ADS during the Class Period.

C.      **Count III: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder, Against E-House, HoldCo, the Consortium Defendants, and Defendant Chao**

90.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

91.     This claim is brought against Defendants E-House, HoldCo, the Consortium Defendants, and Defendant Chao under Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5. 278.

92.     E-House, HoldCo, the Consortium Defendants, and Defendant Chao possessed material nonpublic information about E-House, including information about the Undisclosed Projections, the planned Subsequent Transaction, and the unfairness of the Merger ("MNPI").

93.     By virtue of the foregoing, these Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly, made material omissions and violated §10(b) and Rule 10b-5.  Plaintiffs, and members of the Class, sold E-House ADS contemporaneously with these Defendants' purchase of E-House ADS.

94.     As a result of the Merger, Defendant E-House purchased ADS from Plaintiffs and members of the Class while in possession of MNPI.  At that time, E-House was acting as agent for the Consortium Defendants, who also possessed MNPI at that time.  Such Consortium Defendants thus also purchased E-House ADS.

95.     The following is alleged in the alternative: As a result of the Merger, Merger-Sub purchased ADS from Plaintiffs and members of the Class, while in possession of MNPI.  As a result of the Merger, E-House is responsible for Merger-Sub's conduct and is properly named as a Defendant as a result of Merger Sub's purchase.  At that time, Merger-Sub was acting as agent for the Consortium Defendants, who also possessed MNPI at that time.  Such Consortium

21

Defendants thus also purchased E-House ADS.

96.     The following is also alleged in the alternative: the Consortium Defendants purchased the E-House ADS. They acquired E-House through the Merger, which was conducted for their benefit.

97.     Defendants are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

**D.     Count IV: For Violation of Section 20A of the Exchange Act Against E-House, HoldCo, the Consortium Defendants, and Defendant Chao**

98.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

99.     This Count is asserted pursuant to Section 20A of the Exchange Act against E-House, HoldCo, the Consortium Defendants and Defendant Chao.

100.     As a result of the Merger, Defendant E-House purchased ADS from Plaintiffs and members of the Class, while in possession of MNPI.  At that time, E-House was acting as agent for the Consortium Defendants, who also possessed MNPI at that time, wherein it purchased the ADS through its agent.

101.     The following is alleged in the alternative: As result of the Merger, Merger-Sub purchased ADS from Plaintiffs and members of the Class, while in possession of MNPI.  As a result of the Merger, E-House is responsible for Merger-Sub's conduct and is properly named as a Defendant as a result of Merger Sub's purchase.  At that time, Merger-Sub was acting as agent for the Consortium Defendants, who also possessed MNPI at that time, wherein it purchased the ADS through its agent.

102.     Defendant Chao is a control person of Defendant SINA and violated Section 20A; when SINA purchased ADS as a result of the merger, Chao possessed MNPI at that time.

22

Defendant Zhou is a control person of Defendants E-House, Merger Sub, Kanrich, On Chance, and Jun, and violated Section 20A; when those entities purchased ADS as a result of the merger, Zhou also possessed MNPI at that time.  Defendant Shen is a control person of E-House, Smart Create, and Smart Master, and violated Section 20A; when those entities purchased ADS as a result of the merger; Shen also possessed MNPI at that time.  As a result, these Defendants violated 20A.

103.     Defendants are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

**E.      Count V: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder E-House, HoldCo, the Consortium Defendants, and Defendant Chao**

104.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

105.     This Count is brought against Defendants E-House, HoldCo, the Consortium Defendants, and Defendant Chao under § 10(b) and Rule 10b-5(a) and (c) promulgated thereunder.

106.     During the Class Period, these Defendants (and Merger Sub, now E-House), engaged in a fraudulent scheme to deprive Unaffiliated Holders of the fair value of their E-House ADS.  This scheme involved buying the ADS for less than fair value, or controlling entities that did so, without disclosing the plans to relist the Company in Asia after the Merger.

107.     In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

108.    Plaintiffs and the Class reasonably relied upon the integrity of the market in which E-House ADS traded.

109.    During the Class Period, Plaintiffs and the Class were unaware of these Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiffs and the Class known of the unlawful scheme and unlawful course of conduct, they would not have sold their E-House ADS, or if they had, they would not have done so at the artificially deflated prices paid for such ADS.

110.    As a direct and proximate result of the Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their sale of E-House ADS during the Class Period.

