UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————— x
                                    :
                                    :   Case No. 1:20-cv-02943-ER
                                    :
                                    :   <u>CLASS ACTION</u>
                                    :
IN RE E-HOUSE SECURITIES            :
LITIGATION                          :   AMENDED COMPLAINT
                                    :   FOR VIOLATIONS OF
                                    :   THE FEDERAL SECURITIES LAWS
                                    :
                                    :   <u>DEMAND FOR JURY TRIAL</u>
                                    :
———————————————— x

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     SUMMARY OF THE ALLEGATIONS ....................................................................2

III.    JURISDICTION AND VENUE ................................................................................8

IV.     PARTIES AND SECURITIES AT ISSUE................................................................9

V.      CORE FACTUAL ALLEGATIONS........................................................................14

        A.      The Origins of the Merger ..........................................................................16

        B.      The Initial Proxy is Published.....................................................................17

                1.      The Required Vote & Merger Structure ...........................................17

                2.      Dissenter Rights ...............................................................................18

                3.      Fairness Opinions and Projections...................................................19

                4.      Purpose and Reasons for the Merger ...............................................21

        C.      Several Amended Proxies Are Issued..........................................................23

        D.      Shareholders Vote on the Merger and the Merger Closes ..................................26

        E.      The Truth Is Revealed During the Appraisal.............................................27

        F.      E-House is Relisted at a Far Higher Valuation than the Merger Price ..............32

VI.     FALSE AND MISLEADING STATEMENTS AND OMISSIONS..............................35

VII.    OMISSIONS VIOLATING DUTIES TO DISCLOSE .........................................41

        A.      Duty to Disclose Imposed by Cayman Islands Law ...........................................41

        B.      Duty to Disclose Imposed by SEC Regulations ...........................................42

        C.      Duty to Disclose Due to Insider Trading ...................................................44

VIII.   SCIENTER ALLEGATIONS RELEVANT TO CERTAIN COUNTS.........................45

        A.      Motive and Opportunity................................................................................46

        B.      Knowledge, Recklessness, and Involvement....................................................47

        C.      Corporate Scienter .......................................................................................47

IX.     LOSS CAUSATION AND ECONOMIC LOSS .................................................47

X.     APPLICABILITY OF PRESUMPTION OF RELIANCE ...............................48

XI.    NO SAFE HARBOR ........................................................................................50

XII.   CLASS ACTION ALLEGATIONS ................................................................52

XIII.  COUNTS..........................................................................................................53

      A.    Count I: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Each Member of the Buyer Group and Defendant E-House..........................................................53

      B.    Count II: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against Each Member of the Buyer Group and Defendant E-House ................................................54

      C.    Count III: For Violation of Section 13(e) of the Exchange Act and Rule 13e-3 Promulgated Thereunder Against Each Member of the Buyer Group and Defendant E-House...........................................................55

      D.    Count IV: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendant E-House and Each Member of the Buyer Group, Except Defendant Chao, Regarding Insider Trading.................................................................................57

      E.    Count V: For Violation of Section 20A of the Exchange Act Against Defendant E-House and Each Member of the Buyer Group, Except Defendant Chao, Regarding Insider Trading.........................................58

      F.    Count VI: For Violation of Section 20(a) of the Exchange Act Against Defendants Zhou, Shen, and Chao.....................................................58

      G.    Count VII: For Violation of Section 20(a) of the Exchange Act Against Defendants Shen, Chao, Xiang, Zhu, Zeng, Zhou, Li, and Jian .......................59

XIV.  PRAYER FOR RELIEF ..................................................................................59

XV.   JURY DEMAND .............................................................................................60

Plaintiffs Maso Capital Investments Limited ("MCIL"), Blackwell Partners LLC –
Series A ("Blackwell"), Crown Managed Accounts SPC for and on behalf of Crown/Maso
Segregated Portfolio ("Crown," and together with MCIL and Blackwell, the "Maso Entities"),
and Altimeo Asset Management ("Altimeo," and together with the Maso Entities, "Co-Lead
Plaintiffs"), individually and on behalf of all others similarly situated, allege the following.

The allegations herein are based on personal knowledge as to Co-Lead Plaintiffs and Co-
Lead Plaintiffs' own acts, and upon information and belief as to all other matters based upon the
investigation conducted by and through Co-Lead Plaintiffs' attorneys, which included, among
other things, a review of Securities and Exchange Commission ("SEC") filings by E-House
(China) Holdings Limited ("E-House" or the "Company"), information that was disclosed in
proceedings in *In re E-House (China) Holdings Ltd.*, No. FSD 170 of 2016 (IMJ) before the
Grand Court of the Cayman Islands (the "Appraisal"), as well as conference call transcripts,
media reports, and analyst reports about the Company.  Co-Lead Plaintiffs believe that
substantial evidentiary support will exist for the allegations set forth herein after a reasonable
opportunity for discovery.

I.    **INTRODUCTION**

1.    This is a securities class action brought on behalf of former owners of E-House
American Depository Receipts ("ADS"), who sold their ADS from July 1, 2016, until August
31, 2016, against E-House, E-House Holding Ltd., Neil Nanpeng Shen, Charles Chao, Bing
Xiang, Hongchao Zhu, Jeffrey Zeng, Xin Zhou, Winston Li, David Jian Sun, Canhao Huang,
SINA Corporation, Kanrich Holdings Limited, On Chance Inc., Jun Heng Investment Limited,
Smart Create Group Limited, and Smart Master International Limited.

2.    Defendants defrauded investors by deceiving them into accepting a management
buyout at an unfairly low price.  They reaped well over a billion dollars in profit at the expense

of public investors in E-House.  Defendants' scheme is a paradigmatic example of the sort of

deceit that the federal securities laws are designed to prevent.

3.        E-House's CEO and Chairman, Defendant Zhou, another of its directors,

Defendant Shen, and one of its biggest business partners, SINA Corporation ("Sina"), formed a

Buyer Group (defined herein) and proposed a buyout.  The buyout valued the Company at $1.06

billion.  They issued SEC filings pitching the deal that included projections and fairness

opinions relying on those projections.  These SEC filings also stated that there were no other

"plans or proposals" for any major transactions, such as a merger, major asset sale, or relisting

on a public market.  In other words, Defendants just wanted to buy the Company because they

felt results could be improved outside the "short-term pressure" of public markets.

4.        In truth, Defendants had far more favorable projections than those that were

publicly disclosed.  Before the Merger even closed, they used these much higher projections to

pitch new investors on participating in a transaction to buy just one segment of E-House.  The

presentation materials for one such pitch, valued just that one segment of E-House at materially

more than the valuations shown for the entire Company in the buyout documents that were

disclosed to the Company's current shareholders.  As soon as Defendants succeeded in tricking

investors into accepting the buyout, they began executing their undisclosed plan, restructuring

E-House, bringing in new private investors, and relisting just ***part*** of the Company on the Hong

Kong stock exchange at a market capitalization of $2.651 billion, which far exceeded the $1.06

billion they valued the ***entire*** Company at when they bought it through the privatization.

## II.        SUMMARY OF THE ALLEGATIONS

5.        E-House is a "leading real estate services company in China."  It listed ADS on

the New York Stock Exchange ("NYSE") and each ADS represented one share of common

stock.  Following several prior disclosures about a potential management buyout, E-House

announced on April 15, 2016, that its Board had agreed to a proposed management buyout (the "Merger").  The Merger price was set at $6.85 per ADS, a modest 9.08% premium to E-House's share price before the Merger was announced.

6.      While the Board had approved the Merger, the deal still required shareholder approval.  Two-thirds of all shareholders voting on the Merger needed to vote in favor of the deal for the transaction to proceed.

7.      The Company published a preliminary proxy seeking that approval on April 25, 2016.  The preliminary proxy described the terms of the deal.  It explained the structure the Merger would use if it proceeded.  It also explained that investors rejecting the deal would be entitled to seek an appraisal of the fair value of their shares by taking certain steps prior to the Merger closing.  This proxy also included certain management projections, purporting to show management's estimation of cash flows from 2016 until 2020 and fairness opinions from the Board, as well as the committee that negotiated the Merger (the "Committee"), and Duff & Phelps, LLC ("D&P"), the investment banking firm retained by that Committee.

8.      Additionally, the preliminary proxy purported to disclose the Buyer Group's reasons for the Merger.  It stated that the "Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company."  It clarified this statement by noting that "as a privately held company, the Company will have greater flexibility to focus on addressing the challenges to the Company's long-term profitability without the constraints caused by the public [market]."

9.      In other words, Defendants presented the Merger in a traditional light for a management buyout.  Management supposedly felt that pressure to post strong results over the short-term was holding the Company back.  And they supposedly wanted to run the Company

3

privately and profit from the benefits of being able to manage for a longer-time horizon.  Their supposed thesis was not that the Company was presently undervalued, but just that it could be worth more under their private management versus operating as a public company.

10.     In the same vein, Defendants assured the market that they did not have other plans and that they were not merely planning to flip the Company for a quick profit. Specifically, the preliminary proxy stated that the Buyer Group "does not have any present plans or proposals" that would result in any "extraordinary corporate transaction involving the Company's corporate structure, business, or management" or the sale or transfer of a "material amount of assets" or "any other material changes to the Company's business" (a "Subsequent Transaction").

11.     On May 27, 2016, Defendants filed an amended proxy, which included updated projections that were lower than the projections in the preliminary proxy (the "2016 Management Projections").  This change was supposedly related to currency exchange rates and issues relevant to one segment of E-House's business referred to as "Leju."  Aside from that change, the amendment reiterated the prior statements about the Buyer Group's plans for the Company and about the fairness of the Merger.  An additional amended proxy was filed on June 16, 2016, which again reiterated these statements.

12.     Finally, on July 1, 2016, Defendants filed the Final Proxy.  It once again reiterated that the Buyer Group had no "plans or proposals" regarding post-Merger transactions. It also republished the 2016 Management Projections, and assured investors—in the present tense as of that filing—that this more recent set of projections "reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and

belief, the expected course of action and the expected future financial performance of
the Company."

13.     As would later come to light – prior to the publication of the Final Proxy, E-
House's management had prepared undisclosed and much higher projections that they used to
solicit new investors to participate in a post-Merger Subsequent Transaction.  Thus, at the time
E-House was pitching private investors with undisclosed higher projections – to get them to
invest in a post-Merger E-House business – they were simultaneously soliciting public market
investors with lower projections to get them to sell their shares on the cheap.  In this way, the
Buyer Group was scheming to pay public investors less than what their shares were worth,
while using the real value of the Company to solicit interest in the post-Merger business.

14.     These private, undisclosed projections are referred to as the PTPs or "Parallel
Transaction Projections," because of their role in pitching investors in post-Merger Subsequent
Transactions, in parallel with the proposed public Merger.  The undisclosed projections were
approved by Defendant Zhou and were not premised on future synergies or value created due to
the Merger – they updated and replaced the 2016 Management Projections and reflected
developments within the Company, since the prior publicly disclosed projections were
generated in early 2016.

15.     The PTPs were far more favorable than the publicly disclosed 2016 Management
Projections.  For example, the net income figures, an important figure for valuation purposes, in
the 2016 Management Projections had estimated only 4.65% annual growth from 2016 until
2019.  In contrast, the undisclosed projections show explosive annual growth during that period
of 19%—about four times the growth that was publicly disclosed.  Additionally, the PTPs
incorporated E-House's results for the first half of 2016, during which time its net income grew

by 37%, more than 19 times the amount in the lower 2016 Management Projections for the entire year.

