**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____  x
                                   :
                                   :
                                   :
                                   :
                                   :
                                   :
                                   :
IN RE E-HOUSE SECURITIES           :   Case No. 1:20-cv-02943-ER
LITIGATION                         :
                                   :
                                   :   **ORAL ARGUMENT REQUESTED**
                                   :
                                   :
                                   :
                                   x
_____

**LEAD PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO**
**DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ........................................................................1

II.   SUMMARY OF THE FACTS ........................................................................4

III.  ARGUMENT ..............................................................................................6

      A.    Legal Standards..............................................................................6

      B.    The Complaint Adequately Alleges False and Misleading Statements and
            Disclosure Duties ...........................................................................6

            1.    Defendants' Projection Statements ...........................................6

            2.    Defendants' Subsequent Transaction Statements ......................9

            3.    Defendants' Fairness Statements ............................................13

            4.    Defendants Had Independent Duties to Disclose......................14

            5.    The Complaint Adequately Alleges Scheme Liability ..............15

      C.    The Complaint Pleads a Strong Inference of Scienter .........................15

            1.    The Complaint Adequately Alleges Motive and Opportunity..............16

            2.    Defendants' Conscious Misbehavior & Recklessness...........................17

            3.    Plaintiffs Adequately Allege E-House's Scienter...................18

      D.    The Complaint Adequately Alleges Loss Causation ...........................19

      E.    The Complaint Adequately Alleges Reliance....................................22

IV.   The Complaint Adequately Alleges a Claim Under Section 13(e)................24

V.    The Complaint Adequately Pleads Control Person Liability.........................24

VI.   The Complaint Adequately Alleges Insider Trading Claims.........................25

CONCLUSION................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)........................................................................................3, 19, 24

*Allied Irish Banks, P.L.C. v. Citibank, N.A.*,
  2015 WL 4104703 (S.D.N.Y. June 30, 2015) ......................................................18

*Altimeo Asset Management v. WuXi PharmaTech (Cayman)*,
  2020 WL 6063539 (S.D.N.Y. Oct. 14, 2020) ....................................................8, 11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)........................................................................................6

*Azar v. Blount Int'l, Inc.*,
  2017 WL 1055966 (D. Or. Mar. 20, 2017) .......................................................7, 20

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)......................................................................................ø *passim*

*Basile v. Valeant Pharm. Int'l*,
  2015 WL 7352005 (C.D. Cal. Nov. 9, 2015)..........................................................25

*Baum v. Harman Int'l Indus., Inc.*,
  408 F. Supp. 3d 70 (D. Conn. 2019)..........................................................................7

*Black v. Finantra Cap., Inc.*,
  418 F.3d 203 (2d Cir. 2005)....................................................................................23

*Brown v. Brewer*,
  2010 WL 2472182 (D. Del 2010) ...........................................................................20

*Brown v. Papa Murphy's Holdings Inc.*,
  2021 WL 235865 (W.D. Wash. Jan. 12, 2021).......................................................20

*Buxbaum v. Deutsche Bank, A.G.*,
  2000 WL 33912712 (S.D.N.Y. Mar. 6, 2000) ...........................................9, 10, 16

*Carps. Pens. Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)......................................................................................6

*Castellano v. Young & Rubicam, Inc.*,
  257 F.3d 171 (2d Cir. 2001)....................................................................................11

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020)........................................................................11

*Credit Suisse First Bos. Corp. v. ARM Fin. Grp., Inc.*,
    2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ...........................................8, 11, 12, 22

*Davis v. Scottish Re Group. Ltd.*,
    159 A.D.3d 528 (N.Y. App. Div. 2018) ..................................................................14

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................21

*Fisher v. Plessey Co.*,
    1983 WL 1328 (S.D.N.Y. June 22, 1983) ..............................................................24

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000).............................................................................10, 16

*Grace v. Rosenstock*,
    228 F.3d 40 (2d Cir. 2000)..................................................................................3, 22

*Gray v. Wesco Aircraft Holdings*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020)................................................................20, 21

*Green v. Hamilton Int'l Corp.*,
    437 F. Supp. 723 (S.D.N.Y. 1977) ........................................................................25

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)................................................................................................23

*Hanley v. Warburg Pincus Cap. Co., L.P.*,
    2005 WL 8161161 (D. Ariz. 2005).........................................................................24

*Howing Co. v. Nationwide Corp.*,
    826 F.2d 1470 (6th Cir. 1987),
    *remanded on other grounds*, 502 U.S. 801 (1991) ...............................................24

*In re AT&T/DirecTV Now Sec. Litig.*,
    2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) .......................................................15

*In re Avon Sec. Litig.*,
    2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) .......................................................14

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)....................................................................21

*In re Duane Reade Inc. Sec. Litig.*,
    2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) .......................................................9

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017)................................................................15

*In re Envision Healthcare Corp.*,
  2019 WL 3494407 (D. Del. Aug. 1, 2019) .........................................................20

*In re Facebook, Inc. IPO Sec. & Deriv Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)................................................................12

*In re Fairway Grp. Hold. Corp. Sec. Litig.*,
  2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) .......................................................19

*In re Forcefield Energy Inc. Sec. Litig.*,
  2015 WL 4476345 (S.D.N.Y. July 22, 2015) .....................................................23

*In re GE Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012)................................................................19

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018),
  *aff'd*, 955 F.3d 254 (2d Cir. 2020) ...................................................................23

*In re Hot Topic, Inc. Sec. Litig.*,
  2014 WL 7499375 (C.D. Cal. May 2, 2014) ..................................................7, 20

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)................................................................24

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  251 F. Supp. 3d 596 (S.D.N.Y. 2017)..................................................................8

*In re Jumei Int'l Hold. Ltd.*,
  2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) .........................................................17

*In re MCI Worldcom Sec. Litig.*,
  93 F. Supp. 2d 276 (E.D.N.Y. 2000) .................................................................16

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  2011 WL 1330847 (S.D.N.Y. Mar. 29, 2011) ....................................................10

*In re Mindbody, Inc. Sec. Litig.*,
  2020 WL 5751173 (S.D.N.Y. Sept. 25, 2020)...........................................9, 14, 15

*In re NQ Mobile, Inc. Sec. Litig.*,
  2015 WL 1501461 (S.D.N.Y. Mar. 27, 2015) ....................................................24

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014)..................................................................19

*In re Parmalat Sec. Litig.*,
  375 F. Supp. 2d 278 (S.D.N.Y. 2005).................................................................24

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015).................................................................18

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)............................................................17, 18

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001).................................................................................6

*In re Shanda Games Ltd. Sec. Litig.*,
  2019 WL 11027710 (S.D.N.Y. Sept. 30, 2019)..................................7, 16, 18, 22

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993).................................................................................10

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016).............................................................................12

*Iowa Pub. Empls.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  340 F. Supp. 3d 285 (S.D.N.Y. 2018)...............................................................16

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*,
  620 F.3d 137 (2d Cir. 2010).............................................................................12

*IPERS v. Deloitte & Touche LLP*,
  919 F. Supp. 2d 321 (S.D.N.Y. 2013)...............................................................16

*Joseph v. Mobileye, N.V.*,
  225 F. Supp. 3d 210 (S.D.N.Y. 2016)...............................................................10

*Laborers Loc. No. 231 Pens. Fund v. Cowan*,
  2020 WL 7056070 (3d Cir. Dec. 2, 2020) ..........................................................9

*Levie v. Sears, Roebuck & Co.*,
  496 F. Supp. 2d 944 (N.D. Ill. 2007). ......................................................... *passim*

*Lickteig v. Cerberus Cap. Mgmt.*,
  2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020).......................................................7

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)........................................................................19, 25

*Lorenzo v. SEC*,
  139 S. Ct. 1094 (2019)....................................................................................15

v

*Malone v. Brincat*,
　722 A.2d 5 (Del. 1998) ...................................................................................................15

*Martinek v. AmTrust Fin. Servs.*,
　2020 WL 4735189 (S.D.N.Y. Aug. 14, 2020) .........................................................10