F.    **Count VI: For Violation of Section 20(a) of the Exchange Act Against the Director Defendants**

111.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112.    Defendant Chao is a control person of Defendant SINA.  Defendant Zhou is a control person of Defendants HoldCo, Merger Sub, Kanrich, On Chance, and Jun.  Defendant Shen is a control person of Smart Create, and Smart Master.  Each of the Director Defendants is a control person of Defendant E-House.

113.    The Director Defendants, as culpable participants, acted as controlling persons, as described in the prior paragraph, within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control those entities, these Defendants had the power and ability to control their relevant conduct, statements and omissions.  These Defendants are liable pursuant to Section 20(a) of the Exchange Act, to the extent that those entities are liable for any violation of the Exchange Act.

## XI.   PRAYER FOR RELIEF

114.   WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating Plaintiffs as Co-Lead Plaintiffs and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs' counsel Labaton Sucharow LLP as Lead Counsel for the Class;

(b)   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Awarding such equitable or injunctive or other relief as deemed appropriate by the Court.

## XII.   JURY DEMAND

115.   Plaintiffs demand a trial by jury.

DATED: April 9, 2020                    Respectfully submitted,

                                        **LABATON SUCHAROW LLP**

                                        /s/ *Francis P. McConville*
                                        Christopher J. Keller
                                        Francis P. McConville
                                        Carol C. Villegas
                                        David J. Schwartz
                                        Jake Bissell-Linsk
                                        140 Broadway
                                        New York, New York 10005
                                        Telephone: (212) 907-0700
                                        Facsimile: (212) 818-0477
                                        ckeller@labaton.com
                                        fmcconville@labaton.com
                                        cvillegas@labaton.com
                                        dschwartz@labaton.com
                                        jbissell-linsk@labaton.com

                                        *Counsel for Plaintiffs MCIL,*
                                        *Blackwell, and Crown*

## CERTIFICATION

I, Manoj Jain, a Co-Chief Investment Officer of Maso Capital Partners Limited ("MCPL"), the Investment Manager for Maso Capital Investments Limited ("MCIL"), the Investment Manager for Blackwell Partners LLC – Series A ("Blackwell"), and the Trading Advisor for Crown Managed Accounts SPC for and on behalf of Crown/Maso Segregated Portfolio ("Crown," and together with MCIL and Blackwell, the "Maso Entities"), hereby certify as follows:

1.   I am personally authorized to enter into and execute this certification on behalf of the Maso Entities.

2.   I have reviewed a complaint prepared against E-House (China) Holdings Limited ("E-House") alleging violations of the federal securities laws, generally adopt its allegations without waiving the right to alter the allegations in a consolidated and/or amended complaint, and authorize the filing of this pleading;

3.   The Maso Entities did not transact in the securities of E-House at the direction of counsel or in order to participate in any private action under the federal securities laws;

4.   The Maso Entities are willing to serve as lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

5.   The Maso Entities' transactions in E-House securities during the period specified in the complaint are reflected in Exhibit A attached hereto;

6.   The Maso Entities have not sought to serve as a lead plaintiff in any class action filed under the federal securities laws during the last three years;

7.   Beyond its pro rata share of any recovery, the Maso Entities will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this ___9___ day of April, 2020.

_____
Manoj Jain
Authorized Signatory
Maso Capital Partners Limited
and the Maso Entities

## EXHIBIT A

## TRANSACTIONS IN E-House (China) Holdings Limited

| Party* | Transaction Type | Trade Date | ADR |
|---|---|---|---|
| Blackwell | Purchase | 4/15/2016 | 16,274 |
| Crown | Purchase | 4/15/2016 | 4,600 |
| MCIL | Purchase | 4/15/2016 | 11,700 |
| MCIL | Purchase | 4/18/2016 | 52,919 |
| Blackwell | Purchase | 4/19/2016 | 119,000 |
| Crown | Purchase | 4/28/2016 | 29,200 |
| Blackwell | Purchase | 5/5/2016 | 45,936 |
| Crown | Purchase | 5/5/2016 | 12,800 |
| MCIL | Purchase | 5/5/2016 | 32,500 |
| Crown | Sale | 7/27/2016 | (214,000) |
| Blackwell | Sale (Tender) | 8/16/2016 | (2,103,628) |
| Crown | Sale (Tender) | 8/16/2016 | (370,658) |
| MCIL | Sale (Tender) | 8/16/2016 | (1,484,904) |

---

* "Blackwell" refers to Blackwell Partners LLC – Series A; "Crown" refers to Crown Managed Accounts SPC for and on behalf of Crown/Maso Segregated Portfolio; and "MCIL" refers to Maso Capital Investments Limited.