16.     To be sure, there is nothing wrong with E-House outperforming its projections, but Defendants were obligated to disclose the material information — that E-House had massively outperformed and projected continued outperformance — prior to closing the Merger.  Defendants were obligated to disclose the higher projections and results, both because the failure to do so rendered their statements misleading (such as their public assertion that the 2016 Management Projections were the "best currently available estimates"),, and because of disclosure obligations under Cayman law, SEC regulations, and insider trading law.

17.     During July 2016 (and unknown to the public), Defendants further evidenced their true intentions of executing a Subsequent Transaction, by incorporating the undisclosed PTPs into private investor presentations.  For example, one such presentation occurred on July 26, 2016.  Defendants' presentation included a slide titled Valuation and Exit, which showed a plan to engineer a future stock listing in Asia.  Another slide, titled "Valuation," showed that just one segment of E-House was worth $1.2 billion.  To put that in context, the financial advisor working on the Merger, using the outdated 2016 Management Projections, valued that segment at only $332 million.  In addition to having an affirmative obligation to disclose the better valuation information, Defendants' undisclosed knowledge of the higher valuation, and use of that higher valuation in soliciting private investments before the Merger closed, strongly demonstrates that their assertions that the deal was fair was not an honestly held belief and instead presented a deeply misleading depiction of the information available to Defendants.

18.     On August 5, 2016, E-House filed a press release announcing that shareholders had voted in favor of the Merger—albeit with grossly incomplete and inaccurate information. And on August 12, 2016, the Merger closed.

19.     Further highlighting the stark falsity of Defendants' denial of any "plan or proposal" for a Subsequent Transaction and their belief instead in the reliability of the PTPs, Defendants closed post-Merger equity sales in August and September that were based on the previously discussed private $1.2 billion valuation figure for just one of E-House's segments. Those sales included a contractual term whereby the Company effectively promised the investors that they would be compensated if the net profits in 2016-2017 came in lower than 95% of the projected profit in the PTPs.  Defendants were not only using the PTPs to pitch Subsequent Transactions—they were guaranteeing the projections as part of the deal.

20.     Consistent with their true plans, over the next two years Defendants reorganized the Company, brought in additional investors, and then relisted the Company with an initial public offering ("IPO") on the Hong Kong stock exchange.  The IPO documents, which Defendant Zhou controlled as the CEO, Chairman, and dominant shareholder of the relisting company, admitted the Buyer Group's true reason for the Merger.

21.     The IPO documents stated that the Merger was initiated—not based on the hope that management could improve performance with a longer-time horizon as had been previously stated—but based on a view that the Company was "undervalued in the U.S."  It also admitted that the Merger was initiated to enable the Buyer Group to "restructure different business units" and pursue their "capital market strategies," *i.e.,* sell substantial stakes in the Company through post-Merger equity sales and execute their plan of relisting the Company on an Asian stock exchange.

22.     The scheme worked.  The entity that was relisted, was entirely comprised of business-lines that were previously part of the NYSE-listed E-House but did not include at least two large portions of the privatized Company.  Given that narrower composition, it is particularly astounding that Defendants were able to sell shares at a market capitalization of $2.651 billion—roughly 2.5 times the valuation pitched to E-House's public investors for the entire Company through the Merger.  As a result, collectively Defendants secured for themselves well over a billion dollars in illicit profits.



### III.    JURISDICTION AND VENUE

23.     The claims asserted herein arise under (1) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); (3) Section 20A of the Exchange Act, 15 U.S.C. § 78t–1; and (4) Section 13(e) of the Exchange Act, 15 U.S.C. § 78m(e), and Rule 13e–3 promulgated thereunder, 17 C.F.R. § 240.13e–3.

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

25.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and

28 U.S.C. § 1391(b).  A significant portion of Defendants' actions, and the subsequent damages,

took place within this District.  E-House ADS traded on the NYSE during the Class Period,

which is located in this District.  The ADS Depository is located in this District.  The ADS

agreement contains a forum selection clause selecting this District.  In connection with the acts

alleged in this complaint, Defendants, directly or indirectly, used the means and

instrumentalities of interstate commerce, including, but not limited to, the mails, interstate

telephone communications, and the facilities of the national securities markets.

## IV.     PARTIES AND SECURITIES AT ISSUE

26.     The Maso Entities each sold E-House ADS during the Class Period and were

each damaged as the result of Defendants' wrongdoing as alleged in this complaint.  *See* ECF

No. 29-1.  Each of the Maso Entities bought their ADS through the NYSE.

27.     Plaintiff Altimeo is an institutional asset manager that manages investment assets

through separate funds and is authorized to bring legal action on their behalf.  Prior to seeking

appointment as Lead Plaintiff, Altimeo obtained a valid assignment of the claims of the fund

Altimeo Optimum.  Altimeo sold E-House securities during the Class Period, including ADS that

Altimeo purchased on the NYSE, and was damaged as the result of Defendants' wrongdoing as

alleged in this complaint.  *See* ECF Nos. 28-1, 28-2.

28.     Defendant E-House was, at all relevant times, an exempted company with

limited liability incorporated under the laws of the Cayman Islands and a leading real estate

services company with a network covering more than 260 cities.  Its principal executive offices

were located at11/F, Yinli Building, 383 Guangyan Road, Jing'an District, Shanghai 200072,

People's Republic of China.

29.     E-House ADS traded on the NYSE since August 8, 2007, under the ticker symbol "EJ."  Each ADS was a security representing one E-House ordinary share.  Technically, the instrument that trades across the NYSE is the physical receipt, referred to as an American Depository Receipt ("ADR"), that evidences ownership of the ADS, which itself represents ownership of one E-House common share.  Because market participants rarely distinguish between the terms ADR and ADS, the term ADS is used herein, unless it is of particular relevance to discuss the receipt itself.

30.     The ADS program was sponsored by E-House, meaning that the Company voluntarily established the program to conduct public offerings and access the capital markets in the United States.  It also means that the Company registered the ADS with the SEC.  The ADS program was administered by JPMorgan Chase Bank N.A. (the "Depository"), and the office of the Depository, where any exchange or surrender of any ADS would take place, was 1 Chase Manhattan Plaza, Floor 58, New York, NY 10005-1401.

31.      Defendant E-House Holdings Ltd. ("HoldCo" or "Parent") was, at all relevant times, an exempted company incorporated with limited liability under the laws of the Cayman Islands.  HoldCo was formed solely for the purpose of entering into the Merger agreement and the related financing agreements and consummating the transactions contemplated by such agreements.  Defendant Zhao was a director of HoldCo and signed the Merger agreement on its behalf.  HoldCo was an agent of Defendants Zhou, Shen, Chao, Sina, Kanrich, On Chance, Jun Heng, and Smart Create Group Limited, Smart Master International Limited, since its function was to act for them in the Merger.

32.     Defendant E-House Merger Sub Ltd. ("Merger Sub") was, at all relevant times, an exempted company with limited liability under the laws of the Cayman Islands.  Merger Sub

was formed solely for the purpose of entering into the Merger agreement and consummating the transactions contemplated by such agreements.  Defendant Zhao was a director of Merger Sub and signed the Merger agreement on its behalf.  Merger Sub is not named as a defendant herein, because, as a result of the Merger, it no longer exists separately and apart from E-House, which is responsible for all of its actions and liabilities.

33.     Defendant Xin Zhou ("Zhou") is one of the Company's co-founders and at all relevant times was the co-chair of the Board.  Defendant Zhou served as the Company's CEO from 2003 to 2009 and from April 2012 through at least the end of the Class Period.  According to the proxies, he was a permanent resident of the People's Republic of China at the time the proxies were published.  Defendant Zhou was a member of the Buyer Group.

34.     Defendant Neil Nanpeng Shen ("Shen") was, at all relevant times, a member of the Board.  Defendant Shen was a member of the Buyer Group.

35.     Defendant Charles Chao ("Chao") was, at all relevant times, the co-Chair of the Board.  Defendant Chao was also the CEO of Defendant Sina.  Defendant Chao was a CEO of Sina, a member of the Buyer Group.

36.     Defendant Bing Xiang ("Xiang") was, at all relevant times, a member of the Board and the Committee.

37.     Defendant Hongchao Zhu ("Zhu") was, at all relevant times, a member of the Board and the Committee.

38.     Defendant Jeffrey Zhijie Zeng ("Zeng") was, at all relevant times, a member of the Board and the Committee.

39.     Defendant Winston Li ("Li") was, at all relevant times, a member of the Board, and the chair of the Committee.

40.     Defendant David Jian Sun ("Sun") was, at all relevant times, a member of the Board.  He was temporarily a member of the Committee but stepped down on June 12, 2015.

41.     Defendant Canhao Huang ("Huang") was, at all relevant times, a member of the Board.

42.     Defendant Sina is an exempted company with limited liability incorporated under the laws of the Cayman Islands.   It is a technology company that primarily operates in China.  Its common stock trades on the NASDAQ, a national exchange based in New York.  It participated in the Merger as a member of the Buyer Group.

43.      Defendant Kanrich Holdings Limited ("Kanrich") is a business company with limited liability incorporated under the laws of the British Virgin Islands.  It is controlled by Defendant Zhou.  It participated in the Merger as an affiliate of Defendant Zhou and as a member of the Buyer Group.

44.     Defendant On Chance Inc. ("On Chance"), is a business company with limited liability incorporated under the laws of the British Virgin Islands.  It is controlled by Defendant Zhou.  It participated in the Merger as an affiliate of Defendant Zhou and as a member of the Buyer Group.

45.     Defendant Jun Heng Investment Limited ("Jun Heng"), is a business company with limited liability incorporated under the laws of the British Virgin Islands.  It is controlled by Defendant Zhou.  It participated in the Merger as an affiliate of Defendant Zhou and as a member of the Buyer Group.

46.     Defendant Smart Create Group Limited ("Smart Create"), is a business company with limited liability incorporated under the laws of the British Virgin Islands.  It is controlled

by Defendant Shen.  It participated in the Merger as an affiliate of Defendant Shen and as a member of the Buyer Group.

47.     Defendant Smart Master International Limited ("Smart Master"), is a business company with limited liability incorporated under the laws of the British Virgin Islands.  It is controlled by Defendant Shen.  It participated in the Merger as an affiliate of Defendant Shen and as a member of the Buyer Group.  The term "Buyer Group" refers to Defendants Zhou, Shen, Chao, Sina, Kanrich, On Chance, Jun Heng, Smart Create, Smart Master, Parent, and Merger Sub.

48.     The following table displays the roles of E-House's directors in the Merger:

| Role of Directors | |
|---|---|
| Defendant Winston Li | Chair of the Committee |
| Defendant Bing Xiang | Member of the Committee |
| Defendant Hongchao Zhu | Member of the Committee |
| Defendant Jeffrey Zhijie Zeng | Member of the Committee |
| Defendant Zhou | E-House CEO, Founder, Board Co-Chair<br><br>Member of Buyer Group, including through controlled entities: Defendant Kanrich Holdings Limited; Defendant On Chance, Inc.; and Defendant Jun Heng Investment Limited |
| Defendant Shen | Director<br><br>Member of Buyer Group, including through controlled entities: Smart Create Group Limited; Smart Master International Limited |
| Defendant Chao | E- House Board Co-Chair<br><br>Director and CEO of member of Buyer Group, Defendant Sina |
| Defendant David Jian Sun | Director and temporary member of the Committee |
| Defendant Canhao Huang | Director |

**V.     CORE FACTUAL ALLEGATIONS**

49.     E-House described itself as a "leading real estate services company in China."  It operated a network of real estate businesses in over 260 Chinese cities.