*McIntire v. China MediaExpress Holdings, Inc.*,
　38 F. Supp. 3d 415 (S.D.N.Y. 2014) ........................................................................23

*Meyer v. JinkoSolar Holdings Co.*,
　761 F.3d 245 (2d Cir. 2014) ...............................................................................6, 12

*Mills v. Elec. Auto-Lite Co.*,
　396 U.S. 375 (1970) .............................................................................3, 20, 22, 23

*NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*,
　2017 WL 4453561 (D. Or. Oct. 3, 2017),
　*adopted*, 2018 WL 533912 (D. Or. Jan. 24, 2018) ..................................................7

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000) .....................................................................................15

*ODS Capital LLC v. JA Solar Holdings Co.*,
　2020 WL 7028639 (S.D.N.Y. Nov. 30, 2020) ..................................13, 16, 18, 22

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
　834 F.3d 481 (3d Cir. 2016) ......................................................................................9

*Omnicare, Inc. v. Laborers Distr. Council Constr. Indus. Pension Fund*,
　575 U.S. 175 (2015) ...........................................................................................13, 14

*Pa. Ave. Funds v. Borey*,
　2009 WL 902070 (W.D. Wash. Mar. 30, 2009) ......................................................25

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
　2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) .........................................................12

*Patel v. L-3 Commc'ns*,
　2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) ..........................................................18

*Pittiglio v. Mich. Nat'l Corp.*,
　906 F. Supp. 1145 (E.D. Mich. 1995) .....................................................................24

*Plumbers & Pipefitters Nat'l Pens. Fund v. Davis*,
　2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ....................................................12, 15

*S.E.C. v. China Ne.e. Petro.. Holdings Ltd.*,
　27 F. Supp. 3d 379 (S.D.N.Y. 2014) .......................................................................15

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) ....................................................12

*Speakes v. Taro Pharm. Indus., Ltd.*,
   2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018) ..........................................................................19

*State of N.J. & Its Div. of Inv. v. Sprint Corp.*,
   2004 WL 1960130 (D. Kan. Sept. 3, 2004) ..............................................................................10

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ........................................................................................................14

*Stream SICAV v. Wang*,
   989 F. Supp. 2d 264 (S.D.N.Y. 2013) .......................................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................................................15, 19

*U.S. v. O'Hagan*,
   521 U.S. 642 (1997) ..................................................................................................................25

*Villella v. Chem. & Mining Co. of Chile*,
   333 F.R.D. 39 (S.D.N.Y. 2019) ................................................................................................24

*Vine v. Beneficial Fin. Co.*,
   374 F.2d 627 (2d Cir. 1967) ......................................................................................................25

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ........................................................................................................24

## Statutes

15 U.S.C. § 78j(b) .......................................................................................................... *passim*

15 U.S.C. § 78m(e) ........................................................................................................ *passim*

15 U.S.C. § 78cc(a) ................................................................................................................14

## Rules

Fed. R. Civ. P. 8 ....................................................................................................................19

Fed. R. Civ. P. 12(b)(6) ............................................................................................................6

## Other Sources

Disclosure and Remedies Under the Securities Laws, §§ 20:53, 20:7 (Mar. 2020) ............19

Lead Plaintiffs Altimeo Asset Management and the Maso Entities (together, "Plaintiffs"), respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss.[1]

## I.      PRELIMINARY STATEMENT

This is a simple case: Defendants misrepresented the financial performance of E-House and hid their true plans for the Company.  They did this to keep E-House's share price artificially low and to induce shareholders to accept an unfairly priced buyout led by the Company's CEO.

To pitch that deal, Defendants issued a Final Proxy purportedly showing their "***best currently available***" projections and information about their reasons for the buyout.   After the deal closed, Defendants' lies were exposed in a separate appraisal action.  That action revealed (through evidence presented at trial) that ***prior*** to the publication of the Final Proxy, Defendants had more up-to-date projections – based in part on a half year of ***actual*** results – that forecast ***4 times faster profit growth*** than what was shown in the Final Proxy.  Before the Merger even closed, these newer and higher projections were used to pitch new private investors in E-House at a ***valuation 83% higher*** than that offered by the buyout.  Defendants were so confident in the undisclosed projections that they gave private investors a ***financial guarantee*** that E-House's core business would perform within 95% of these projections.  Defendants ultimately turned around and relisted ***just part*** of the Company on the Hong Kong exchange at a valuation of $2.65 billion, which far exceeded the $1.06 billion valuation set by the Merger for the entire Company.

Knowing they are caught red-handed, based on their own internal documents, Defendants try to distract with arguments that should be summarily rejected.  Defendants first argue, rather shockingly, that it was perfectly acceptable for them to provide only "outdated" projections to their shareholders because they both disclaimed any duty to update and reported the date the

---

[1] The "Complaint," ECF No. 50, is cited as "¶__"; and the "Motion to Dismiss," ECF No. 63, as "MtD __." Unless stated otherwise, terms are defined as in the Complaint and emphasis is added.

disclosed projections were prepared.  (MtD 8-10).  Tellingly, Defendants do not deny that the higher projections existed and were hidden from public investors, but argue only that they had no obligation to share them.  *Id.*  Defendants' argument fails because the higher projections existed when the Final Proxy was published, rendering their duty to update argument irrelevant.  It was highly misleading to publish the earlier projections, and false to call them the "***best currently available***," without also disclosing the new, much better ones.  In any event, Defendants had numerous obligations to disclose the better projections under SEC regulations, Cayman law, and insider trading law, regardless of any boilerplate disclosures they made.

Defendants also argue that their statements concerning the reason for the merger and their plans for the Company were not false.  But this is belied by both the actual statements they made to the public and the facts revealed in the appraisal action and relisting IPO.  Despite telling the market that they did not have any plans to engage in transactions at the time, Defendants were simultaneously and secretly pitching such transactions to private investors with the undisclosed, higher projections.  And, despite publicly denying any plans to relist the Company, Defendants were contemporaneously presenting pitch decks to those private investors, documenting their plan to relist on an Asian stock exchange—which Defendants later did at incredible profits.

On scienter, Defendants fail to challenge the clear allegations of motive and opportunity.  They make a halfhearted attempt to invoke the extremely narrow "adverse interest exception."  But Defendants cannot evade the clear allegation that they had a direct motive, as they would reap hundreds of millions if they closed the buyout at the lowball price.  In fact, there have been multiple securities cases brought based on other management buyouts of Chinese companies on strikingly similar facts where courts found falsity and found scienter adequately pled based ***solely*** on motive and opportunity.  Plaintiffs also easily show a strong inference of conscious misbehavior or recklessness based on the Buyer Group's undisclosed, higher projections at the

2

time the false statements were made.  This is an ***independent basis*** for scienter that Plaintiffs

adequately plead against each member of the Buyer Group and E-House.

Defendants then misconstrue Plaintiffs' strong loss causation allegations.  Plaintiffs'

theory is simple and well accepted: Plaintiffs suffered losses because they sold their shares for

less than what they were worth. The Supreme Court has long recognized that damages for

defrauded sellers in securities claims are "the difference between the fair value of all that . . .

seller received and the fair value of what he would have received had there been no fraudulent

conduct." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972).  Courts

therefore clearly hold that sellers adequately plead loss causation in the merger context when

they are defrauded into selling shares for less than fair value.  The allegations here easily meet

the plausibility standard applied to loss causation, because the undisclosed higher projections

supported a higher valuation.  Defendants falsely assert that Plaintiffs' theory of loss depends on

proving that a better merger would have occurred absent the fraud.  But, as just explained, the

Complaint alleges loss based on the shares' present fair value, not an alternative merger.

Defendants also challenge reliance – but only as to those shareholders who tendered into

the Merger (conceding reliance for those who sold at depressed prices during the rest of the Class

Period).  Their arguments fail because directly applicable Second Circuit and Supreme Court

precedent holds that proof of reliance is not required where, as here, a shareholder vote is needed

and a merger proxy is false, misleading, or incomplete.  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375,

382 (1970); *Grace v. Rosenstock*, 228 F.3d 40, 48-49 (2d Cir. 2000).  While nothing more is

required, Plaintiffs also satisfy this element through *Basic* and *Affiliated Ute*.