50.     E-House operated several different businesses including through ownership of significant stakes in several publicly traded corporations.[1]  E-House's businesses were as follows:

51.     The "Real Estate Online Services" business refers to E-House's holdings in Leju Holdings Limited ("Leju").  Leju is a publicly traded company listed on the NASDAQ, but E-House owned approximately 66.3% of its stock at the time of the Merger.  Leju operates real estate e-commerce, online advertising, and online listing services through an online platform.  It also operates various real estate and home furnishing websites for Defendant Sina.

52.     The "Wealth Management Services" business refers to E-House's holdings in Jupai Holdings Limited (JP) ("Jupai").  Jupai is a publicly traded company listed on the NYSE, but at the time of the Merger E-House owned about 28% of Jupai.  Jupai operates wealth management services, primarily for wealthy individuals in China.  It was formed and began publicly trading in 2016, in a transaction in which E-House's wealth management business was spun out and combined with other assets, in exchange for E-House's interest in Jupai.

53.     The "Community Value Added Services" business refers to E-House's holdings in Shanghai Weidian Information Technology Co., Ltd., which operates a business called "Shi Hui."  Shi Hui is a joint venture between E-House, Defendant Sina, and several other companies and at the time of the Merger, E-House owned approximately 51% of the business.  Shi Hui is a

---

[1] In disclosures related to the Merger, the naming convention used to describe E-House's businesses was slightly different than the convention used in its periodic SEC filings. The terminology in this complaint tracks the approach E-House used in the context of the Merger.

mobile application that provides promotions for businesses near the application's user.  The

business was founded in July 2014 and rapidly expanded, reaching over 40 cities in China with

over 11 million users.  It was in a growth stage and not yet profitable.

54.     The term "EJ Core" refers to the remainder of E-House's businesses, including

real estate brokerage services, real estate information and consulting services, real estate

advertising and promotional event services, and headquarter functions.

55.     The following table displays these four components of E-House's business, along

with the percent of each business that was owned by E-House at the time of the Merger and how

Defendants valued those businesses in the Merger and for private investors:

| Summary of E-House's Business Components | | | | | | |
|---|---|---|---|---|---|---|
| Component | Real Estate Online Services | Wealth Management Services | Community Value Added Services | EJ Core | | |
| Also Known As | Leju | Jupai | Shi Hui | EJ Core | | |
| E-House's Ownership | 66.3% | 28% | 51% | 100% | Other* | Total |
| D&P's Value** | $513.9 | $90.4 | $73.4 | $300.4 | $65.4 | $1,001 |
| Adjusted Value*** | $513.9 | $90.4 | $73.4 | <u>$1,200</u> | $65.4 | <u>$1,943</u> |

All units in millions of dollars.

* This column shows the value certain call options which, as explained by the financial advisor working on the Merger, D&P, contributed to the overall value of E-House prior to the Merger.

** This row displays the valuation of E-House's interest in each business/asset, as presented by the financial advisor working on the Merger, D&P, in its fairness opinion, which was based on the 2015 Management Projections.  Where D&P's valuation uses a high and low estimate, the average has been taken to show a single number.

*** This row displays the valuation based on the revised valuation for EJ Core, based on the PTPs and as shown to investors as part of the non-public July 2016 Presentation, as described herein.  The only difference from the prior row is that higher valuation of EJ Core, and the corresponding higher total valuation.

A.    **The Origins of the Merger**

56.    On June 9, 2015, E-House announced that it had received a proposed buyout offer.  The offer was made by Defendants Zhou and Shen.  The offer price was $7.38 per ADS.  That day, a transaction committee (*i.e.,* the Committee) was formed to evaluate the offer.  The Committee was composed of Winston Li (as chair), Bing Xiang, Hongchao Zhu, Jeffrey Zhijie Zeng and David Jian Sun.  However, on June 12, 2015, David Jian Sun resigned from the Committee over potential conflicts.

57.    On June 19, 2015, the Committee was informed that Defendant Sina had joined Defendants Zhou and Shen in forming a group of potential acquirers.  The composition of the Buyer Group, from this point on, would only change to reflect the inclusion of entities under the control of Zhou or Shen.

58.    On June 25, 2015, the Committee retained Davis Polk & Wardwell LLP ("Davis Polk") as legal counsel and Duff & Phelps, LLC (*i.e.,* "D&P") as financial advisors.  The Buyer Group was represented by Skadden, Arps, Slate, Meagher & Flom LLP.

59.    Between November 2, 2015, and March 3, 2016, the Buyer Group and Committee negotiated the transaction, with several counter-offers regarding proposed prices.  On March 4, 2016, the Committee told the Buyer Group that it would preliminarily accept a price of $6.85.  At that price, the Company would have had a market capitalization of approximately $1.06 billion.  On April 14, 2016, D&P rendered a fairness opinion that the $6.85 price was fair.  The Committee and Board then approved the offer.

60.    On April 15, 2016, the Company and the Buyer Group executed a merger agreement.  E-House issued a press release announcing that it had agreed to be taken private by the Buyer Group at a price of $6.85 per ADS, subject to a shareholder vote.  The Merger would

be funded with cash contributed by the Buyer Group and $350 million in debt.  The Merger was expected to close in the second half of 2016, if all conditions were met.

### B.    The Initial Proxy is Published

61.    On April 25, 2016, E-House filed an SEC Rule 13e-3 Transaction statement on Schedule 13E-3 (the "Initial Proxy").  The Initial Proxy acknowledged that the Merger would be a "going-private transaction" which would be subject to disclosure requirements under Section 13(e) of the Exchange Act and SEC Rule 13e-3.  Therefore, the Initial Proxy was both a Schedule 13E-3 transaction statement and a proxy soliciting shareholders to vote in favor of the Merger.  The Initial Proxy was signed by and filed by Defendant E-House and the Buyer Group.

62.    The Initial Proxy purported to describe key information about the Merger, as required by Rule 13e-3.  As relevant here, it described the following.

### 1.    The Required Vote & Merger Structure

63.    The Initial Proxy explained that the Merger could only be closed upon approval by two-thirds of shares voting on the transaction.  It also explained that the Buyer Group owned about 44.9% of outstanding shares, which would all be voted in favor of the Merger.  The two-thirds requirement meant that public investors could block the Merger by voting against it.

64.    The Initial Proxy explained that if the Merger closed, E-House would merge with Merger Sub, which was owned by HoldCo, which in turn was owned by members of the Buyer Group.  It also explained that the surviving entity of the merger between E-House and Merger Sub would be E-House.  This kind of merger structure, where a subsidiary of the acquirer merges into the acquisition target, with the target remaining as the surviving entity is called a "Reverse Triangular Merger."

65.    The following diagram shows the proposed Merger's structure, with Parent being owned by the Buyer Group:



66.     The Initial Proxy explained that, upon the close of the Merger, investors who did not exercise appraisal rights, would have the right to exchange their shares or ADS for the Merger consideration.  For ADS holders, this sale would require exchanging one's ADRs—which are the literal receipts they trade and represent the ADS—with the ADS Depository in exchange for the Merger consideration.  The Initial Proxy stated that "[p]romptly after the Merger is completed, the ADS depositary will call for the surrender of all ADRs for delivery of the merger consideration."  Therefore, for non-dissenting ADS holders, the sale of their ADS as a result of the Merger would take place at the Depositary's office in New York, NY.

67.     Additionally, Parent—as agent acting for the Buyer Group—would be responsible for paying the Merger consideration, by providing sufficient cash to a payment agent.  The payment agent would then be responsible for providing instructions to shareholders on how to surrender (*i.e.*, "tender") their shares or ADS to receive the Merger consideration.

## 2.      Dissenter Rights

68.     The terms "appraisal rights" and "dissenter rights" are interchangeable and refer to the right to seek an appraisal of one's shares, rather than selling them as part of the Merger.

69.     Under the heading "Am I entitled to dissenter rights?," the Initial Proxy explained that "Shareholders who dissent from the Merger will have the right to receive payment of the fair value of their Shares if the Merger is completed, but only if they deliver to the Company, before the vote on the Merger is taken at the extraordinary general meeting, a

written objection to the Merger and they subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of dissenter rights." In other words, shareholders would have the right to refuse to sell their shares as part of the Merger, and could instead seek an appraisal, if they took certain steps before the Merger vote.

70.     The Initial Proxy also explained that those holding ADS could exercise appraisal rights by first redeeming their ADS with the Depositary for common stock and then dissenting as a holder of that common stock.  Practically speaking, this meant that ADS holders still had a mechanism to exercise appraisal, but would need to take an additional step to do so.

71.     The same section related to dissenter rights, also explained that "[t]he fair value of their Shares as determined under that statute could be more than, the same as, or less than the merger consideration they would receive pursuant to the Merger Agreement."  If an appraisal found that shares were worth more than the Merger price, E-House would have to pay the dissenting shareholders additional Merger consideration.  This would effectively cost the Buyer Group that amount of additional money, as the then-owners of E-House.  As a result, if they believed the Merger Price was lower than the fair value of E-House ADS, the Buyer Group had a strong incentive to dissuade shareholders from seeking an appraisal.  Defendants' misrepresentations concerning the Merger described in this Complaint prevented Co-Lead Plaintiffs and the Class from being able to make an informed decision about whether to vote in favor of the Merger or exercise their appraisal rights.

### 3.     Fairness Opinions and Projections

72.     The Initial Proxy included numerous assurances that the Committee, Board, Buyer Group, and D&P believed that the Merger was fair to investors.  For example, the Initial

Proxy said that "the Buyer Group believes that the Merger is substantively and procedurally fair to the unaffiliated security holders."

73.     The Initial Proxy included a section purporting to describe financial projections prepared by management relevant to the Merger (the "2015 Management Projections").  The Initial Proxy stated that these projections reflected "the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of the Company."

74.     Two tables purporting to summarize the 2015 Management Projections were provided in the Initial Proxy.  The first summarized the projected net revenues, gross profit, operating expenses, income from operation, and net income from E-House's Leju business segment.  The second summarized the same metrics for the segment referred to as EJ Core.

75.     The Initial Proxy also included a so-called "fairness opinion" from D&P, whose analysis was expressly relied upon by the Committee and the Board as they reached their opinion that the Merger was fair.  As is typical, that fairness opinion considered both a "discounted cash flow" ("DCF") analysis and an analysis of comparable deals.  However, D&P determined not to incorporate the comparable deals analysis into its conclusions, stating that this decision was reached "due to certain characteristics of the transaction and the target companies" considered by that analysis.  As a result of not relying upon a comparable deals analysis, the fairness opinion rendered by D&P depended entirely or nearly entirely on the DCF analysis.

76.     A DCF analysis attempts to ascertain a company's value by considering projections of future cash flows, analysis of what cash flows will be after the period of projections, and the weighted average cost of capital for the company.  The cash flows used in

20

the DCF are based on the projections provided by management.  Therefore, the fairness opinion

provided by D&P is dependent upon the projections provided by management.