Finally, Defendants' other challenges – to insider trading allegations, claims under

Section 13(e), control person liability, scheme liability, and their multiple affirmative disclosure

duties — fail for the reasons stated herein.  In addition to all being legally flawed, these

arguments do not really deny the core wrongful conduct – Defendants hope to get away with it.[2]

## II.   SUMMARY OF THE FACTS

E-House is a leading real estate services company in China.  ¶28.  It has four business segments: EJ Core (E-House's main business, which includes its real estate brokerage) and three businesses that E-House owns stakes in—Leju (Real Estate Online Services), Jupai (Wealth Management Services), and Shi Hui (which runs promotions for local businesses).  ¶¶50-55.

The Buyer Group—which includes Defendants Zhou (E-House's CEO, Founder, and Chairman), Shen (an E-House Director), Sina (a Chinese technology company with a seat on E-House's Board held by Sina's CEO, Defendant Chao), and their affiliates[3]—offered to purchase E-House in June 2015.  ¶¶33-34, 42, 56-57, 98.  The transaction Committee that advised the Board that the Merger price was fair includes Xiang, Zhu, Zeng, Li, and Sun. ¶¶35-40, 48, 77.  On July 1, 2016, Defendants issued the Final Proxy soliciting shareholders to vote in favor of the Merger, which valued E-House at $1.06 billion.  ¶¶59, 61, 87-93.  On August 5, 2016, shareholders approved the Merger, which closed on August 12.  ¶¶96-97.

The Final Proxy included financial projections for the EJ Core and Leju businesses from 2016 through 2020.  ¶90.  The projections were prepared by E-House's management in January 2016 (the "2016 Management Projections") and the Committee and D&P (the Committee's financial advisor) relied on them in making their assessments of the Merger.  ¶¶88-93.

A single dissenting shareholder filed an appraisal petition in the Cayman Islands.  ¶99. Evidence produced in discovery and presented at trial there revealed that in June 2016, *before* the Final Proxy was published, E-House's management prepared a more up-to-date set of

---

[2] In a clear effort to distract from these compelling facts, Defendants' Motion to Dismiss opens by mischaracterizing these claims as an "appraisal action masquerading as a securities fraud class action." (MtD 1).  However, an appraisal is not the remedy for fraud, let alone the exclusive remedy for fraud, and the authority described herein shows that the securities laws cover this exact scenario.
[3] Specifically, Kanrich, On Chance, Jun Heng, Smart Create, and Smart Master ¶¶43-47.

projections. ¶¶100-05. These projections—the "Parallel Transaction Projections" or "PTPs"—were based on EJ Core's results in the first half of 2016, and were approved by Defendant Zhou and the auditing firm PriceWaterhouseCoopers. ¶104.

The secret PTPs show that EJ Core's profit grew by 37% in the first half of 2016. ¶106. This vastly exceeded the 2016 Management Projections' estimate that its profit would grow just 1.9% for all of 2016. ¶106. In total, the PTPs projected a consolidated annual profit growth rate through 2019 of 19%, compared to the meager 4.65% in the Final Proxy (*i.e.*, **4x+ faster** annual growth), as well as higher sales and EBIT (earnings before interest and taxes). ¶107.

Defendants' documents also show that E-House and the Buyer Group made a written presentation to potential investors in July 2016—before shareholders voted on the Merger on August 5—that contained a section titled "Valuation and Exit" that described their plan to conduct a relisting in Asia. ¶¶95, 109. Another slide, titled "Valuation," valued portions of EJ Core at $1.2 billion based on the secret PTPs. ¶110. This was approximately $870 million more than the $332 million valuation for the entirety of EJ Core, at the high end, in the Merger. ¶111.

In addition, an investment agreement shows that E-House and the Buyer Group made sales in August 2016 (contemporaneous with the Merger, ¶97) and September 2016 to private investors using the $1.2 billion valuation for EJ Core. ¶113. The Buyer Group even provided a *financial guarantee* that EJ Core's profit in 2016-2017 would come within 95% of the PTPs. ¶113. Then, immediately after the Merger, E-House continued preparing for its relisting by bringing in more investors in December 2016 and January 2017, and restructuring the Company. ¶¶115-16. E-House completed its IPO in Hong Kong on July 20, 2018. ¶¶114, 120. Zhou admitted in the IPO documents that the Buyer Group took E-House private because it was "*undervalued* in the U.S." and the Merger would allow E-House's management to profit by restructuring the Company and "pursu[ing] their respective capital market strategies." ¶117.

Defendants had numerous duties to disclose the PTPs, the true reasons for the Merger, and their post-Merger plans for E-House.   ¶¶145-60.  SEC regulations required such disclosure (¶¶147-55), as did the duty under Cayman Island law to provide sufficient information before a shareholder vote (¶146), and insider trading law, since the Buyer Group bought shares while in possession of the undisclosed information (¶¶156-60).  In addition to violating affirmative duties to disclose, Defendants made several false and misleading statements in the Final Proxy to convince shareholders to accept the Merger as described herein.  Through this fraud, Defendants reaped enormous profits.  Based on the PTPs, E-House was worth $1.94 billion in June 2016, compared to the $1.06 billion Merger price.  ¶¶59, 112.  The relisting IPO valued just part of the business at $2.651 billion.  ¶120.  Moreover, the Buyer Group already started to cash out when they sold stock to new investors from the time of the Merger through the IPO.  ¶¶113, 119.

## III.   ARGUMENT

### A.   Legal Standards

The elements of a Section 10(b) claim are (1) a material misrepresentation, omission, or fraudulent conduct, (2) in connection with a purchase or sale of a security; (3) scienter; (4) transaction causation (*e.g.*, reliance); and (5) loss causation.  *Carps. Pens. Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Under Rule 12(b)(6), the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014).  Even under the PSLRA, "pleading of detailed eviden[ce]" is not required.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

### B.   The Complaint Adequately Alleges False and Misleading Statements and Disclosure Duties

#### 1.   Defendants' Projection Statements

Defendants misrepresented the 2016 Management Projections for E-House in the Final

Proxy because those projections were already outdated by the far-better PTPs that were based on E-House's performance in the first half of 2016.  ¶¶104, 140-42.  Defendants also falsely stated that the 2016 Management Projections "reflect[] the ***best currently available*** estimates and judgments" of E-House's management.  ¶¶143-44.

The law is clear that projections are actionable in the merger context when the buyers privately used a better set of projections to value the company higher than what was disclosed in the proxy materials.  *See Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 88 (D. Conn. 2019) (defendant provided better projections to the buyer and used the worse set "for the fairness opinion"); *Azar v. Blount Int'l, Inc.*, 2017 WL 1055966, at *8 (D. Or. Mar. 20, 2017) (sustaining claims that "more pessimistic financial projections [were presented] to shareholders to justify a merger"); *In re Hot Topic, Inc. Sec. Litig.*, 2014 WL 7499375, at *2, 6 (C.D. Cal. May 2, 2014) (same).[4]  It is also actionable for defendants to misrepresent that projections "reflected management's most up-to-date and accurate forecasts," as Defendants did here.  *NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*, 2017 WL 4453561, at *11 (D. Or. Oct. 3, 2017), *adopted*, 2018 WL 533912 (D. Or. Jan. 24, 2018); *see also Lickteig v. Cerberus Cap. Mgmt.*, 2020 WL 1989424, at *3-4, 10-11 (S.D.N.Y. Apr. 26, 2020) (holding valuation multiple was actionable where a slide deck showed the figure was "grossly understated"); *In re Shanda Games Ltd. Sec. Litig.,* 2019 WL 11027710, at *5-6 (S.D.N.Y. Sept. 30, 2019) (omission of full projections actionable).  Moreover, the Buyer Group clearly understood the PTPs to be ***more accurate*** than the stale 2016 Management Projections, because they used them to close deals at a higher valuation with private investors and gave a ***financial guarantee*** of the PTPs.  ¶¶110-13.