77.     According to D&P's fairness opinion, EJ Core had a value of $268,259,000 to

$332,459,000.  D&P also estimated 154,239,957 fully diluted shares[2] were outstanding,

meaning that D&P was stating that EJ Core had a value of about $1.74 to $2.16 per share.  The

fairness opinion also stated that entire company had a value of $6.26 to $7.27 per share.  Based

on this analysis, D&P said that the Merger consideration of $6.85 per ADS and per share was

fair.

### 4.     Purpose and Reasons for the Merger

78.     The Initial Proxy also contained assurances that the Merger was not part of an

effort by the Buyer Group to acquire E-House merely to turn around and resell it (or portions of

it) to new investors at a higher price—whether through a relisting in China, restructuring, or

otherwise.[3]  The existence of a Subsequent Transaction—especially one that valued the

Company far higher than the Merger price—would be highly relevant to investors evaluating

the Merger for several reasons.

79.     First, it would strongly suggest an appetite by the Buyer Group to pay more than

the Merger price, as it would imply that the Buyer Group had compelling options to create value

from acquiring E-House.

---

[2] The reference to "fully diluted" shares is a typical convention when analyzing per share valuation.  It takes into account the existence of not-yet-issued shares that would exist if parties exercise rights and options.

[3] As previously defined, the term "Subsequent Transaction" refers to those transactions E-House was representing it was not planning to conduct: Specifically, the preliminary proxy stated that the Buyer Group "does not have any present plans or proposals" that would result in any "extraordinary corporate transaction involving the Company's corporate structure, business, or management" or the sale or transfer of a "material amount of assets" or "any other material changes to the Company's business."

80.     Second, it would strongly suggest to investors that they could secure greater value by rejecting the Merger and pushing management to structure an alternative transaction, providing them the value of the Subsequent Transaction plan.  In other words, investors could "cut out the middle man," rather than letting the Buyer Group extract a large fee (in the form of the difference between the price they were paying in the Merger and the value they were receiving in the Subsequent Transaction) for arranging the Subsequent Transaction.

81.     Third, the Subsequent Transactions that the Buyer Group planned here valued E-House at significantly more than the value implied by the Merger price.  That is why the Buyer Group sought to turn around and sell portions of the Company after the Merger.  The subsequent investors were willing to pay more because information was given to them that was not given to public holders of E-House ADS prior to the Merger.

82.     In a section titled "Buyer Group's Purpose and Reasons for the Merger," the Initial Proxy stated that the "Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company."  Through this, the Buyer Group was effectively stating that it was not planning to relist the Company, because doing so would mean the Company would not be taking advantage of the benefits of "being" a privately held company.

83.     The Initial Proxy also said: "The Buyer Group believes that, as a privately held company, the Company will have greater flexibility to focus on addressing the challenges to the Company's long-term profitability without the constraints caused by the public equity market's valuation of the Company and emphasis on short-term period-to-period performance."

84.     Similarly, the Initial Proxy also contained a section titled "Plans for the Company after the Merger," which stated that after the Merger, it would "cease to be a publicly traded company."  Most importantly, it stated (emphasis added):

> The Buyer Group has advised the Company that, other than as described in this proxy statement and transactions already under consideration by the Company, it does not have any present **plans or proposals** that relate to or would result in any of the following: [1] an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations; [2] sale or transfer of a material amount of assets; or [3] any other material changes in the Company's business.

85.     Investors interpreting this clause would have understood the words "plans" and "proposals" to have its ordinary meaning.  The Merriam-Webster Dictionary defines a plan as "something that a person intends to do."  Similarly, the same dictionary defines a proposal as the "act of putting something forward or stating something for consideration."

86.     Immediately following this disclosure, the Initial Proxy stated that the Buyer Group "may propose or develop plans and proposals which they consider to be in the best interests of the Company and its equity holders."  This explanation about what they "may" do in the future, further emphasized that they did not presently have any plan or proposal that would result in an extraordinary corporate transaction or sale of a material amount of assets.

**C.     Several Amended Proxies Are Issued**

87.     On May 27, 2016, E-House filed the first amendment to the Initial Proxy (the "First Amended Proxy").  The First Amended Proxy was signed and filed by each party that had signed the Initial Proxy.  It included much of the same information that was provided in the Initial Proxy, including the same statements regarding the fairness of the Merger and the plans for the Company after the Merger.

88.    However, the First Amended Proxy updated the management projections, supplanting the 2015 Management Projections with two summary tables showing the "2016 Management Projections."  According to the First Amended Proxy, the 2016 Management Projections were prepared in January 2016, whereas the 2015 Management Projections were said to be prepared in November 2015.

89.    The First Amended Proxy clarified that the 2016 Management Projections were "considered by the special committee in connection with their analysis of the Merger and D&P in connection with their delivery of the fairness opinion" and the First Amended Proxy restated the fairness opinion included in the Initial Proxy.

90.    The summary table showing the 2016 Management Projections for EJ Core is shown below:

[table on the following page]

| 2016 Management Projections | | | | | |
|---|---|---|---|---|---|
| | | Fiscal Year Ending December 31 | | | |
| EJ Core | 2016E | 2017E | 2018E | 2019E | 2020E |
| | (in USD millions except percentage) | | | | |
| Net Revenue | | | | | |
|     Real Estate Brokerage | 352 | 365 | 371 | 383 | 395 |
|     % Growth | -4.3% | 3.7% | 1.6% | 3.1% | 3.1% |
|     Real Estate Information & Consulting | 78 | 86 | 101 | 119 | 133 |
|     % Growth | 33.6% | 10.9% | 16.3% | 18.1% | 11.8% |
|     Real Estate Promotional Events | 26 | 29 | 32 | 35 | 39 |
|     % Growth | 21.6% | 13.3% | 9.7% | 9.3% | 9.3% |
| Net Revenues | 456 | 481 | 504 | 537 | 566 |
| % Growth | 1.9% | 5.5% | 4.7% | 6.5% | 5.5% |
| Gross Profit* | 171 | 181 | 194 | 211 | 226 |
| % Margin | 37.4% | 37.7% | 38.4% | 39.3% | 39.9% |
| Operating Expenses* | 162 | 164 | 165 | 168 | 172 |
| % Net Revenue | 35.6% | 34.0% | 32.7% | 31.3% | 30.3% |
| Income from Operations | 8 | 18 | 29 | 43 | 54 |
| % Margin | 1.8% | 3.7% | 5.8% | 8.0% | 9.6% |
| Net Income | (7) | 7 | 16 | 27 | 36 |
| % Margin | -1.6% | 1.4% | 3.2% | 5.0% | 6.3% |
| Depreciation & Amortization | 12 | 13 | 13 | 13 | 14 |
| % Net Revenue | 2.6% | 2.7% | 2.6% | 2.5% | 2.4% |
| Capital Expenditures | 7 | 8 | 8 | 8 | 9 |
| % Net Revenue | 1.6% | 1.6% | 1.6% | 1.5% | 1.5% |
| Net Working Capital | 283 | 284 | 280 | 291 | 302 |
| % Net Revenue | 62.1% | 58.9% | 55.6% | 54.2% | 53.3% |

91.     According to the First Amended Proxy, the 2016 Management Projections were changed to reflect "the depreciation of Renminbi against U.S. dollar in terms of both the spot and the forward exchange rate from December 2015 to early 2016," as well as certain factors relevant to Leju, but not to EJ Core.

92.     On June 16, 2016, E-House filed the second amendment to the Initial Proxy (the "Second Amended Proxy"). The Second Amended Proxy was signed and filed by each party that had signed the Initial Proxy. It included much of the same information that was in the Initial Proxy, including the statements regarding the fairness of the Merger and the plans for the

Company after the Merger.  It also included the same 2016 Management Projections that were included in the First Amended Proxy.

93.     On July 1, 2016, E-House filed the third amendment to the Initial Proxy (the "Final Proxy").  The Final Proxy was signed and filed by each party that had signed the Initial Proxy.  It included much of the same information that was provided in the Initial Proxy, including the same statements regarding the fairness of the Merger and the plans for the Company after the Merger.  It included the same 2016 Management Projections that were included in the First Amended Proxy.

94.     The Final Proxy also set the date for the extraordinary general meeting of shareholders as August 5, 2016.  The Final Proxy stated that the depository would endeavor to cast votes for ADS holders, per their instruction, if they submitted their votes by the close of business on July 11, 2016, in New York.  Similarly, it stated that the record date for shareholders was July 22, 2016 (the "Record Date"), and only those shareholders that held as of that date would be entitled to vote.  According to the Final Proxy, the ADS holders wishing to redeem their ADR for common stock, would need to do so by July 18, 2016, in order to become direct holders of those shares in time for the record date.

95.     No further amended transaction statements were issued prior to the extraordinary general meeting of shareholders on August 5, 2016.

**D.     Shareholders Vote on the Merger and the Merger Closes**

96.     On August 5, 2016, E-House filed a press release announcing the results of the vote on the Merger.  The press release stated that 89.79% of votes cast voted in favor of the Merger.  This number meant that sufficient votes were cast in favor of the Merger for the deal to proceed.  However, it shows little about the overall support of the deal, since the vote total only

reflects votes cast, rather than all shareholders.  The press release also stated that Merger was expected to close at some point in August 2016.

97.     The Merger closed on August 12, 2016.  As part of closing the Merger, the ADS were delisted from the NYSE.  Merger Sub was merged into E-House, with the survivor of that merger being E-House.  This resulted in HoldCo being the sole direct shareholder of E-House and the Defendants Sina, Shen, and Zhou indirectly owning E-House.

98.     Upon the closing of the Merger, the Buyer Group's Ownership in E-House increased substantially.  The following chart shows the change in the percent ownership of the Company:

| Buyer Group's Change in Ownership Following Merger | | | |
|---|---|---|---|
| Name | % Owned Before Merger | % Owned After Merger | % Change in Ownership |
| Defendant Zhou and his controlled entities | 22.8% | 51.6% | +28.8% |
| Defendant Shen and his controlled entities | 2.4% | 5.4% | +3% |
| Defendant Sina | 19% | 43% | +24% |

**E.     The Truth Is Revealed During the Appraisal**

99.     On October 14, 2016, Senrigan Master Fund (the "Dissenter") filed a petition in the Grand Court of the Cayman Islands requesting appraisal of its shares (the "Appraisal").  In other words, the Dissenter was exercising its appraisal rights.

100.     The parties to the Appraisal exchanged discovery and expert reports.  The expert reports together were 700 pages long.  On November 3, 2017, the court in the Appraisal issued a written opinion on a dispute about certain pre-trial procedural issues.

101.     The Dissenter was represented by Jeremy Goldring QC (the "Dissenter's Counsel") of South Square, a leading group of commercial barristers.  He is a graduate of both Yale University and Oxford University.  He regularly appears in United Kingdom courts of all

levels and has a decorated career in complex financial litigation.  The Dissenter was also represented by Andrew Jackson.  He is a graduate of the University of Liverpool and BPP Law School.  He is of counsel at Appleby, a leading Cayman Islands law firm.  Additionally, the Dissenter retained William Inglis, a Senior Managing Director in the Singapore Office of FTI Consulting, a global expert services firm.  E-House was also represented by reputable counsel, including Mac Imrie and Paul Smith of Maples and Calder, a leading Cayman Islands law firm.