Defendants essentially offer two defenses in a futile effort to try to justify their decision

---

[4] Plaintiffs' allegations are even stronger than in *Baum*, *Hot Topic*, and *Blount* since the proxies there included or referred to the better projections, whereas Defendants here ***totally hid*** the PTPs.

to not provide the PTPs to shareholders; none of them have merit.

**First**, Defendants contend that Plaintiffs "fail to allege that the PTPs existed at the time of the Proxy." (MtD 10 n.2). But this is contrary to the documentary evidence pled from the appraisal action which shows that the PTPs were prepared in June 2016 - before the Final Proxy was issued in July. ¶104. Defendants mischaracterize this evidence as "lawyer argument from another action," by citing cases that dealt only with "uncorroborated allegations" from a complaint and anonymous sources in a short-seller report. (MtD 10 n.2).[5] Here, the allegations are based on Defendants' own documents that were ***presented in great detail at trial*** by distinguished attorneys in the appraisal action. ¶¶99-113.

**Second**, Defendants argue that they disclosed that the 2016 Management Projections were current only as of January 2016, not July. (MtD 8-9). As to the narrow issue of the falsity of the published projections themselves, this defense could only justify the failure to generate new projections, not the failure to disclose new projections that already existed in July; the existence of the newer projections renders the isolated disclosure of the old ones misleading. More importantly, Defendants' argument — that they had disclaimed their duty to update — is undermined by the statement in the Final Proxy that the 2016 Management Projections were the "best ***currently*** available." ¶143. Investors would understand that to mean that even if Defendants had no duty to update, they were *choosing* to affirm that the January projections were still the best currently available. This was clearly false and misleading, as it would cause any reasonable investor to believe there were not more recent, higher projections. *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (whether "a reasonable

---

[5] Further, *Altimeo Asset Management v. WuXi PharmaTech (Cayman)*, 2020 WL 6063539 (S.D.N.Y. Oct. 14, 2020), addressed only the omission of subsidiary-specific projections, not a secret set of updated projections comparable to those that were actually published in the operative merger proxy. *Id.* at *4, 6.

investor would have received a false impression . . . is generally a question" of fact).[6]

The situation here is similar to *In re Mindbody, Inc. Sec. Litig.*, 2020 WL 5751173 (S.D.N.Y. Sept. 25, 2020), where, before a final proxy, the company had outperformed what it had previously projected for its most recent quarter.  Judge Caproni held it was misleading to omit the company's updated "earnings [that] were known to have beaten projections." *Id.* at \*20 n.19.  By touting the stale projections — and calling them the best available — Defendants mislead investors into believing those projections were not outdated by higher projections.  ¶89.[7]

## 2.   Defendants' Subsequent Transaction Statements

Defendants' Subsequent Transaction Statements denied the Buyer Group's plan at the time of the Merger to sell stakes in the Company to private investors and to conduct a subsequent IPO in Asia.  ¶¶131, 133, 135.  Defendants' stated that they did not have "***any*** present plans or ***proposals***" at the time of the Merger to engage in these types of transactions (¶¶129-30).  Defendants' plans for the Company were highly material to investors' assessment of the Merger, including because knowing a purchaser plans to flip their purchase suggests the deal price itself is suboptimal for the seller.  *See* ¶¶78-81 (describing materiality of these false statements).

The law is clear that it is false for defendants to deny the existence of plans for corporate transactions when such plans already existed.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 (1988); *Buxbaum v. Deutsche Bank, A.G.*, 2000 WL 33912712, at \*3 (S.D.N.Y. Mar. 6, 2000);

---

[6] Defendants are also wrong (and improperly introduce supposed facts) in arguing that just disclosing the 2016 Management Projections was not misleading because the PTPs were "based on different data and different assumptions." (MtD 10-11).  The PTPs were updated versions of the same projections.  ¶104.

[7] The cases that Defendants cite (MtD 9) do not allow them to disavow the 2016 Management Projections based on generic disclaimers, because they "do not involve defendants repeating disproven predictions." *Mindbody*, 2020 WL 5751173, at \*12 n.11 (distinguishing  *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at \*7 (S.D.N.Y. Nov. 25, 2003)). Similarly, in *Laborers Loc. No. 231 Pens. Fund v. Cowan*, 2020 WL 7056070 (3d Cir. Dec. 2, 2020), the proxy *disclosed* the "downward revisions" to projections. *Id.* at \*2-4. And in *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016), there was no allegation that the other projections were used "during [the failed] negotiations." *Id.* at 488, 500-01.

*Martinek v. AmTrust Fin. Servs.*, 2020 WL 4735189, at \*12-14 (S.D.N.Y. Aug. 14, 2020). Defendants focus on the Buyer Group's relisting plan (MtD 12-15), but ignore the Buyer Group's sales of stakes in EJ Core, which the July 2016 Presentation shows that the Buyer Group pitched **before** shareholders voted on the Merger, and closed contemporaneously with and immediately after the Merger. ¶¶96-97, 108-13, 116. Defendants' denied "any present plans or proposals" for "extraordinary corporate transaction[s]"; the "sale or transfer of a material amount of assets"; or "any other material changes" to E-House's business. ¶130. This was false.

Defendants' Subsequent Transaction Statements were also false and misleading for the **independent reason** that the Buyer Group planned, when they made these statements, to restructure E-House and relist its main business on a stock exchange in Asia. (*See supra* at 5). The Supreme Court held in *Basic* that when defendants state that they do not have plans to conduct a substantial corporate transaction, the level of significance of even *preliminary* plans— including "the probability that the event will occur"—raises factual issues that cannot be decided at this stage. 485 U.S. at 239; *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162-63 (2d Cir. 2000) (explaining that "materiality of merger negotiations depends on the specific facts"); *Joseph v. Mobileye, N.V.*, 225 F. Supp. 3d 210, 214, 219-20 (S.D.N.Y. 2016) (holding whether defendants had "then-existing plans for an IPO" was a fact issue, where the company brought in investors to help "move toward an IPO" that was "expected . . . in perhaps a year and a half"); *In re Merrill Lynch Auction Rate Sec. Litig.*, 2011 WL 1330847, at \*2, 8 (S.D.N.Y. Mar. 29, 2011) (statements touting ARS market were actionable in light of defendants' "*contemplat[ing]* ending their [market] intervention"); *Buxbaum*, 2000 WL 33912712, at \*18. Similarly, defendants may not omit plans under "active and serious consideration" when doing so renders other statements misleading. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993); *State of N.J. & Its Div. of Inv. v. Sprint Corp.*, 2004 WL 1960130, at \*7 (D. Kan. Sept. 3, 2004) (addressing

"what defendants were considering" concerning executives' employment).

Defendants argue that because they disclosed that "after the Merger," the Buyer Group "may propose or develop plans and proposals . . . , including the possibility of relisting the Company or a substantial part of" it, Plaintiffs are required to plead that the Buyer Group had a "concrete plan to relist." (MtD 13-14). This argument fails for multiple reasons.

**First**, even under Defendants' overly demanding standard, the Buyer Group's relisting plan was actual and concrete, as it was discussed in a presentation Defendants used to pitch new investors while the Merger was pending. ¶109.[8]

**Second**, Defendants' assertion that their risk language converts their denial of present plans into a disclaimer of only "concrete" plans, ignores what the Final Proxy actually said. Defendants disclaimed "any present plans or proposals." ¶130. As the Complaint stated, the terms "plans" or "proposals" simply refer to what they "intend[ed] to do" or "put[] . . . forward . . . for consideration." ¶85. Warning of the possibility that later – *after* the Merger – Defendants might develop a plan, cannot change the meaning of the words "plan" or "proposal." But, that is what Defendants request, by claiming their risk language changes the assertion in the Final Proxy into one about only "concrete" plans one. Defendants' argument is even weaker because, at most, it comes down to a definitional dispute and such a dispute is a fact issue, not a basis to dismiss. *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 178 (2d Cir. 2001) (holding there was "a jury question as to" the interpretation of defendant's statement concerning potential IPO); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't*, 477 F. Supp. 3d 123,

---

[8] Defendants' arguments are based entirely on *Qihoo*, *JA Solar*, and *WuXi*. (MtD 12-15). But *Qihoo* and *JA Solar* are being appealed and the courts in *WuXi* and *JA Solar* adopted *Qihoo*'s "concrete and definite" standard. Even Defendants do not adopt that overly demanding standard, arguing instead that Plaintiffs must allege an "actual, concrete plan." (MtD 14). Moreover, while Plaintiffs respectfully submit that *Qihoo* and *JA Solar* erred in dismissing relisting claims, they did not address the facts at issue here. And the evidence in *WuXi* did "not mention relisting" at all. 2020 WL 6063539, at *6.