102.    The first day of trial in the Appraisal was held on April 10, 2018.  The trial was open to the public and scheduled to run until April 24, 2018.[4]  It lasted two days before ending in a settlement.  The case was heard by the Honourable Justice Mangatal in the Grand Court of The Cayman Islands Financial Services Division.  The case was assigned the title *In the Matter of E-House (China) Holdings Limited* and the index number FSD 170 of 2016 (IMJ).

103.    During the trial, counsel for E-House and the dissenters discussed the existence of certain projections that were not publicly disclosed in the transaction statements prior to the Merger.  The Dissenters referred to those projections as the "Parallel Transaction Projections" or "PTPs."

104.    On April 11, 2018, during the second day of the appraisal hearing, the Dissenter's Counsel explained that, for internal purposes, these newer projections replaced the

---

[4]  At the instruction of the Maso Entities, two articled clerks in the employ of Walkers attended the trial (one articled clerk attended on day 1 of the trial and a second articled clerk attended on day 2 of the trial).  An "articled clerk" is a person who has obtained the required academic qualifications and is undertaking the practical stage of his/her training to be an attorney-at-law in the Cayman Islands pursuant to articles of clerkship registered with the Grand Court of the Cayman Islands under regulation 18 of the Legal Practitioners (Students) Regulations (as revised) articling him/her to a practicing Cayman Islands Attorney-at-Law.  The two articled clerks took contemporaneous written notes of the trial.  Co-Lead Counsel have reviewed those written notes and the allegations herein describing the information disclosed in that trial is based on those written notes.

2016 Management Projections, which had become out of date and were superseded by the PTPs due to the Company's improved performance. These updated projections reflected management's current assessment when they were prepared. The Dissenter's Counsel also explained that the PTPs were approved by Defendant Zhou and that the accounting and auditing firm PriceWaterhouseCoopers performed diligence on these figures to confirm their reliability. Notably, he explained that, the PTPs were not premised on future synergies (based on the presumed value of any transaction occurring). Rather, they were updated projections comparable in form to the publicly disclosed 2016 Management Projections. The Dissenter's Counsel also explained that the PTPs were made in June 2016.

105.   The PTPs were presented to the Appraisal court as part of the "bundle" of trial documents. Both experts used the PTPs in their attempt to value the Company—the expert for the Dissenter used them as a primary source of valuation information and the Company used them in the backup model that their expert used as a cross check.

106.   During the second day of the Appraisal hearing, the Dissenter's Counsel discussed the PTPs, after directing Justice Mangatal to them as a trial exhibit. He explained that they showed 37% growth in net income (*i.e.,* profit) for EJ Core in the first 6 months of 2016 that had already occurred. In contrast, the 2016 Management Projections had estimated EJ Core's net income growth for the entirety of 2016 at only 1.9%. In other words, EJ Core had produced more than 19 times more profit growth in the first half of 2016 than the 2016 Management Projections forecasted for the entire year.

107.   The Dissenter's Counsel further explained that the projections in the PTPs showed higher profit (*i.e.,* net income) figures, high sales figures, and significantly higher

EBIT,[5] than what was previously disclosed.  He also explained that the PTPs, which ran until

2019, showed a consolidated annual growth rate ("CAGR") in net income of 19%, compared to

the meager 4.65% CAGR in the 2016 Management Projections.  In other words, while E-House

was actually projecting explosive 19% annual profit growth from EJ Core, its public statements

to investors prior to the Merger said that it was only expecting modest gains of 4.65%, far below

EJ Core's average of 16.3% for the three years prior to the Merger.

108.    During the second day of the Appraisal hearing, the Dissenter's Counsel

explained that prior to the Merger closing, there was a proposal to take large parts of EJ Core

and form a new business.  The new business would be based entirely out of these parts of EJ

Core.  The Company and the Buyer Group provided a presentation to potential investors in July

2016 (the "July 2016 Presentation") that included the PTPs as the key input that supported a far

higher valuation than what Defendants disclosed publicly during the Merger.  For example,

Defendants made one such presentation on July 26, 2016.  The July 2016 Presentation was

submitted to the Appraisal court as a trial exhibit and reviewed during the hearing.

109.    During the second day of the appraisal hearing, the Dissenter's Counsel

explained that the July 2016 Presentation included a section titled Valuation and Exit, which

showed a plan to engineer a future stock listing in Asia.  In other words, while the Merger was

pending, there was already a plan to immediately engage in major capital transactions, with an

ultimate plan of relisting the shares publicly.

110.    The Dissenter's Counsel also explained that the July 2016 Presentation included

a slide titled "Valuation," describing that the relevant portions of EJ Core were currently (as of

the July 2016 Presentation) worth $1.2 billion, based on the PTPs.

---

[5] "EBIT" refers to earnings before interest and taxes.

111.    In comparison, the D&P analysis that formed the basis for fairness statements in the proxy materials found that the entirety of EJ Core was worth about $332 million at the high end.  Using the same number of outstanding shares that D&P used (154,239,957), the $1.2 billion valuation for parts of EJ Core was worth $7.78, compared to D&P's valuation for the whole Company at between $6.26 and $7.27 per ADS.  This means that *just* EJ Core was worth over $0.50 per ADS more—about 7%—than the *top* of D&P's range for the entire Company.

112.    Using D&P's valuations for each portion of E-House's business, and taking the average between the high and low figure whenever they provided a range, but replacing D&Ps valuation of EJ Core with the $1.2 billion figure, shows how the undisclosed, more up-to-date figure affects the value of E-House.  That calculation shows a total valuation of about $1.94 billon, which would be about $12.60 per ADS, meaning that the Merger consideration of $6.85 was only about 54% of the Company's fair value, based on its own valuation of EJ Core before the Merger.

113.    The Dissenter's Counsel also submitted, as a trial exhibit, an investment agreement, by which equity was sold to investors in a transaction that utilized the $1.2 billion valuation figure for EJ Core.  Those actual sales closed in August 2016 (contemporaneous with the closing of the Merger) and September 2016 (just one month after the Merger).  As part of those sales, investors in the subsequent transactions were given a contractual term by the Company that effectively promised the investors they would be compensated if the net profits in 2016-2017 came in lower than 95% of the PTPs' projected profits.  Defendants were not only using the PTPs to pitch Subsequent Transactions – they were guaranteeing the projections as part of the deal.

31

**F.      E-House is Relisted at a Far Higher Valuation than the Merger Price**

114.    The undisclosed plans for a Subsequent Transaction involved an ultimate plan to relist E-House on an exchange in Asia—the "Exit" that Defendants described in the July 2016 Presentation—as well as a plan to conduct substantial transactions promptly after closing the Merger.  E-House's post-Merger plans culminated in the registration of its shares for listing on the Hong Kong stock exchange on July 1, 2018 and E-House's relisting through the Hong Kong IPO.

115.    The IPO documents clearly explained that the relisted entity was formed entirely from parts of the previously privatized E-House.  Notably the documents describe an internal restructuring in anticipation of the IPO, but do not state that any businesses were contributed to the relisted entity outside of those businesses previously owned by E-House.  The IPO documents expressly state: "Our business was wholly-owned by [E-House] at the time of its privatization."  However, the relisted entity did not own interests in Leju or Jupai.  This meant that the relisted entity was (according to the analysis of D&P) supposedly comprised of businesses worth only 40% of the overall value of the entity that had privatized.

116.    E-House began preparing for the previously planned IPO immediately after going private.  Between December 2016 and January 2017, it brought in strategic investors and started the IPO preparation.  According to an article in Beijing Commercial Daily, published on January 4, 2018,  an individual close to the Company explained that after the completion of the delisting, E-House introduced a number of new investors and made other changes in order to start the relisting.

117.    The IPO documents, which Defendant Zhou controlled as CEO and Chairman of the Company as it was being relisted, provided a candid admission of the Buyer Group's true

reasons for taking the Company private.  Roughly two years after the Merger, these documents

stated:

> The privatisation **was** initiated because, among other reasons, **it was considered that the Group was undervalued in the U.S.** and that the privatisation would allow the then management of E-House (China) Holdings greater flexibility to develop the long-term strategy and restructure different business units to improve the valuation, long-term performance and profitability of the relevant business segments (where applicable), **and pursue their respective capital market strategies**, without the short-term performance driven pressure from the public by market.

118.     The notion that the purchaser (here, the Buyer Group) of an asset (here, the

Company) believed the thing being purchased was "undervalued," may ordinarily not seem

remarkable.  After all, investors routinely buy shares because they think those shares are

undervalued.   However, Defendants here expressly represented that the transaction price in E-

House's privatization reflected its "fair" value.  Moreover, in merger and acquisition ("M&A")

transactions buyers frequently purchase assets with a theory of how they can create value

through the transaction (often referred to as merger "synergies"), meaning that a deal can be

valuable to an acquirer, even if they are paying a price reflecting its entire fair pre-merger value.

For example, the Final Proxy had touted that by privatizing E-House the Company would avoid

SEC compliance costs.  Here, the truth was being admitted—the Merger was not about reducing

such costs, rather it was about buying E-House on the cheap, without disclosing the information

necessary to permit investors to know the Buyer Group's true plans or the Company's true

value.

119.     Prior to the IPO, Defendant Zhou remained E-House's dominant shareholder.

He engaged in a series of "Pre-IPO Investments" in the relisted entity.  Functionally, these sales

permitted Defendant Zhou to begin selling a large percent of his shareholdings at a substantial

premium to what he paid in the Merger – though at a discount to the ultimate IPO price. He then sold an additional portion of his shares through the IPO.

120. The Hong Kong IPO occurred on July 20, 2018. On the day of the IPO, E-House had a market capitalization of $2.651 billion. This was roughly 2.5 times more than the valuation of $1.06 billion, implied by the Merger price of $6.85. Incredibly, this higher market capitalization for the relisted business was for a company that did not include E-House's prior interest in Leju and Jupai. According to D&P, as of their fairness opinion, Leju constituted between $469,527,000 and $558,252,000 of E-House's total value, and Jupai constituted $90,357,000 of E-House's total value. *See supra* ¶55. As a result, a reasonable comparison between the Merger price and the relisting price would take the valuation of $1.06 billion implied by the Merger price and subtract both the $469,527,000 valuation for Leju and the $90,357,000 value of Jupai. This would leave a Merger valuation of about $500 million for the remainder of E-House;[6] the IPO market capitalization of $2.081 billion even after making the very conservative adjustment of subtracting the proceeds of the IPO,[7] and $2.081 billion is roughly four times greater than the $500 million valuation for the privatized entity, less the value of Jupai and Leju. This was not merely an overpriced IPO; it shows that EJ Core was substantially undervalued in the Merger. The Company maintained an average market capitalization of over $2.5 billion between the IPO and February 20, 2019—seven months after the IPO.

---

[6] Even using this number may understate the disparity in valuation – as the $469.5 million figure the value of Shi Hui and certain call options, do not appear to be included in the value of the relisted entity.

[7] The IPO raised approximately HK$4,473.0 in proceeds, which was worth about USD$570 at the time. A very conservative adjustment would subtract out this value from the market capitalization, since it reflects newly injected capital. The market capitalization was $2.651 billion; the valuation after this adjustment would be $2.081 billion.

121.    Through this relisting and prior stock sales leading up to the IPO, Defendants

Zhou and Shen were able to capture well over a billion dollars in profit, as compared to the

price they paid less than two years earlier in the privatization.