130 (S.D.N.Y. 2020) (holding definition of the term "renewal" is a factual issue); *Credit Suisse First Bos. Corp. v. ARM Fin. Grp., Inc.*, 2001 WL 300733, at *9 (S.D.N.Y. Mar. 28, 2001) (whether risk disclosures "were substantial enough" are for "discovery [to] reveal").

**Third**, Defendants' risk language cannot – as a matter of well-established law – protect their statements about "present plans" because the "safe-harbor provision does not protect . . . present representations." *In re Vivendi*, *S.A. Sec. Litig.,* 838 F.3d 223, 246 (2d Cir. 2016); *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) (same as to bespeaks-caution doctrine). This clear-cut rule plainly forecloses Defendants' argument. In addition, Defendants' risk language not only fails to protect their statement about "present plans" – it is itself an independently actionable misstatement.  Defendants mischaracterize their warning as disclosing "the possibility of relisting." (MtD 13).  But they actually warned that, only after the Merger, the Buyer Group might first develop plans for a potential relisting.  This was misleading because they had ***already*** developed such plans.  *See In re Facebook, Inc. IPO Sec. & Deriv Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (warnings are misleading if the "risk has already materialized"); *Plumbers & Pipefitters Nat'l Pens. Fund v. Davis*, 2020 WL 1877821, at *12 (S.D.N.Y. Apr. 14, 2020) (statements about *potential* future problems were misleading).[9]

The Complaint also alleges that the supposed reasons for the Merger stated in the Final Proxy were misleading: Defendants said they wanted to run E-House as a private company to focus on "long-term profitability" not "short-term" performance.  ¶¶132, 134.  But the relisting

---

[9] Moreover, even if Defendants did warn of the possibility of a future relisting (as opposed to potential plans that might be first developed in the future), that warning would also be false—and would not protect Defendants' statements about present plans.  *See JinkoSolar*, 761 F.3d at 251 (holding risk disclosure does not suffice when omitted information would "cause a reasonable investor to make an overly optimistic assessment of the risk"); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1172 (9th Cir. 2009) (holding risk disclosure about "significant costs [that may] result[] from product liability claims" was false), *aff'd*, 563 U.S. 27, 34 (2011); *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *11-13 (S.D.N.Y. Sept. 27, 2020) (disclosures did not disclose "presently-existing [regulatory] risk").

IPO admitted that Defendants bought E-House to conduct "capital market strategies" (*i.e.*, sell stakes in the Company or relist),[10] and because E-House "was undervalued" in the U.S.  ¶117. Defendants' only response is that selling equity is a right of private ownership.  (MtD 12).  But this response (a) is not colorable given their separate express denials of any such plans; and (b) cannot explain away their misleading omission of the fact that E-House was "undervalued."

### 3.    Defendants' Fairness Statements

Defendants misrepresented the fairness of the Merger price because E-House was worth substantially more at the time of the transaction than what Defendants represented as "fair" in the Final Proxy.  ¶¶124-28.  This valuation difference is confirmed by the PTPs, which were based on EJ Core's updated financial performance and formed the basis for EJ Core being valued at $870 million more than it was in the Final Proxy.  ¶¶104-13.  The Buyer Group's plan to profit from subsequent transactions also highlights the unfairness of the Merger price.  ¶¶109, 114-21.

Defendants incorrectly argue that Plaintiffs have not adequately alleged that Defendants "did not believe the Merger was fair." (MtD 15).  The fairness statements are actionable because (1) Defendants could not have believed that the Merger was fair given (a) E-House's higher valuation based on the PTPs and its recent financial performance, and (b) the planned-for Subsequent Transactions; and (2) these statements "conflict[ed] with what a reasonable investor would take from the[m]." *Omnicare, Inc. v. Laborers Distr. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-85, 188-92 (2015).  Courts regularly hold that fairness statements are actionable when defendants possessed contradictory information.  For example, in *ODS Capital LLC v. JA Solar Holdings Co.*, where the projections were contradicted by the company's actual performance, plaintiffs "plausibly alleged that Defendants could not have possibly believed that

---

[10] Notably, this disclosure in the relisting IPO documents further shows that the Subsequent Transactions were planned prior to the publication of the Final Proxy, since they were the real reason for the deal.

the projections" were accurate.  2020 WL 7028639, at *11 (S.D.N.Y. Nov. 30, 2020).

Defendants' statements misleadingly "implied [that they] had no non-public information that

would materially affect [the] share price." *Mindbody*, 2020 WL 5751173, at *11-13*; see also*

*supra* at 7 (discussing projections in merger cases).  Furthermore, while Defendants' subjective

belief "is irrelevant" when their statements "conflict with what a reasonable investor would take

from" them, *In re Avon Sec. Litig.*, 2019 WL 6115349, at *17 (S.D.N.Y. Nov. 18, 2019) (quoting

*Omnicare*), the Complaint establishes a strong inference that Defendants did not actually believe

their statements for the reasons described below. (S*ee infra* at 17-19).

### 4.    Defendants Had Independent Duties to Disclose

"[A] duty to disclose under Section 10(b) can derive from statutes or regulations that

obligate a party to speak." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015);

*Mindbody*, 2020 WL 5751173, at *13 n.13.  In addition to making affirmatively false statements,

Defendants had independent duties under Section 13(e), Cayman law, and insider trading law to

disclose the PTPs, E-House's valuation, and the Buyer Group's plans.  (Complaint Section VII).

Section 13(e) and Rule 13e-3 require disclosure of, among other things, any "plans,

proposals or negotiations" to restructure the company or for the acquisition or disposition of

company securities, including transactions "after the Rule 13e-3 Transaction"; a detailed

discussion of the buyer's reasons for, and benefits from, the transaction; and prompt disclosure

of "any material changes" to the information that was previously disclosed.  ¶¶149, 151, 153.[11]

Defendants also had the Cayman law duty to disclose "sufficient information" about the Merger,

*Davis v. Scottish Re Group. Ltd.*, 159 A.D.3d 528, 529-30 (N.Y. App. Div. 2018), and the duty

under insider trading law to disclose material non-public information (¶¶156-60).  Defendants

---

[11] Defendants' supposed disclaimer of any duty to update the projections fails for the additional reason
these regulations **expressly** required such an update – and one cannot just disclaim compliance with SEC
regulations.  *Cf.* 15 U.S.C. § 78cc(a) (baring any stipulation or provision waiving compliance).

violated these duties by failing to disclose the Buyer Group's negotiations with investors for subsequent transactions, its plan to reorganize E-House to prepare for relisting, and the material changes to E-House's projections and valuation based on its performance in the first half of 2016.  ¶¶146, 150-55, 156-58.  Defendants do not cite any contrary authority.  (MtD 11 n.3).[12]

### 5.    The Complaint Adequately Alleges Scheme Liability

Defendants wrongly argue that Plaintiffs' claims for scheme liability are the same as their claims based on misstatements and omissions.  (MtD 17 n.5).  Scheme liability is "expansive" and "capture[s] a wide range of conduct."  *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 470 (S.D.N.Y. 2017) (scheme liability is based on defendant's "inherently deceptive act[s]").  Count II of the Complaint adequately alleges scheme liability under Rule 10b-5(a) and (c) because the Buyer Group plotted to underpay for E-House so that the Buyer Group could resell and relist the Company at a much higher price.[13]

### C.    The Complaint Pleads a Strong Inference of Scienter

Scienter may be pled by alleging (a) defendants' "motive and opportunity" to defraud *or* (b) "strong circumstantial evidence of conscious misbehavior or recklessness."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  The test is whether the allegations "taken collectively" support a strong inference of scienter that is "cogent and at least as compelling as any opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007).