## VI.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

122.    The Final Proxy contained several false and misleading statements and

omissions.  Each of these statements are attributable to E-House, since they were published in

the Final Proxy filed by E-House.  Each statement presenting information about the Buyer

Group (Statements 1, 3, 4, 6 and 7) is also attributable to each Defendant that was a member of

the Buyer Group (Defendants Zhou, Shen, Chao, Sina, Kanrich, On Chance, Jun Heng, Smart

Create, Smart Master, Parent, and Merger Sub), since each of them were members of the Buyer

Group and signatories of the Final Proxy.  Each statement presenting information about the

Board or management (Statements 2, 9) is attributable to Defendants Zhou, Shen, and Chao,

since each were members of the Company's management and signatories of the Final Proxy.

Furthermore, each statement is attributable to each member of the Buyer Group as signatories

and filers of the Final Proxy.

123.     The statements in ***bold/italics*** text within this section are alleged to be

materially false, misleading, and/or incomplete.

124.    Statements 1 and 2 relate to the fairness of the Merger.  For convenience, they

can be referred to as the "Fairness Statements."

125.    Statement 1: "***Each member of the Buyer Group believes that the Merger is***

***substantively and procedurally fair to the security holders who are not affiliated to the***

***Company.***"

126.    Statement 1 was materially false, misleading, and incomplete because at the time

the Final Proxy was published, Defendants knew that the most recent projections for EJ Core

were far higher than those used by D&P when issuing its fairness opinion.  It was materially

misleading for Defendants to assert their belief that the Merger was fair without disclosing this

highly significant information that would tend to substantially undermine this view.  Statement

1 was also misleading because Defendants did not believe the Merger was fair, as (1) they knew

of the much higher projections in the PTPs, which cannot be squared with a plausible belief that

the Merger was fair and (2) they knew the Merger was part of a multi-step plan to deprive

investors of the much higher value for the Company that Defendants were planning to secure for

themselves, rendering the Merger both procedurally and substantively unfair.

127.    Statement 2: "***The Board, acting upon the unanimous recommendation of the
Special Committee . . . determined that it was fair (both substantively and procedurally) and
in the best interests of the Company and its security holders, including security holders
unaffiliated to the Company, and declared it advisable, to enter into the Merger Agreement
and the transaction agreements contemplated by the Merger Agreement.***"

128.    Statement 2 was materially false, misleading, and incomplete because at the time

the Final Proxy was published, Defendants knew that the most recent projections for EJ Core

were far higher than those used by D&P when issuing its fairness opinion.  It was materially

misleading to repeat this supposed determination regarding the fairness of the Merger without

also disclosing the existence of the PTPs, which contained highly significant information that

would tend to substantially undermine Defendants' stated view regarding the Merger's fairness.

129.    Statements 3-7 relate to the reasons for the Merger and Defendants' failure to

honestly disclose plans to engage in Subsequent Transactions—including the plan to relist the

Company.  For convenience, they can be referred to as the "Subsequent Transaction

Statements."

36

130.     Statement 3: the preliminary proxy contained a section titled "Plans for the

Company after the Merger," which stated that: "***The Buyer Group has advised the Company***

***that, other than as described in this proxy statement and transactions already under***

***consideration by the Company, it does not have any present plans or proposals that relate to***

***or would result in any of the following: [1] an extraordinary corporate transaction involving***

***the Company's corporate structure, business, or management, such as a merger,***

***reorganization, liquidation, relocation of any material operations; [2] sale or transfer of a***

***material amount of assets; or [3] any other material changes in the Company's business***."

131.     Statement 3 was false, misleading, and incomplete because it falsely stated that

the Buyer Group did not have any "present plans or proposals" related to the Company's

structure or business.  This statement was also false, misleading, and incomplete because it

omitted and failed to disclose that the Buyer Group was planning to engage in Subsequent

Transactions, including marketing significant parts of E-House during the Merger, and selling

stakes in EJ Core immediately after the Merger, and then relisting the Company on a stock

exchange in Asia.  Reasonable investors would have read the representation in Statement 3 that

the Buyer Group "does not have any present plans or proposals" as meaning just that—that the

Buyer Group was not planning a Subsequent Transaction (including to relist the Company),

when the Buyer Group was actually planning to engage in such transactions, was actively

shopping those transactions to private investors, and had a planned "exit" for investors through

a planned relisting on an Asian exchange.

132.     Statement 4: In a section of the Final Proxy titled, "Buyer Group's Purpose and

Reasons for the Merger," the Defendants' stated "***The Buyer Group decided to undertake the***

***going-private transaction at this time because it wants to take advantage of the benefits of the***

***Company being a privately held company as described above and because Parent and Merger***

***Sub were able to obtain debt financing in connection with the Merger. In the course of***

***considering the going-private transaction, the Buyer Group did not consider alternative***

***transaction structures, because the Buyer Group believed the Merger was the most direct and***

***effective way to enable the Buyer Group to acquire ownership and control of the Company.***"

133.    Statement 4 was materially false, misleading, and incomplete because it falsely

stated the Buyer Group's reasons and motives for the Merger.  As was eventually partially

disclosed by the relisting IPO documents, the Buyer Group's true reason for delisting was their

determination that E-House was undervalued, and that they could profit through Subsequent

Transactions.  This statement is particularly egregious because it states the opposite of the

truth—Defendants did not intend to "take advantage of the benefits of the Company being . . .

privately held"; in truth Defendants intended to engage in lucrative Subsequent Transactions,

and ultimately to relist the Company on an exchange in Asia.  Similarly, it is indisputable that

the Buyer Group did "consider alternative transactions," since they were arranging and pitching

investors for subsequent transactions even before the Merger closed.

134.    <u>Statement 5</u>: In a section of the Final Proxy titled, "Buyer Group's Purpose and

Reasons for the Merger," the Defendants' stated "***The Buyer Group believes that, as a privately***

***held company, the Company will have greater flexibility to focus on addressing the***

***challenges to the Company's long-term profitability without the constraints caused by the***

***public equity market's valuation of the Company and emphasis on short-term period-to-***

***period performance.***"

135.    Statement 5 was materially false, misleading, and incomplete because it

concealed the plan of the Company relisting on an Asian exchange, by boasting of the benefits

of private ownership outside of the public equity markets—without disclosing Defendants' intention to relist the shares on precisely such a market.  Reasonable investors would have read Statement 5 and concluded that the Merger was not a mere step toward relisting, when, in truth, Defendants were planning to relist the Company on an exchange in Asia.

136.    Statement 6: the preliminary proxy also contained a section titled "Plans for the Company after the Merger," which stated that after the Merger the Company would "*cease to be a publicly traded company.*"

137.    Statement 6 was materially false, misleading, and incomplete because, while the Company would literally not be publicly traded for a time after the Merger, Defendants planned for that to be a mere interlude before relisting, wherein E-House would continue to be a publicly traded Company.  To describe that something will "cease" to have some trait, without disclosing the plan for it to return to having that trait, misleadingly depicts the true state of affairs. Reasonable investors would have read Statement 6 and concluded that the Merger was not a mere step toward relisting, when, in truth, Defendants were planning to relist the Company on an exchange in Asia.

138.    Statement 7: Immediately after Statement 6, Defendants stated that "*the Buyer Group will continue to evaluate the Company's entire business and operations from time to time, and may propose or develop plans and proposals which they consider to be in the best interests of the Company and its equity holders, including the disposition or acquisition of material assets, alliances, joint ventures, and other forms of cooperation with third parties or other extraordinary transactions, including the possibility of relisting the Company or a substantial part of its business on another stock exchange.*"

139.     Statement 7 was false, misleading and incomplete because it described something that actually existed—plans to engage in Subsequent Transactions—as a mere possibility.  To be clear, the fruition or success of the plan was—as all future events are—a mere possibility.  However, the existence of the plan, was a presently-existent fact at the time Statement 7 was made.

140.     Statements 8 and 9 relate to the projections disclosed within the Final Proxy and Defendants' failure to disclose the PTPs.  For convenience, they can be referred to as the "Projection Statements."

141.     Statement 8: The Final Proxy included the 2016 Management Projections (reproduced in ¶ 90).

142.     Statement 8 (*i.e.,* the publication of the 2016 Management Projections) was false, misleading, and incomplete because it reproduced outdated projections without disclosing the fact that management had created more recent far higher projections (the PTPs).  By presenting the 2016 Management Projections, without disclosing the PTPs or their existence, Defendants were falsely conveying that the 2016 Management Projections were not outdated or supplanted, and were still relevant and accurate.  The statement was misleading in that it omitted to disclose the existence of the PTPs, despite the fact that the existence of those disclosures would dramatically change the way investors would view this statement.

143.     Statement 9: Defendants stated that the 2016 Management Projections "***reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of the Company.***"

144.     Statement 9 was false, misleading, and incomplete because it stated that the
projections—which were actually outdated and substantially undervalued EJ Core as of the
publication of the Final Proxy—were the "best currently available estimates" and reflected
management's "knowledge and belief" regarding the expected course for the Company, without
disclosing the existence of the PTPs.  The undisclosed higher projections in the PTPs—which
were prepared by management—strongly demonstrate that the 2016 Management Projections
were not, at that time, management's best view of the Company's course and expected future
financial performance.  The statement was misleading in that it omitted to disclose the existence
of the PTPs, despite the fact that the existence of those disclosures would dramatically change
the way investors would view this statement.

## VII.     OMISSIONS VIOLATING DUTIES TO DISCLOSE

145.     In addition to the omissions described in Section VI, each of which relate to
specific statements rendered incomplete or misleading, Defendants also omitted and failed to
disclose information that they had affirmative duties to disclose.

### A.     Duty to Disclose Imposed by Cayman Islands Law

146.     E-House was a Cayman incorporated corporation.  Directors of Cayman Island
Corporations have a duty to disclose "sufficient information" to investors, to allow them to
fairly understand matters they are called upon to vote on.[8]  This duty may be violated where
directors fail to provide a meaningful valuation or fail to disclose information about other
planned transactions.  This duty imposes an affirmative obligation to make disclosures and does
not merely require honesty when one chooses to speak.  Defendants Zhou, Shen, and Chao
violated this duty by providing outdated projections and outdated valuation information that

---

[8] *Davis v. Scottish Re Grp. Ltd.*, 159 A.D.3d 528, 529 (N.Y. App. Div. 2018) (citing *Sharp v. Blank,* [2015] EWHC 3220 [Ch], ¶ 5).

relied on those outdated objections.  Defendants Zhou, Shen, and Chao also violated this duty by not disclosing the planned Subsequent Transactions.

### B.     Duty to Disclose Imposed by SEC Regulations

147.    The Merger constituted a "Rule 13e-3 Transaction" as defined by 17 C.F.R. 240.13e-3, because it was a transaction to privatize by E-House affiliates.  As a result, SEC Rule 13e-3(b)(2)(i), requires the transaction statements filed in support of the Merger to comply with Rule 13e-3(d)-(f).

148.    Rule 13e-3(d) and (e) together required each member of the Buyer Group to file and/or sign Schedule 13E-3 transaction statement that includes the information required by each "Item" of Schedule 13E-3.  Among those items are the following requirements that Defendants failed to comply with.