The Complaint does not rely on impermissible group pleading.  (MtD 17-18).  The

---

[12] Defendants' Cayman law duty is roughly analogous to the familiar duty under Delaware law to disclose all material information before a merger.  *See e.g., Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998); *Mindbody*, 2020 WL 5751173, at *13, n.13 (holding violation of such duties supports a violation of Section 10(b)).  Contrary to *Shanda*'s interpretation (MtD 11 n.3), *Davis* refers to a disclosure duty based on the publication of transaction documents, not a false statement in those documents.
[13] Defendants cite *In re AT&T/DirecTV Now Sec. Litig.*, 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) (MtD 17 n.5), but it merely dealt with conduct that was not inherently deceptive.  In contrast, *S.E.C. v. China Ne.e. Petro.. Holdings Ltd.*, 27 F. Supp. 3d 379, 392 (S.D.N.Y. 2014), found an actionable scheme where defendants, like here, raised money in order to enrich themselves through undisclosed transactions.

Section 10(b) claims are brought against E-House and the Buyer Group, which consisted of just Zhou, Shen, Sina, Chao, and their affiliated entities.  ¶¶33-35, 42-48, 98.  These Defendants acted with scienter for the reasons explained below.  The Complaint also explains why each misstatement is attributable to each Defendant.  ¶122.  "[I]t is not impermissible group pleading to refer to defendants' collective actions" or to identify them as a group.  *Iowa Pub. Empls.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018).[14]

### 1.    The Complaint Adequately Alleges Motive and Opportunity

"Motive and opportunity" is a sufficient basis to plead a defendant's scienter regardless of the defendant's knowledge.  *See Ganino*, 228 F.3d at 170.  Each member of the Buyer Group had the motive and opportunity to defraud shareholders.  ¶¶163-64.  EJ Core alone was worth about $870 million more than what the Final Proxy disclosed and E-House was worth over $1.5 billion more upon relisting.  ¶¶111-12, 120.  The Buyer Group also started to cash out by selling stakes in the Company from the time of the Merger through its relisting.  ¶¶113, 116, 121.

Courts regularly hold that defendants who buy companies based on false information that allows them to substantially underpay have a motive to commit fraud.  *Buxbaum*, 2000 WL 33912712, at *14, 19 (holding a buyer who "thinks he can save money by lying[,] has all the motive and the opportunity" to defraud); *In re MCI Worldcom Sec. Litig.*, 93 F. Supp. 2d 276, 283-85 (E.D.N.Y. 2000).  Judge Carter held in highly similar scenarios in *Shanda* and *JA Solar* that scienter was adequately pled against senior managers, directors, and buyer group members based on motive and opportunity.  2019 WL 11027710, at *7; 2020 WL 7028639, at *12.[15]

Defendants claim the Buyer Group did not have the "opportunity to defraud." (MtD 19).

---

[14] Defendants' cases dealt with more generalized allegations that the courts also rejected on other grounds, separate from any issue of group pleading.  (*See generally* MtD 18).

[15] None of the cases that Defendants cite dealt with a management buyout.  *See Ganino*, 228 F.3d at 170 (remanding for consideration of whether allegations of motive sufficed) and *IPERS v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 333 (S.D.N.Y. 2013) (complaint did not even try to allege any motive).

But Defendants "cannot seriously dispute that such senior executives have the opportunity to commit fraud." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 647-48 (S.D.N.Y. 2007) (also holding Audit Committee had motive and opportunity). In addition, Defendants Zhou, Shen, Chao (who were all E-House Co-Chairmen or Directors), and Sina all signed the Final Proxy, with Zhou signing as a Director and Chairman of E-House in addition to as a member of the Buyer Group. ¶¶33-35, 48, 98,161, 93, 122; (Defs.' Ex. A, ECF No. 64-1 at 19-20, 29, and 34). The Buyer Group also directly had the opportunity to influence the statements about their plans and their own claim that the Merger was fair. Further, Zhou was responsible for the projections in the Final Proxy because he was E-House's CEO and approved the PTPs. ¶¶33, 104.

### 2.    Defendants' Conscious Misbehavior & Recklessness

Defendants do not dispute that each member of the Buyer Group was aware of the PTPs, the July 2016 Presentation that contained them, or the Buyer Group's own plans for subsequent transactions. Indeed, Zhou specifically approved of the PTPs. ¶104. Moreover, the projections were based on EJ Core's actual performance in the first half of 2016 so that the Buyer Group could profit from the higher valuation that the PTPs supported. ¶¶109-10, 113, 116-17, 165-68.

Instead, Defendants argue only that the Complaint does not allege "contemporaneous information contradicting the Proxy's disclosures." (MtD 19). That is wrong because evidence from the appraisal action shows that the PTPs were made in June 2016, before the Final Proxy was issued on July 1. ¶¶93, 104.[16] Furthermore, the plan to conduct subsequent transactions was documented in the July 2016 Presentation and the Buyer Group completed sales in August, when the Merger closed. ¶¶108-10, 113; *see also* ¶¶114-20.[17] Zhao also admitted in E-House's

---

[16] Defendants also do not deny that the PTPs existed prior to the shareholder vote or Merger closing. They had an affirmative duty to disclose this information prior to these events. (*See supra* at 14-15).

[17] In contrast, in *In re Jumei Int'l Hold. Ltd.*, (cited at MtD 20), defendants had not even "started the shift in" business until after the alleged misstatements. 2017 WL 95176, *2 n. 2, 5 (S.D.N.Y. Jan. 10, 2017).

subsequent IPO that the Buyer Group took E-House private in the Merger to conduct "capital market strategies" because E-House "was undervalued" in the U.S.  ¶117.  *See In re Refco*, 503 F. Supp. 2d at 658-59 (holding "suspicious" circumstances support scienter).

### 3.   Plaintiffs Adequately Allege E-House's Scienter

Zhou, Shen, and Chao's scienter are all imputed to E-House because they were its Co-Chairmen and Director when E-House's Board approved the Merger.  ¶¶33-35, 56-67, 127. Zhou also signed the Final Proxy as E-House's Chairman.  (Defs.' Ex. A, ECF No. 64-1 at 29, 34).  Moreover, it does not matter whether the Buyer Group members "made" misstatements on behalf of E-House, because "the person whose state of mind is imputed to the [company] need not also be the person who made the material misstatements." *Patel v. L-3 Commc'ns*, 2016 WL 1629325, at *15 n.38 (S.D.N.Y. Apr. 21, 2016); *see Shanda*, 2019 WL 11027710, at *7; *JA Solar*, 2020 WL 7028639, at *13.

Defendants respond by trying to invoke what is often called the adverse-interest exception.  (MtD 21 n.7).  This rule is a "most narrow" exception, applied to "outright theft or looting or embezzlement." *Allied Irish Banks, P.L.C. v. Citibank, N.A.*, 2015 WL 4104703, at *8 (S.D.N.Y. June 30, 2015).  It applies only if the insider "totally abandoned" the company so that the corporation did not "benefit[] to *any* extent" from the fraud.  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 382-83 (S.D.N.Y. 2015) (emphasis in original).[18] While the Buyer Group's fraud harmed E-House's minority shareholders, it benefited E-House by burdening it with less debt, and clearly served the Buyer Group, which owned 44.9% of E-House pre-Merger.  ¶¶60, 63, 98; *Shanda*, 2019 WL 11027710, at *8 (rejecting adverse interest exception on similar facts).

---

[18] Defendants try to bypass the adverse-interest exception by arguing that they were not acting as E-House's agents (MtD 20-21).  But they were E-House's senior management and Directors.  The default presumption is that "the knowledge of an agent such as a corporate executive is generally imputed to the" corporation.  *Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 277 (S.D.N.Y. 2013).