149.    Item 6 of Schedule 13E-3 requires the transaction statement to "[d]escribe any plans, proposals or negotiations that relate to or would result in: (1) Any extraordinary transaction, such as a merger, reorganization or liquidation, involving the subject company or any of its subsidiaries; (2) Any purchase, sale or transfer of a material amount of assets of the subject company or any of its subsidiaries; (3) Any material change in the . . . capitalization of the subject company; . . . (5) Any other material change in the subject company's corporate structure or business; . . . (9) The acquisition by any person of additional securities of the subject company, or the disposition of securities of the subject company."  The instructions to Item 6 of Schedule 13E-3 further clarify that this should include "any activities or transactions that would occur after the Rule 13e-3 Transaction."

150.    The Buyer Group violated this disclosure obligation by failing to disclose the existence of investor presentations, such as the July 2016 Presentation, and the plans for a

Subsequent Transaction, including the plan to reorganize E-House in anticipation of a relisting on an exchange in Asia, and plans for transactions in August and September of 2016.

151.    Item 7 of Schedule 13E-3 requires the disclosure of the "purposes" for the transaction, the "reasons" for undertaking the transaction, and the "effect" of the transaction on the Buyer Group.  The instructions to Schedule 13E-3  further clarify that "[c]onclusory statements will not be considered sufficient" and that the requirement to disclose the "effects" should include a "reasonably detailed discussion" of the "benefits of the transaction," for the Buyer Group which must be "quantified to the extent practicable."

152.    The Buyer Group violated this disclosure obligation by failing to disclose the true reasons for the transaction, which were that the Buyer Group believed the Company was undervalued in the U.S. and because they failed to disclose that Defendants intended to engage in Subsequent Transactions and ultimately relist the Company on an exchange in Asia. Defendants also failed to describe the benefits that would accrue to them through the transaction, as a result of buying the Company while it was "undervalued" or due to the planned Subsequent Transactions.

153.    Additionally, Rule 13e-3(d)(2) requires "an amendment to Schedule 13E-3 reporting promptly any material changes in the information set forth in the schedule previously filed" and Rule 13e-3(f)(1)(iii) similarly required Defendants to "promptly disseminate disclosure of material changes."

154.    The Buyer Group violated this disclosure duty by failing to update the proxy materials as their plans to conduct Subsequent Transactions developed; by failing to disclose the preparation of presentation materials for potential investors in the post-Merger E-House; and by failing to disclose to public investors the July 2016 Presentation that was made to private

investors—which was material information regarding Defendants' plans for the Company after the Merger.

155.    In addition, while Defendants' statements alleged in Section VI (concerning the fairness of the Merger, the projections that the fairness assessment was based on, and the Buyer Group's plans for after the Merger) were false and misleading when made for the reasons described above, Defendants also violated their disclosure duty under Rule 13e-3(d)(2) because they (1) failed to describe the availability and substance of the PTPs, and development of the plans for Subsequent Transactions, and (2) failed to correct or update their statements in light of the PTPs and post-Merger plan before the August 5, 2016 shareholder vote on the Merger.

### C.    Duty to Disclose Due to Insider Trading

156.    An insider who possesses material non-public information ("MNPI") is under a duty to abstain from—or disclose that information prior to—trading.  This same duty applies to issuers when they buy and sell the securities they issued or, sometimes, to non-insiders who receive MNPI from insiders.

157.    At all relevant times each member of the Buyer Group possessed MNPI, including information about the existence of the PTPs, information about actual results from the first half of 2016, information about the July 2016 Presentation, information about the planned Subsequent Transactions, and information about the Buyer Groups' true reasons for the Merger.

158.    Defendant E-House violated this duty by closing the Merger without disclosing the MNPI it possessed.  Upon the close of the Merger, E-House purchased all the outstanding shares of its stock.  E-House was the most direct purchaser of the shares through the Merger, because it filed the documents soliciting investors to accept the Merger and because it engaged in the formal Merger, whereby securities ultimately were tendered for the Merger consideration.

E-House failed to disclose the MNPI it possessed. By doing so, it violated the duty to disclose all MNPI before trading.

159.     Additionally, it is alleged that the Buyer Group, except Defendant Chao,[9] are properly deeeemed purchasers of the outstanding shares. Members of the Buyer Group completed this purchase through their agent, Merger Sub by directing Merger Sub to close the Merger. When members of the Buyer Group completed this process, they failed to disclose the MNPI that the Buyer Group possessed, including the PTPs. By doing so, the Buyer Group violated the duty to disclose all MNPI before trading.

160.     Additionally, Parent and Merger Sub, acting as agent of the Buyer Group, are also properly deemed purchasers of the shares through the merger, and possessed MNPI while failing to disclose that information. Specifically, they both were directed by Defendant Zhao and therefore have knowledge of MNPI as alleged herein. Parent is properly deemed a purchaser because it paid the money used to buy the shares. Merger Sub is properly deemed a purchaser because it engaged in the formal Merger, whereby securities ultimately were tendered for the Merger consideration.

## VIII.   SCIENTER ALLEGATIONS RELEVANT TO CERTAIN COUNTS

161.     At all relevant times, Defendants E-House and the Buyer Group acted with scienter. Defendants Zhou, Shen, and Chao had actual knowledge that the statements and omissions made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions.

---

[9] Defendant Chao is member of the Buyer Group due to his control over Sina, but he is not a direct participant in the Merger. All other members of the Buyer Group either owned shares that were "rolled over" through the Merger, meaning that they continued owning E-House (and increased their relative ownership) as a result of the Merger, directly participated in the formal merger itself (*i.e.,* the combination of Merger Sub and E-House) or directly owned Merger Sub.

162.     E-House has the scienter of its management-level employees, including Defendants Zhou, Shen, and Chao.  Defendant Sina had the scienter of its management-level employees, including Defendant Chao.  Defendants Kanrich Holdings Limited, On Chance, Inc., and Jun Heng Investment Limited, HoldCo, and Merger Sub, each had the scienter of their management-level employees, including Defendant Zhou.  Smart Create Group Limited, and Smart Master International Limited each had the scienter of their management-level employees, including Defendant Shen.  Defendant Parent and Merger Sub each had the scienter of their management-level employees, including Defendant Zhou.

A.     **Motive and Opportunity**

163.     The Buyer Group's fraudulent intent can be established due to each of its members' motive and opportunity to defraud.  At all times, the members of the Buyer Group stood to benefit substantially by reducing the price they would need to pay in order to acquire E-House, and by closing the Merger so that they could proceed with their plans for Subsequent Transactions.  By publishing false, misleading, and incomplete information, and by failing to make required disclosures, Defendants were able to buy what they viewed as an undervalued company for a low price.  Had they disclosed the withheld information, Defendants would have been less likely to accomplish their goals of acquiring the Company, and necessarily would have been pushed to offer ADS holders a higher price.

164.     As signatories of the Final Proxy, as members of E-House's management, as speakers of statements within the Final Proxy, and as participants in the Merger, the Buyer Group had substantial control over the contents of the Final Proxy, and therefore had the opportunity to act on their motives to defraud public investors.

### B.      Knowledge, Recklessness, and Involvement

165.    The PTPs were management projections and used in pitching Subsequent Transactions to potential private investors.  Defendant Zhou approved of the figures in the PTPs.  Each member of the Buyer Group would have been aware of the PTPs due to their roles as senior management of E-House, and due to their roles—as the soon-to-be sole owners of E-House—in any Subsequent Transaction.

166.    After the Merger, the Buyer Group would own E-House.  Any Subsequent Transaction would, by definition, have been conducted by them and would necessarily have been for their benefit.  The only reasonable inference is that the Buyer Group would have been involved in or aware of the July 2016 Presentation, which was itself part of their broader post-Merger plans for the Company.

167.    The relisting IPO documents disclosed that the Buyer Group had taken the Company private in order to conduct Subsequent Transactions and because they believed the Company was undervalued.  There is no doubt Defendants knew their own plans, views, and purposes.

### C.      Corporate Scienter

168.    The Merger and management's projections (including the PTPs), were matters of such core importance to E-House that Defendants' knowledge of this information can be presumed.  It would not be possible to generate "management" projections, such as the PTPs, without management's involvement in, and knowledge of, those projections.

## IX.    LOSS CAUSATION AND ECONOMIC LOSS

169.    During the Class Period, as detailed herein, Defendants wrongfully deprived investors of material information that (a) artificially depressed the price of E-House's ADS relative to where the ADS would have traded had Defendants not made misleading and

incomplete disclosures, and (b) induced or caused Co-Lead Plaintiffs and members of the Class to sell shares at less than the fair value of those shares. If Defendants had disclosed the truth about the Merger, the Merger price—and therefore the market price of E-House ADS—would have been higher to reflect that information.

170.    Co-Lead Plaintiffs and members of the Class suffered economic loss (*i.e.,* damages), when they sold their ADS for less than fair value.  The amount of loss suffered is equal to the fair value of the shares minus the price that Co-Lead Plaintiffs and members of the Class received when they sold their E-House ADS during the Class Period.

171.    Upon discovery and through the use of credible valuation techniques, it will not be difficult to ascertain the fair value of E-House ADS during the Class Period.  However, for now it is sufficient to allege that the fair value exceeded the price paid to investors. It is clear that the fair value exceeded the Merger price of $6.85, because, as detailed herein, the most up-to-date projections at the time of the Merger implied a far higher valuation.  For example—and without implying the true valuation is not higher still—the July 2016 Presentation valued just one portion of E-House at $1.2 billion.  Using the information found in D&P's valuation – but substituting in the more up-to-date valuation for EJ Core of $1.2 billion – implies a per share value of between $12.90 and $12.30, compared to the Merger price of $6.85.

X.    **APPLICABILITY OF PRESUMPTION OF RELIANCE**

172.    The requirement to plead reliance in this case is relaxed because the votes of unaffiliated holders were required to close the transaction, and the proxies containing false and misleading statements and omissions were essential links in the completion of the Merger.

173.    To the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Co-Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972).

174.    Co-Lead Plaintiffs are also entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine, in that, among other things:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   the omissions and misrepresentations were material;

c.   the omissions and misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the E-House ADS;

d.   Co-Lead Plaintiffs and other members of the Class transacted in E-House ADS between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts; and

e.   the ADS traded in an informationally efficient market, meaning that the market for E-House ADS promptly digested current information regarding E-House from publicly available sources and reflected such information in the price of E-House ADS.

175.    The existence of an informationally efficient market does not imply that the market price reflects the true fair value of the Company or that information is incorporated in a perfectly rational way.  Here, it is particularly alleged that the market price of E-House did not reflect its fair value, at least in part, due to Defendants' misstatements and omissions.

176.    Rather, an informationally efficient market is one in which material information would be received and interpreted by market participants and that, as a result, most publicly available information is reflected in market price.  Many factors indicate that the market for E-House securities was informationally efficient, as that term was just described, including:

a.   E-House filed periodic public reports with the SEC and filed documents related to the Merger with the SEC;

b.   E-House regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

c.   E-House ADS were actively traded in a liquid market with reasonably high transaction volumes;

d.   E-House was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s), and that were publicly available and entered the public marketplace;

e.   E-House's stock price moved in reaction to the disclosures, including disclosures about the Merger;

f.   Throughout the Class Period, E-House had a reasonably high market capitalization;

g.   Throughout the Class Period, E-House traded at a low bid-ask spread;

h.   Throughout the Class Period, public investors owned a high proportion of outstanding shares of E-House.

177.   Under these circumstances, all those who purchased or otherwise acquired E-House ADS during the Class Period suffered similar injury through sales of E-House ADS at artificially deflated prices, and the presumption of reliance applies.