E-House's scienter is also alleged based on the scienter of the Committee, which had access to all of the Company's information, including its performance in the first half of 2016 that supported the PTPs.  ¶¶56-59, 75, 89.  In addition, E-House's financial performance and the Buyer Group's plans to sell the Company deal with such central parts of E-House that a management level employee would have known that information.  *See Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *9 (S.D.N.Y. Sept. 24, 2018).

Lastly, the inference of scienter need only be "at least as compelling" as any nonculpable inference on a "holistic" basis.  *Tellabs*, 551 U.S. at 324-26.  A common-sense review shows that the inference of scienter is at least as strong as Defendants' improbable competing assertion that the PTPs and Buyer Group's plans did not exist when the Final Proxy was issued.  *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (scienter alleged as to defendant's plan as a whole)*; In re GE Co. Sec. Litig.*, 857 F. Supp. 2d 367, 394-98 (S.D.N.Y. 2012).

### D.    The Complaint Adequately Alleges Loss Causation

The burden of pleading loss causation "is not a heavy one."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).  Pleading "some indication of the loss," *Speakes*, 2018 WL 4572987 at *10, will satisfy the applicable Rule 8 standard.  *In re Fairway Grp. Hold. Corp. Sec. Litig.*, 2015 WL 249508 at *16 (S.D.N.Y. Jan. 20, 2015).

The Complaint alleges that Plaintiffs "suffered economic loss (*i.e.*, damages) when they sold their ADS for less than fair value."  ¶¶169-71.  It is clearly established law that a securities plaintiff defrauded into selling is entitled to "the difference between the fair value of all that . . . seller received and the fair value of what he would have received had there been no fraudulent conduct." *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 155 (1972); Jacobs, DISCLOSURE AND REMEDIES UNDER THE SECURITIES LAWS, §§ 20:53, 20:7 (Mar. 2020) (a defrauded seller's "out-of-pocket" loss is equal to "***the fair value of the security he sold minus the fair value of***

*the consideration he received*"); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 388 (1970) (endorsing damages based on "fairness of the terms of the merger [when] it was approved").

Precise valuation will require experts, but the Complaint easily meets the applicable pleading standard by alleging that E-House's stand-alone value exceeded the $6.86 per share Merger price (or any price during the Class Period), given the undisclosed PTPs that the Buyer Group was so confident in that they **guaranteed** in transactions contemporaneous with the Merger, and Defendants' pre-Merger presentation that implied a valuation of at least $12.30 a share.  ¶¶113, 171.  Courts clearly hold that these types of allegations support loss causation in the merger context.  *See, e.g.*, *Hot Topic,* 2014 WL 7499375, at *8 (loss causation well pled where higher projections showed "intrinsic value" was greater than merger price); *Azar,* 2017 WL 1055966, at *11 (similar); *Brown v. Papa Murphy's Holdings Inc.*, 2021 WL 235865, at *8 (W.D. Wash. Jan. 12, 2021) (similar); *In re Envision Healthcare Corp.*, 2019 WL 3494407, at *8 (D. Del. Aug. 1, 2019); *Brown v. Brewer*, 2010 WL 2472182, *25 (D. Del 2010) (endorsing damages based on fair value and permitting appraisal expert report).

Defendants try to recast this well-accepted out-of-pocket measure of loss causation as a request for "lost profit" damages.  (MtD 21).  This argument appears to be based purely on loose word association: the *present value* of equity shares depends on the expected future cash flows ("profit") of the *issuer*.  But this does not convert a claim of being defrauded out of **present fair value** into one seeking plaintiff's lost **future** profits.  Under Defendants' view, every seller case would seek impermissible lost profits, giving acquirors complete impunity to defraud.

Defendants also invent the notion that Plaintiffs are required to allege a better alternative merger.  (MtD 21).  This is based on a misleading quotation of *Gray v. Wesco Aircraft Holdings*, which Defendants cite to argue that the "failure" to allege an alternative merger is "fatal."  (MtD 22 (quoting 454 F. Supp. 3d 366, 407 (S.D.N.Y. 2020))).  The prior sentence of that very

opinion, however, endorses ***Plaintiffs'*** theory of damages by holding explicitly that the lack of "a specific merger or other transaction . . . should not in itself be fatal to [plaintiff's] claim of loss causation; it is not logically or legally impossible that the decision to be acquired could cause a loss compared to the decision to remain independent." *Gray,* 454 F. Supp. 3d at 407. Plaintiffs easily satisfy the standard from *Gray* – and the cases cited above – by alleging that shareholders were better off keeping their shares, since their fair value exceeded the Merger price.

Defendants' remaining arguments conflate the elements of loss causation and transaction causation, which is discussed *infra* at Section III.E.  They cite *In re Bristol Myers Squibb Co. Sec. Litig.,* for the contention that Plaintiffs must "link" the misstatement to the harm.  MtD 22 (citing 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008)).  That link is provided by pleading transaction causation (*i.e.*, reliance), which links the fraud to Plaintiffs' sales at unfairly low prices.[19]

Similarly, Defendants argue that loss causation is somehow disproven because E-House's share price increased slightly on various dates after the Merger was announced.  (MtD 21).  But the core of Plaintiffs' loss causation claim is that E-House's fair value was ***substantially higher*** than the announced Merger price that Defendants say the price reacted to. This allegation is not based on "pure speculation" (MtD at 22), but rather, on Defendants' own internal valuation from before the Merger. That is precisely the type of evidence that the cases cited above hold to adequately allege loss causation in the merger context.

Defendants thus appear to be trying to convert an argument about "price impact" (a

---

[19] *Bristol* was a defrauded *purchaser* case that has nothing to do with a merger, and analyzed whether a specific stock drop was a corrective disclosure, a theory of loss that does not map onto Plaintiffs' allegations.  586 F. Supp. 2d at 163.  *Bristol*'s focus on corrective disclosures is based on the premise established by *Dura Pharm., Inc. v. Broudo*, that a defrauded purchaser suffers no loss if the price of the stock they bought remains inflated at the time of their sale, since (until a corrective revelation) they could sell at that price and avoid any losses.  544 U.S. 336, 343 (2005).  No similar potential issue arises in cases that are premised on investors selling at unfairly low prices (rather than purchasing at inflated prices).  That is precisely why courts do not apply the corrective-disclosure approach in ordinary defrauded seller cases.  *E,g.*, *Levie v. Sears, Roebuck & Co.*, 496 F. Supp. 2d 944, 948 (N.D. Ill. 2007).

component of the fraud-on-the-market doctrine of reliance, *see infra* at 23), into an argument about loss causation.  Not only have Defendants not done any analysis to interpret these price moves (such as comparing the price moves to peer and index moves), but they have done ***nothing*** to explain why the moves undermine Plaintiffs' loss causation allegations.  Even *assuming arguendo* that the price moves were significant and firm specific, ***the entire thrust of the Complaint*** is that investors were defrauded into thinking the Merger was favorable (justifying price increases as the deal looked more likely to close) because they were deprived of material information in judging the fairness of the deal, which was actually terrible for them.[20]

### E.    The Complaint Adequately Alleges Reliance

The Complaint brings claims on behalf of shareholders that (1) sold ADS during the Class Period but before the Merger closed and (2) tendered shares in the Merger.  Defendants do not dispute reliance as to the first group, and therefore concede it is adequately pled.  (MtD 22); ¶¶26-27, 180.  Defendants attempt to escape liability as to the Tendering Shareholders based on *Shanda* and *JA Solar*.  (MtD 22).  Their argument fails for the following four reasons:

***First***, the Buyer Group only held 44.9% of shares, meaning they needed to solicit shareholder votes (¶63); reliance is satisfied where the shareholders' "vote" was "required" to close a merger, and was obtained through misleading or deficient proxies.[21] *Grace v. Rosenstock*, 228 F.3d 40, 47-49 (2d Cir. 2000) (holding *Mills* applies to Section 10(b)); *Mills* 396 U.S. at 385 (proof of reliance is not required where a "proxy solicitation itself, rather than the defect in the solicitation materials," served as "an essential link in the . . . transaction."); *Basic,* 485 U.S. at 243 (endorsing *Mills*). These cases are directly controlling and fully resolve this issue.