## XI.   NO SAFE HARBOR

178.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false, misleading, and

incomplete in this complaint.  As a threshold matter, the statutory safe harbor does not apply to going-private transactions. Moreover, the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of E-House who knew that the statement was false when made.

179.    Certain of the false statements made by Defendants relate to projections and plans and projections themselves are forward looking, in that they predict the future.  However, these statements are alleged to be false, misleading, and incomplete, based on presently existing facts at the time the statements were made.  For example, the fact that a plan or set of projections exists is verifiable at any point in time.  Defendant's statements are misleading based on the misrepresentation of facts that existed at the time of their statements, and the falsity of their statements does not depend on contingent future events.  Therefore, despite relating to plans and projections, the statements at issue do not fall under the safe harbor for forward looking statements.

**XII.   CLASS ACTION ALLEGATIONS**

180.    Co-Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of (the "Class") all former owners of E-House ADS who sold E-House ADS, and were damaged thereby, (a) during the period from July 1, 2016, until August 31, 2016, inclusive (the "Class Period"), and/or (b) by way of or as a result of tendering their E-House ADS as part of the Merger, regardless of when that tender occurred.  For the avoidance of doubt, "tendering" as used in the prior sentence shall be interpreted as broadly as possible to describe any transaction in which E-House ADS were cashed-out for Merger consideration.[10]

181.    Excluded from the Class are: Defendants (as defined herein); any officers or directors of Defendants during the Class Period (the "Excluded D&Os"); members of Defendants' and the Excluded D&Os' immediate families; the subsidiaries and affiliates of the Company, including the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); any entity in which Defendants or the Excluded D&Os have or had a controlling interest; and the legal representatives, heirs, successors, or assigns of any excluded person or entity.

182.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

        a.    Whether the Exchange Act was violated by Defendants;

---

[10] Part (a) of the Class Period is defined as extending until August 31, 2016, primarily as a tool of convenience for the public.  The Merger closed on August 12, 2016, but many parties' trading records will reflect dates sometime after that, as the date on which their shares were sold as part of the Merger.  For the avoidance of doubt, there is no date limitation on Part (b) of the class definition.

     b.   Whether Defendants omitted and/or misrepresented material facts;

     c.   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

     d.   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

     e.   Whether the price of E-House ADS was artificially deflated; and

     f.   The extent of the damage sustained by Class members and the appropriate measure of damages.

183.    Co-Lead Plaintiffs' claims are typical of those of the Class because Co-Lead Plaintiffs and the Class sustained damages as a result of Defendants' wrongful conduct.

184.    Co-Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in securities class action litigation. Co-Lead Plaintiffs have no interests that conflict with those of the Class.

185.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIII.  COUNTS

### A.    Count I: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Each Member of the Buyer Group and Defendant E-House

186.    Co-Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein. This Count is brought against each member of the Buyer Group and Defendant E-House.

187.    During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder because Defendants disseminated or approved the false

and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or that Defendants had a duty to disclose for the reasons explained above.

188.     Co-Lead Plaintiffs and the Class have suffered damages in that, as a result of Defendant's wrongful conduct alleged herein, they sold E-House ADS at artificially deflated and unfairly low prices.  Co-Lead Plaintiffs and the Class would not have sold E-House ADS at the prices they did, if they had not been defrauded, and if they had been aware that the market prices had been artificially and falsely deflated by Defendants' misleading statements.

189.     As a direct and proximate result of these Defendants' wrongful conduct, Co-Lead Plaintiffs and the other members of the Class suffered damages in connection with their sales of E-House ADS during the Class Period.

**B.     Count II: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against Each Member of the Buyer Group and Defendant E-House**

190.     Co-Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This Count is brought against each member of the Buyer Group and Defendant E-House.

191.     During the Class Period, Defendants engaged in a fraudulent scheme to deprive unaffiliated holders of the fair value of their E-House ADS.  This scheme involved buying the ADS for less than fair value, without disclosing the plans for Subsequent Transactions.  It also involved orchestrating the Merger, depriving the market of material information, while planning to conduct Subsequent Transactions.  This course of conduct was based on an inherently deceptive plot to misuse inside information at the expense of public investors.

192.     In furtherance of this unlawful plan, scheme, and course of conduct, Defendants E-House, Zhou, and Shen employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Co-Lead Plaintiffs and the Class, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.  In particular, Defendants issued public disclosures designed to hide their true plans and garner public support for the unfair Merger.

193.     Co-Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which E-House ADS traded.

194.     During the Class Period, Co-Lead Plaintiffs and the Class were unaware of the Defendants' fraudulent scheme and unlawful course of conduct.  Had Co-Lead Plaintiffs and the Class known of the unlawful scheme and unlawful course of conduct, they would not have sold their E-House ADS, or if they had, they would not have done so at the artificially deflated prices paid for such securities.

195.     As a direct and proximate result of the Defendants' scheme to defraud and such unlawful course of conduct, Co-Lead Plaintiffs and the Class suffered damages in connection with their sale of E-House ADS securities during the Class Period.

C.     **Count III: For Violation of Section 13(e) of the Exchange Act and Rule 13e-3 Promulgated Thereunder Against Each Member of the Buyer Group and Defendant E-House**

196.     Co-Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This Count is brought against each member of the Buyer Group and Defendant E-House.

197.     The Merger constituted a Rule 13e-3 Transaction under Rule 13e-3.

198.     Defendants violated Section 13(e) of the Exchange Act and Rule 13e-3(b)(2)(ii) in that they engaged in a Rule 13e-3 Transaction while members of the Buyer Group were making materially false, misleading, and incomplete statements in the Final Proxy.

199.     Defendants also violated Section 13(e) of the Exchange Act and Rule 13e-3(b)(2)(ii) in that they engaged in a Rule 13e-3 Transaction while members of the Buyer Group employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Co-Lead Plaintiffs and the Class.  This scheme involved buying the ADS for less than fair value, without disclosing the plans for Subsequent Transactions.

200.     Defendants violated Section 13(e) of the Exchange Act and Rule 13e-3(b)(2)(i) in that they engaged in a Rule 13e-3 Transaction while members of the Buyer Group were failing to comply with the requirements of Rule 13e-3(d), (e), and (f), as detailed herein.

201.     Co-Lead Plaintiffs and the Class have suffered damages in that—as a result of Defendants' wrongful conduct alleged herein—they sold E-House ADS at artificially deflated prices.  Co-Lead Plaintiffs and the Class would not have sold E-House ADS at the prices they did if they had not been defrauded and if they had been aware that the market prices had been artificially and falsely deflated by Defendants' misleading statements.

202.     As a direct and proximate result of Defendants' wrongful conduct, Co-Lead Plaintiffs and the other members of the Class suffered damages in connection with their sales of E-House ADS during the Class Period.

    **D.**    **Count IV: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendant E-House and Each Member of the Buyer Group, Except Defendant Chao, Regarding Insider Trading**

203.    Co-Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This Count is brought against Defendant E-House and each member of the Buyer Group except Defendant Chao.

204.    As a result of the Merger, Defendants may be properly deemed purchasers of the ADS that were tendered as a result of, at the time of, or due to the close of the Merger, as alleged herein.  At the time of this purchase Defendants possessed MNPI.

205.    Co-Lead Plaintiffs and members of the class who sold ADS by way of the Merger being closed ("Tendered") sold their shares contemporaneously with Defendants' purchase.

206.    By virtue of the foregoing, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly, made material omissions and violated Section 10(b) and Rule 10b-5.  Defendants' insider trading constituted unlawful conduct under Rule 10b-5(a) and (c) and an omission in violation of the duty to abstain from trading without disclosing all MNPI, and thus constituted an unlawful omission under Rule 10b-5(b).

207.    Defendants are required to account for all such securities purchases and to disgorge their profits or ill-gotten gains.

E.    **Count V: For Violation of Section 20A of the Exchange Act Against Defendant E-House and Each Member of the Buyer Group, Except Defendant Chao, Regarding Insider Trading**

208.    Co-Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This Count is brought against Defendant E-House and each member of the Buyer Group except Defendant Chao.

209.    As a result of the Merger, Defendants may be properly deemed purchasers of the ADS that were tendered as a result of, at the time of, or due to the close of the Merger, as alleged herein.  At the time of this purchase Defendants possessed MNPI.

210.    Co-Lead Plaintiffs and members of the class who sold ADS by way of the Merger being closed ("Tendered") sold their shares contemporaneously with Defendants' purchase.

211.    By virtue of the foregoing, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly, made material omissions and violated Section 20A of the Exchange Act.

212.    Defendants are required to account for all such securities purchases and to disgorge their profits or ill-gotten gains.

F.    **Count VI: For Violation of Section 20(a) of the Exchange Act Against Defendants Zhou, Shen, and Chao**

213.    Co-Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

214.    Defendant Chao is a control person of Defendant Sina.  Defendant Zhou is a control person of Defendants E-House, HoldCo, Merger Sub, Kanrich, On Chance, and Jun. Defendant Shen is a control person of Defendants E-House, Smart Create, and Smart Master.

215.    Defendants Chao, Zhou, and Shen, as culpable participants, acted as controlling persons, as described in the prior paragraph, within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control those entities, Defendants Chao, Zhou, and Shen had the power and ability to control their relevant conduct.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act, to the extent that those entities are liable for any violation of the Exchange Act..

G.    **Count VII: For Violation of Section 20(a) of the Exchange Act Against Defendants Shen, Chao, Xiang, Zhu, Zeng, Zhou, Li, and Jian**

216.    Co-Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This count is brought against Defendants Shen, Chao, Xiang, Zhu, Zeng, Zhou, Li, and Jian.

217.    Defendants, as culpable participants, acted as controlling persons of E-House within the meaning of Section 20(a) of the Exchange Act, by virtue of their positions and their power to control that entity. By reason of such conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act, to the extent that E-House is liable for any violation of the Exchange Act.

## XIV.   PRAYER FOR RELIEF

218.    WHEREFORE, Co-Lead Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action, and certifying Co-Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Co-Lead Plaintiffs' counsel as Lead Counsel for the Class;

b.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Co-Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Awarding such equitable or injunctive or other relief as deemed appropriate by the Court.

## XV.    JURY DEMAND

219.    Co-Lead Plaintiffs demand a trial by jury.

DATED: October 13, 2020                     Respectfully submitted,

LABATON SUCHAROW LLP                  POMERANTZ LLP

*/s/ Carol. C. Villegas*                    */s/ Jeremy A. Lieberman*
Carol C. Villegas                           Jeremy A. Lieberman
David S. Schwartz                           Michael Grunfeld
Jake Bissell-Linsk                          600 Third Avenue, 20th Floor
140 Broadway                                New York, New York 10016
New York, New York 10005                    Telephone: (212) 661-1100
Telephone: (212) 907-0700                   Facsimile: (212) 661-8665
Facsimile: (212) 818-0477                   Email: jalieberman@pomlaw.com
Email: cvillegas@labaton.com                Email: mgrunfeld@pomlaw.com
Email: dschwartz@labaton.com
Email: jbissell-linsk@labaton.com

*Counsel for Co-Lead-Plaintiff*
*Counsel for the Co-Lead Plaintiff*         *Altimeo Asset Management and Co-Lead*
*the Maso Entities and Co-Lead*             *Counsel for the Class*
*Counsel for the Class*