---

[20] Defendants cite *JA Solar*, 2020 WL 7028639, at *15, (MtD 21-22), but that decision is under appeal and does not explain why price increases would disprove loss causation.

[21] This was not the case in *Shanda*. And *JA Solar* addressed only market efficiency, not this ***separate*** basis for reliance in the merger context. *See Basic*, 485 U.S. at 243.

**Second**, Defendants apply the *Basic* presumption too narrowly by arguing that a "going private" transaction is not an efficient market.  (MtD 22-23). The fraud on the market presumption applies when plaintiffs buy or sell securities that trade in an efficient market, regardless of where plaintiffs traded.  *E.g., Black v. Finantra Cap.*, *Inc.,*  418 F.3d 203, 205-06, 209-10 (2d Cir. 2005) (applying *Basic* to privately negotiated sale); *In re Forcefield Energy Inc. Sec. Litig.*, 2015 WL 4476345, at \*4 (S.D.N.Y. July 22, 2015) (similar); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (applying *Basic* to options trades based on efficiency of market in underlying shares).  Defendants' do not try to argue that the market for E-House ADS was not adequately alleged to be efficient during the Class Period (¶¶174-77), or that Plaintiffs are not entitled to the presumption that they (like *all* investors) relied on those market prices that incorporated the fraud into E-House's share price.

**Third**, market efficiency is only an "indirect proxy for price impact," which is the basis for the *Basic* presumption.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281 (2014) ("*Halliburton II*").  Plaintiffs can show directly that Defendants' misrepresentations impacted the price at which Plaintiffs sold their shares.  Defendants admit that they promoted the Merger price as a premium to E-House's prior trading price, which reacted to this news.  (MtD 1, 3, 5, 17, 21).  If Defendants had disclosed the PTPs or the Buyer Group's plans, they would have been forced to raise the Merger price to deter shareholders dissenting from the transaction. Plaintiffs also relied on the integrity of E-House's ADS price, as it was impacted by the Merger price, when they chose how to act in connection with the Merger.  ¶71.  At most, Defendants raise factual issues that require expert evidence and a hearing at the class certification stage.  *See Halliburton II*, 573 U.S. at 272 ("market efficiency is a matter of degree," and thus "a matter of proof" of the extent of price impact); *In re Goldman Sachs Grp.*, *Inc. Sec. Litig.*, 2018 WL

3854757, at *1 (S.D.N.Y. Aug. 14, 2018), *aff'd*, 955 F.3d 254 (2d Cir. 2020).[22]

      ***Fourth****,* the Tendering Shareholders can proceed via the *Affiliated Ute* presumption of reliance because Defendants had a duty to disclose under Section 13(e), Cayman law, and insider trading law.  ¶173; (*supra* 14-15); *Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) (*Affiliated Ute* may be applied to omissions not "directly related to the earlier statements").  That Plaintiffs ***also*** allege lies cannot worsen plaintiffs' claims based on these pure omissions.

## IV.    The Complaint Adequately Alleges a Claim Under Section 13(e)

      Defendants respond to the §13(e) claims by denying such a cause of action exists, while ignoring the ample body of persuasive authority.  *E.g.,  In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) (recognizing 13(e) cause of action); *Fisher v. Plessey Co.,* 1983 WL 1328 (S.D.N.Y. June 22, 1983) (same, upon *Cort* factors analysis); *Howing Co. v. Nationwide Corp.*, 826 F.2d 1470 (6th Cir. 1987) (same), *remanded on other grounds*, 502 U.S. 801 (1991); *Hanley v. Warburg Pincus Cap. Co., L.P.*, 2005 WL 8161161 (D. Ariz. 2005) (same); *Pittiglio v. Mich. Nat'l Corp.*, 906 F. Supp. 1145 (E.D. Mich. 1995) (same); *see also* SEC Release No. 5884, 1977 WL 187732 (1977) (endorsing private §13(e) claims).

## V.      The Complaint Adequately Pleads Control Person Liability

      As E-House's CEO, Chairmen, and Directors, Zhou, Shen, and Chao controlled the Merger on behalf of E-House and the Buyer Group entities that they represented.  (*See supra* at 17-18).[23]  Xiang, Zhu, Zeng, Li, and Sun also acted as control persons because they comprised the  Committee that evaluated the Merger.  ¶¶48, 56-59, 75, 89.  While Plaintiffs are not required to plead culpable participation at this stage, *see In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278,

---

[22] *See Villella v. Chem. & Mining Co. of Chile*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (price impact evidence is "most necessary" when "indirect factors indicat[e] that the market . . . is inefficient").
[23] In contrast, in *In re NQ Mobile, Inc. Sec. Litig.*, 2015 WL 1501461, at *2 (S.D.N.Y. Mar. 27, 2015) (MtD 24), plaintiffs did not plead that PwC Int'l exerted control over PwC China's audits.

307-10 (S.D.N.Y. 2005), they have done so because the Committee members knew or recklessly disregarded E-House's fair value based on its recent financial performance. (*See supra* at 19).

## VI.    The Complaint Adequately Alleges Insider Trading Claims

Defendants argue that the Insider Trading Defendants are not liable for insider trading because the Complaint fails to plead a predicate Section 10(b) violation. (MtD 25). But the Complaint alleges a predicate violation because trading on material non-public information itself violates Sections 10(b). *See U.S. v. O'Hagan*, 521 U.S. 642, 651-52 (1997).

Defendants are also wrong that Plaintiffs do not allege "contemporaneous trading." (MtD 25). The Complaint explains that E-House and the Buyer Group purchased Plaintiffs' shares in the Merger. ¶¶158-60. The point of the Merger was for the Buyer Group to purchase all public E-House shares, with the "payment agent" serving in a purely ministerial role.[24] ¶¶67, 82. The Complaint also alleges that Plaintiffs "sold ADS" in the Merger (¶¶205, 210), and the law is clear that an exchange of shares in a merger is a "sale." *Vine v. Beneficial Fin. Co.*, 374 F.2d 627, 634-35 (2d Cir. 1967)*; cf. Green v. Hamilton Int'l Corp.,* 437 F. Supp. 723, 727-28 (S.D.N.Y. 1977) (redemption of bonds while possessing non-public information constitutes insider trading). Defendants only response is a misleading out-of-context quote, addressing allegations of purchases made ***months before*** a merger—which is why the plaintiff in that case did not have standing based on his later holdings (or sales) when the merger occurred. *See* MtD 25 (quoting *Pa. Ave. Funds v. Borey*, 2009 WL 902070, at *1, 13 (W.D. Wash. Mar. 30, 2009)).

## CONCLUSION

For all of these reasons, the Court should deny Defendants' Motion in its entirety. In the alternative, Plaintiffs respectfully request leave to amend. *See Wells Fargo*, 797 F.3d at 190.

---

[24] *See generally Basile v. Valeant Pharm. Int'l*, 2015 WL 7352005, at *6 (C.D. Cal. Nov. 9, 2015) (holding one cannot "avoid [insider trading] liability" by trading through "third parties").

25

DATED: February 18, 2021

Respectfully submitted,

**LABATON SUCHAROW LLP**

**POMERANTZ LLP**

*/s/ Carol C. Villegas*_____
Carol C. Villegas
David J. Schwartz
Jake Bissell-Linsk
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
Email: dschwartz@labaton.com
Email: jbissell-linsk@labaton.com

*/s/ Michael Grunfeld*_____
Jeremy A. Lieberman
Michael Grunfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mgrunfeld@pomlaw.com

*Counsel for the Co-Lead Plaintiff
the Maso Entities and Co-Lead
Counsel for the Class*

*Counsel for Co-Lead-Plaintiff Altimeo Asset
Management and Co-Lead Counsel for the
Class*

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2021, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/Michael Grunfeld*
Michael Grunfeld