UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re E-HOUSE SECURITIES LITIGATION

**OPINION & ORDER**

20 Civ. 2943 (ER)

RAMOS, D.J.:

In this putative class action, lead plaintiffs Altimeo Asset Management ("Altimeo")[1] and Maso Capital Investments, Blackwell Partners LLC-Series A, Crown Managed Accounts SPC for and on behalf of Crown/Maso Segregated Portfolio (the "Maso entities," and together with Altimeo, "Plaintiffs") allege that leading Chinese real estate company E-House (China) Holdings Limited ("E-House") and its corporate officers schemed to depress the price of E-House's American depositary shares ("ADS")[2] in advance of a go-private merger.  Defendants move to dismiss Plaintiffs' First Amended Complaint ("FAC"), for failure to state a claim under Fed. R. Civ. P. 8(a), 9(b), 12(b)(6), and Section 101(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  For the reasons set forth below, Defendants' motion is GRANTED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The following facts, taken as true and drawing all reasonable inferences in Plaintiffs' favor, are based on Plaintiffs' FAC, Doc. 50, the proxy materials incorporated by reference in the FAC, and stock price information of which judicial notice may be taken.

---

[1] Altimeo is an institutional asset manager managing investment assets through separate funds and is authorized to bring legal action on behalf of its funds.  ¶ 27.  (Unless otherwise noted, citations to "¶__" refer to the FAC, Doc. 50.)  On May 23, 2020, Altimeo Optimum, which sold E-House securities during the relevant time period, assigned all rights, title, and interest in any causes of action in connection with its purchase or sale of securities of E-House to Altimeo Asset Management.  ¶ 27; *see also* Doc. 28-1.

[2] Each ADS represents one share of common stock.  ¶ 5.  The instrument that trades across the NYSE is the receipt—referred to as an American Depository Receipt ("ADR")—evidencing the ADS.  ¶ 29.  The ADS program was sponsored by E-House, and the Company registered the ADS with the SEC.  The ADS program was administered by JPMorgan Chase Bank N.A. (the "Depository") based in New York, New York.  ¶ 30.

### A. The Parties

Plaintiffs bring this action on behalf of themselves and all others similarly situated—former owners of E-House ADS who sold their ADS between July 1, 2016 and August 31, 2016 (the "Class Period")—alleging that Defendants deceived them into accepting a management buyout at an unfairly low price, in order to transact a merger taking E-House private.  ¶¶ 1-2. Plaintiffs allege violations of §§ 10(b), 13(e), 20A, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the corresponding rules of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5 ("Rule 10b-5") and 17 C.F.R. § 240.13e-3 ("Rule 13e-3").

From August 8, 2007, until the Merger closed on August 12, 2016, E-House listed ADS on the New York Stock Exchange ("NYSE"), trading under the ticker EJ.  Each ADS represented one share of common stock.  ¶¶ 5, 29, 97.  Both Altimeo and the Maso entities purchased E-House ADS on the NYSE and sold E-House ADS during the Class Period.  ¶¶ 26-27.  Between April 15, 2016 and August 17, 2016, Altimeo purchased 213,270 ADS and sold 470,700 ADS. *See* Docs. 28-2, 28-4.  During the same time period, the Maso entities purchased 324,929 ADS and sold or tendered 4,173,190 ADS.  *See* Doc. 29-1 at 4.

Defendants are E-House, E-House Holdings Ltd., Neil Nanpeng Shen, Charles Chao, Bing Xiang, Hongchao Zhu, Jeffrey Zeng, Xin Zhou, Winston Li, David Jian Sun, Canhao Huang, SINA Corporation ("Sina"), Kanrich Holdings Limited ("Kanrich"), On Chance Inc. ("On Chance"), Jun Heng Investment Limited ("Jun Heng"), Smart Create Group Limited ("Smart Create"), and Smart Master International Limited ("Smart Master").  ¶ 1.  E-House is a "leading real estate services company based in China" with a network of real estate businesses covering more than 260 cities in China; at all relevant times it was "an exempted company with limited liability incorporated under the laws of the Cayman Islands."  ¶¶ 28, 49.  E-House operated several businesses through ownership stakes in several publicly traded corporations, including Leju Holdings, Ld. (real estate e-commerce and online advertising), Jupai Holdings Limited (wealth management services for wealthy individuals in China), Shanghai Weidian

Information Technology Co., Ltd. (which operates a business called Shi Hui, an app that provides promotions for businesses near the app user).  ¶¶ 50-53.  The rest of E-House's businesses—real estate brokerage services, real estate information and consulting services, real estate advertising and promotional event services, and headquarter functions—constitute "EJ Core."  ¶ 54.

Defendant E-House Holdings Ltd. was at all relevant times an exempted company incorporated under Cayman Islands Law, formed for the purpose of entering into the Merger agreement as the parent.  ¶ 31.  E-House Merger Sub Ltd. was an exempted company incorporated under Cayman Islands Law, formed for the purpose of entering into the Merger agreement and consummating that transaction.  ¶ 32.  As a result of the Merger, E-House Merger Sub Ltd. no longer exists separately from E-House and thus Plaintiffs do not name it as a defendant in this action.  *Id.*

The individual defendants are Zhou, Shen, Chao, Xiang, Zhu, Zeng, Li, Sun, and Huang. ¶¶ 33-41.  Zhou[3] is a co-founder of E-House and was at all relevant times co-chair of E-House's Board of Directors.  ¶ 33.  He was also the Company's CEO from April 2012 through the end of the Class Period.  *Id.*  Shen, Chao, Xiang, Zhu, Zeng, Li, Sun, and Huang were members of the Board of Directors.  ¶¶ 34-41.  In approximately June 2015, Zhou, Shen, and E-House's business partner Sina, whose director and CEO was Chao, formed a Buyer Group and proposed a buyout of the Company.  ¶¶ 3, 48, 56-57.

In addition to Zhou, Shen, Chao, and Sina, defendant companies Kanrich, On Chance, Jun Heng, Smart Create, and Smart Master, along with E-House Holdings Ltd. (Parent) and E-House Merger Sub Ltd. (Merger Sub), formed the Buyer Group.  ¶¶ 47, 48.  Chao was director and CEO of Sina; Zhou controlled Kanrich, On Chance, and Jun Heng; and Shen controlled Smart Create and Smart Master.  ¶¶ 35, 42-48.

---

[3] The Complaint twice refers to a Defendant Zhao, alleging that Zhao was director of E-House Holdings Ltd. and Merger Sub and signed the Merger Agreement on their behalf.  ¶¶ 31-32.  There is no other reference to Zhao in either the FAC or the parties' papers.  The Court assumes that Plaintiffs meant Defendant Zhou.

After receipt of the proposed buyout offer, E-House formed a transaction committee (the "Committee") to evaluate it.  ¶ 56.  Xiang, Zhu, Zeng, Li, and, briefly, Sun,[4] were members of the Committee that evaluated and negotiated the Merger.  ¶¶ 36-40, 48.

Before the Merger, Zhou and the entities he controlled owned 22.8% of E-House; after, they owned 51.6%.  Shen and the entities he controlled owned 2.4% of E-House before the Merger; after, 5.4%.  Sina owned 19% of E-House before the Merger; after, 43%.  ¶ 98.

**B.  The E-House Merger and Relisting on the Hong Kong Stock Exchange**

*1.  The Merger*

On June 9, 2015, E-House announced that it had received a proposed buyout offer made by Zhou and Shen, at an offer price of $7.38 per ADS.  ¶ 56.  The same day, E-House formed the Committee, composed of Li, Xiang, Zhu, Zeng, and Sun to evaluate and negotiate the offer.  *Id.* On June 19, 2015, the Committee was informed that Sina, whose CEO was Chao, had joined Zhou and Shen as a potential buyer.  ¶ 57.  As noted above, the remaining Buyer Group constituents were companies owned by Zhou or Shen.  *Id.*

On June 25, 2015, the Committee retained Davis Polk & Wardwell LLP as its legal counsel and Duff & Phelps, LLC as financial advisors.  The Buyer Group retained Skadden, Arps, Slate, Meagher & Flom LLP.  ¶ 58.

Between November 2, 2015 and March 6, 2016, the Buyer Group and the Committee negotiated the terms of a potential transaction.  ¶ 59.  In November 2015, Duff & Phelps, at the direction of the Committee, conducted a market check in which it contacted twenty-nine potential buyers, none of whom expressed interest in a buy-out.  Doc. 64-1, Final Proxy at 20-21. On March 4, 2016, after months of negotiations and multiple requests by the Committee that the Buyer Group increase its offer price, the Committee and the Buyer Group "preliminarily agreed on an offer price of $6.85 per ADS, subject to the Buyer Group providing the [Committee] with

---

[4] Sun resigned from the Committee on June 12, 2015 over a potential perceived conflict of interest.  ¶ 56; Doc. 64-1, Final Proxy at 17.

satisfactory evidence of the availability of sufficient financing or satisfactory financing arrangements for the Proposed Transaction[.]"  Final Proxy at 21-23.  On April 14, 2016, the Committee held a meeting with Duff & Phelps, Davis Polk, and the Committee's Cayman counsel, Walkers, at which Duff & Phelps presented the Committee with its financial analyses of the proposed transaction, including its opinion that the transaction was financially fair to shareholders.  ¶ 59; Final Proxy at 24.  That same day, the Committee unanimously recommended that the Board adopt resolutions that it would be fair, advisable, and in the best interests of the Company and its security holders to enter into the Merger.  Final Proxy at 24. The Committee and the Board approved the Buyer Group's offer, and on April 15, 2016, E-House and the Buyer Group executed a merger agreement.  ¶¶ 59-60; Final Proxy at 25.  E-House thereafter issued a press release that it had agreed to be taken private by the Buyer Group at a price of $6.85 per ADS, subject to a shareholder vote.  ¶ 60.

Between April 25, 2016, and July 1, 2016, E-House filed its SEC Rule 13e-3 Transaction statements (the proxy materials), which included information about the Merger subject to disclosure requirements under § 13(e) of the Exchange Act and SEC Rule 13e-3.  ¶¶ 61, 87-93. The proxy materials were signed and filed by E-House and by the Buyer Group.  ¶ 61.  E-House filed its First Amended Proxy on May 27, 2016, its Second Amended Proxy on June 16, 2016, and its Final Proxy on July 1, 2016.  ¶¶ 87-93.  In the proxy materials, E-House explained the purposes and reasons for the Merger, the Merger structure and voting process, shareholders' appraisal and dissenter rights, and fairness opinions and projections.  E-House stated in its proxy materials that its reasons for going private included the benefits of being a privately held company—the "greater flexibility" to target long term financial performance "without the pressures caused by the public equity market's valuation of the Company and emphasis on short-term period-to-period performance"—and did not discuss plans for any subsequent transactions. ¶¶ 78, 83-84; *see also* Final Proxy at 25.

The proxy materials described the structure of the Merger, and the process by which voting would take place.  The Merger would be conducted as a reverse triangular merger:  E-

House would merge with Merger Sub, which was owned by parent company E-House Holdings, Ltd., which itself was owned by the Buyer Group.  E-House would be the surviving entity. ¶¶ 63-64.

The Merger could only be closed upon approval of two thirds of the shares voting on the transaction.  ¶ 63.  Because the Buyer Group controlled less than half of the shares—44.9%— public or non-Company affiliated shareholders could block the Merger if they voted against it. *Id.*  The Final Proxy set the extraordinary general meeting of shareholders for August 5, 2016. ¶ 94.  ADS holders could vote by giving voting instructions to the Depositary by July 11, 2016. *Id.*  ADS holders wishing to vote as shareholders would have to redeem their American deposit receipts (ADR) for common stock by July 18, 2016, in order to become direct shareholders in time for the July 22, 2016 record date, as only shareholders as of that date would be able to vote. *Id.*

Before the voting date, shareholders could exercise appraisal rights or dissenter rights. ¶¶ 69-71.  However, in order to exercise these rights, ADS holders would first have to redeem their ADS with the Depositary in exchange for common stock, thereby becoming shareholders. ¶ 70.  Shareholders intending to dissent would then have to deliver to E-House their written objection to the Merger before the vote and would have to comply with the requirements of Section 238 of Cayman Islands Companies Law.   ¶ 69.  Thus, in order to exercise dissenter rights, ADS holders would have to

> surrender their ADS to the ADS depositary, pay the . . . fees required for such surrender and any applicable taxes, provide instructions for the registration of the corresponding Shares, . . . certify that they have not given, and will not give, voting instructions as to the ADSs . . . before 12:00 p.m. New York City on August 1, 2016, and become registered holders of Shares by the close of business in the Cayman Islands before August 4, 2016. Thereafter, such former ADS holders must also comply with the procedures and requirements for exercising dissenter rights . . . under Section 238 of the Cayman Islands Companies Law.

Final Proxy at 15.  The proxy materials explained that dissenters would be entitled to "receive payment of the fair value of their Shares if the Merger is completed," but that "[t]he fair value of

their Shares as determined under that statute could be more than, the same as, or less than the merger consideration they would receive pursuant to the Merger Agreement." ¶¶ 69, 71. Plaintiffs point out that, if an appraisal determined that shares were worth more than the Merger price, E-House would have to pay dissenting shareholders additional consideration for the Merger, and thus the Buyer Group had an incentive to dissuade shareholders from seeking appraisal. ¶ 71.

To that end, according to Plaintiffs, the proxy materials contained several assurances that the Committee, the Board, the Buyer Group, and Duff & Phelps all believed that the Merger was fair to investors and security holders. ¶ 72. The proxy materials also contained final projections prepared by management and stated that the projections represented "the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief the expected course of action and the expected future financial performance of the Company." ¶ 73 (citing the Initial Proxy). The proxy included a fairness opinion from Duff & Phelps, which concluded that the entire company, with all its components, had a value of $6.26 to $7.27 per share. ¶¶ 75, 77. Thus, Duff & Phelps determined that the Merger consideration of $6.85 per ADS and per share was fair. ¶ 77.

The Final Proxy included projections prepared in January 2016 (the "2016 Management Projections"), which predicted performance from 2016 to 2020 for both Leju and EJ Core. ¶¶ 88, 93; *see also* Final Proxy at 41-43. The 2016 Management Projections replaced earlier projections included in the Initial Proxy, which had been prepared in November 2015. ¶ 88. According to the proxy materials, the 2016 Management Projections were amended to reflect the depreciation of the Chinese renminbi against the U.S. dollar as well as "certain factors relevant to Leju." ¶ 91.

On August 5, 2016, the Merger was approved with 89.79% of votes cast in favor. ¶ 96. Plaintiffs contend that, despite the high approval rate, the outcome "shows little about the overall support of the deal, since the vote total only reflects votes cast, rather than all shareholders." *Id.*

On August 12, 2016, the Merger closed, Merger Sub was merged into E-House, and E-House was delisted from the NYSE.  ¶ 97.

    *2.   Cayman Islands Appraisal Action*

Following the closing of the Merger, on October 14, 2016, a former shareholder, Senrigan Master Fund ("Senrigan") filed a petition in the Grand Court of the Cayman Islands requesting appraisal of its shares.  ¶ 99.  The Grand Court of the Cayman Islands Financial Services Division held a trial on the appraisal action, beginning on April 10, 2018.  ¶ 102.  Although scheduled to last until April 24, 2018, the trial settled after two days.  *Id.*

During the trial, E-House and Senrigan discussed certain alternative projections that were not disclosed in the proxy materials, and which Senrigan referred to as the "parallel transaction projections" (henceforth "parallel projections").  ¶ 103.  The FAC is silent as to who created the parallel projections, whether the Buyer Group, E-House, or another entity, but states that the Buyer Group used them to "pitch[] investors in post-Merger Subsequent Transactions, in parallel with the proposed public Merger."  ¶ 14; *see also* Doc. 63 at 11.  Senrigan argued that the parallel projections—which were more recent projections, made in June 2016[5]—replaced the 2016 Management Projections, which were out of date by and superseded by the parallel projections.  ¶ 104.  Both parties' experts cited the parallel projections in their attempt to value the Company, and Senrigan explained that the parallel projections showed 37% growth in net income for EJ Core in the first six months of 2016, compared with the 2016 Management projections that had "estimated EJ Core's net income growth for the entirety of 2016 at only 1.9%."  ¶¶ 105-06.  Senrigan argued that the parallel projections showed higher profit, higher sales figures, and higher earnings before interest and taxes than previously disclosed, and that they showed a consolidated annual growth rate in net income of 19%, as opposed to the 4.65% in the 2016 Management projections.  ¶ 107.  Senrigan also stated that in July 2016, before the Merger, the Buyer Group and the Company had presented a proposal to create a new business out of

---

[5] Defendants dispute this timing and assert that Senrigan's counsel argued in the Cayman Island's action that "the parallel projections were made by the end of July 2016," that is, possibly at some point after the proxy materials were issued.  Doc. 69 at 3.

components of EJ Core to potential investors and had cited the parallel projections as supporting a much higher valuation than previously disclosed.[6]  ¶ 108.  The trial exhibits included a copy of the July 2016 presentation.  *Id.*  The same presentation, according to Senrigan, included a slide titled "Valuation" that described relevant portions of EJ Core as worth $1.2 billion as of July 2016, based on the parallel projections, and a section on "Valuation and Exit" that showed a "plan to engineer a future stock listing in Asia."  ¶¶ 109-10.  Therefore, Plaintiffs contend that E-House and the Buyer Group already had, while the Merger was pending, "a plan to immediately engage in major capital transactions, with an ultimate plan of relisting the shares publicly." ¶ 109.

By contrast, Duff & Phelps' fairness opinion included with the proxy materials had found that the entirety of EJ Core was worth at most $332 million.  ¶ 111.  Using the parallel projections, Plaintiffs contend that shares in EJ Core alone were in fact worth over $0.50 more per ADS than the $6.85 that Duff & Phelps had found to be fair.  *Id.*  According to Plaintiffs, the price per ADS for the entirety of E-House should have been $12.60, and the Merger consideration was only 54% of the Company's fair value.  ¶¶ 111-12.

Senrigan also submitted at trial an investment agreement to sell equity in the new proposed business to investors, based on the $1.2 billion valuation figure for EJ Core.  ¶¶ 108, 113.  Those sales closed in August and September 2016.  ¶ 113.  The investment agreement included a contractual term promising compensation to investors if net profits for 2016-2017 fell under 95% of the parallel projections' projected profits.  *Id.*

Two days into the trial, in April 2018, the parties settled the matter for an undisclosed amount.  ¶ 102.

---

[6] Plaintiffs do not specify in the FAC which individuals gave the presentation, where, or to whom.  Plaintiffs state that "[t]he Company and the Buyer Group provided a presentation to potential investors in July 2016," and "Defendants made one such presentation on July 26, 2016."  ¶ 108.

### 3. *Relisting on the Hong Kong Stock Exchange*

On July 1, 2018, nearly two years after the Merger, E-House registered its shares on the Hong Kong stock exchange and relisted through an initial public offering (IPO) on the Hong Kong stock exchange.  ¶ 114.  E-House's IPO documents explained that the relisted entity was formed out of constituent parts of the previously privatized E-House, but the relisted entity did not have any ownership interests in Leju or Jupai.  ¶ 115.  Therefore, Plaintiffs allege, "the relisted entity was . . . supposedly comprised of businesses worth only 40% of the overall value" of E-House at the time of its privatization.  *Id.*

Plaintiffs allege that E-House had begun to prepare for the Hong Kong IPO "immediately after going private," and they cite a January 4, 2018 article in *Beijing Commercial Daily* in which "an individual close to the Company explained that after the completion of the delisting, E-House introduced a number of new investors and made other changes in order to start the relisting."  ¶ 116.  The IPO documents included information about E-House's privatization, including a statement that

> [t]he privatisation was initiated because, among other reasons, it was considered that the Group was undervalued in the U.S. and that the privatisation would allow the then management of E-House (China) Holdings greater flexibility to develop the long-term strategy and restructure different business units to improve the valuation . . . and profitability of their relevant business segments[.]

¶ 117.

On July 20, 2018, E-House went public on the Hong Kong stock exchange.  ¶ 120.  At that time, E-House had a market capitalization of $2.651 billion, about 2.5 times greater than its valuation of $1.06 billion at the time of the Merger.  *Id.*  Plaintiffs point out that this higher market capitalization for the relisted business did not include E-House's prior interest in Leju and Jupai.  *Id.*  The Merger valuation for E-House, less Leju and Jupai, was about $500 million—four times less than E-House's Hong Kong IPO market capitalization ($2.081 billion, subtracting the proceeds of the IPO).  *Id.*  Therefore, Plaintiffs argue that the results of the IPO show that EJ

Core was drastically undervalued in the Merger, considering that E-House maintained an average market capitalization of over $2.5 billion from the IPO to February 2019.  *Id.*

### C.  Alleged Misrepresentations and Omissions

Based on the Cayman Islands appraisal action and E-House's 2018 relisting on the Hong Kong stock exchange, Plaintiffs allege that the Final Proxy contained several false and misleading statements and omissions attributable to E-House, members of the Buyer Group, and individual Defendants Zhou, Shen, and Chao, who belonged to the Company's management. ¶ 122.  Plaintiffs allege three categories of false or misleading statements based on what they assert was Defendants' undisclosed plan to relist E-House at a higher value on the Hong Kong stock exchange:  statements portraying the merger as fair; statements concerning an intention not to relist or engage in subsequent transactions; and statements about the future projections. ¶¶ 124, 129, 140.  Finally, Plaintiffs assert that Defendants omitted information that they had affirmative duties to disclose under Cayman Islands Law and SEC regulations.  ¶ 145.

#### 1.  *Statements Concerning Fairness*

Plaintiffs allege that statements in the proxy materials describing the merger as fair were materially false because Defendants knew that the parallel projections projected higher growth than the Management Projections that Duff & Phelps used to prepare the fairness opinion and they did not include the parallel projections in the proxy materials.  ¶¶ 126, 128.  Thus, Defendants could not have believed the Merger was fair in that it would deprive investors of a higher value for E-House shares.  *Id.*  These fairness statements include:  "Each member of the Buyer Group believes that the Merger is substantively and procedurally fair to the security holders who are not affiliated to the Company," ¶ 125; and "The Board, acting upon the unanimous recommendation of the [Committee] . . . determined that it was fair (both substantively and procedurally) and in the best interests of the Company and its security holders . . . to enter into the Merger Agreement[.] "  ¶ 127.

2.  *Statements Concerning Subsequent Transactions*

Plaintiffs allege that the proxy materials contained statements that the Buyer Group had no plans or proposals to change the Company's corporate structure or enter into any subsequent transactions.  ¶¶ 78-79, 84.[7]  Plaintiffs contend that these were false or misleading because, as of the date of the July 2016 presentation, E-House in fact had plans for subsequent transactions after closing the Merger and had an ultimate plan to relist on a stock exchange in Asia.  ¶ 114.

These statements included the representations that E-House decided to go private in order to have greater flexibility and the benefits of private ownership; that after the Merger E-House would cease to be publicly traded; and that the Buyer Group would continue to evaluate the Company's prospects and "may propose or develop plans and proposals . . . including the possibility of relisting the Company or a substantial part of its business on another stock exchange."  ¶¶ 130, 132, 134, 136, 138.  Plaintiffs allege these statements are false or misleading because E-House did not "cease" to be a publicly traded company, and that the use of "may" was false because Defendants intended to relist all along.  ¶¶ 131, 133, 135.

3.  *Statements Regarding Future Projections*

Plaintiffs allege that the 2016 Management Projections included in the Final Proxy, and Defendants' statement that those projections "reflect[] the best currently available estimates and judgments," were false and misleading because the Final Proxy included outdated projections "without disclosing the fact that management had created more recent far higher projections (the [parallel projections])."  ¶ 142.  Therefore, Defendants' inclusion of the 2016 Management Projections, and statements that these were the best available, were false and misleading since the projections undervalued E-House.  ¶¶ 142, 144.

---

[7] The proxy materials did not include any information about any subsequent transaction, ¶¶ 78-79, and in a section titled "Plans for the Company after the Merger," represented that the Buyer Group "does not have any present plans or proposals" relating to "[1] an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations; [2] sale or transfer of a material amount of assets; or [3] any other material changes in the Company's business."  ¶ 84 (citing proxy materials).

### 4.  *Alleged Omissions Violating Defendants' Duties to Disclose*

Finally, Plaintiffs allege that Defendants omitted information that they had affirmative duties to disclose under both Cayman Islands and U.S. federal securities laws.  ¶¶ 145-60. Plaintiffs claim that Zhou, Shen, and Chao, as directors of E-House, violated their Cayman Islands duty to disclose "sufficient information" to investors by providing outdated projections and valuation and by not disclosing planned subsequent transactions.  ¶ 146.  Plaintiffs also allege that Defendants' Schedule 13e-3 statements failed to comply with the requirements for Rule 13e-3 transactions because the schedule did not list plans or proposals for future transactions or changes in the capitalization of the Company, and because Defendants' purported reasons for the Merger were not their "true reasons" for going private.  ¶¶ 147-55.

Plaintiffs further allege that Defendants violated their duties to disclose by engaging in insider trading, in that the Buyer Group possessed material non-public information, including the parallel projections and their "true reasons for the Merger," at the time the Merger closed and E-House purchased outstanding shares of stock.  ¶¶ 156-58.  Plaintiffs assert that the members of the Buyer Group, with the exception of Defendant Chao, are properly deemed purchasers of the outstanding shares through the Merger, and they possessed material non-public information at the time of the Merger.  ¶¶ 159-60.

### D.  Scienter and Loss Causation

Plaintiffs allege that Defendants acted with scienter in that Zhou, Shen, and Chao had actual knowledge that the statements made in the proxy materials were false or misleading, or they acted with reckless disregard for the truth or falsity of those statements, and the other entities—E-House, Sina, Kanrich Holdings, On Chance, Jun Heng, HoldCo, and Merger Sub— had the scienter of their management-level employees.  ¶¶ 161-62.  Plaintiffs allege that the members of the Buyer Group had the motive and opportunity to defraud, because by publishing false, misleading, and incomplete information, they stood to profit from undervaluing E-House in advance of the Merger.  ¶ 163.  Furthermore, as signatories of the Final Proxy and members of E-House management, members of the Buyer Group were able to exercise control over the

substance of the Final Proxy, and thereby had the opportunity to act on their motive to defraud. ¶ 164. Plaintiffs further allege that Defendants had actual knowledge that the statements in the proxy materials were false—or else they acted with reckless disregard for the truth—because they were aware of the parallel projections. Specifically, Zhou approved of the figures in the parallel projections, and individual members of the Buyer Group, who were also E-House management, were aware of them. ¶¶ 165-67. Because both the Merger and the projections, including the parallel projections, were matters of core importance to E-House, scienter on the part of management, and therefore corporate scienter, may be presumed. ¶ 168.

As to loss causation, Plaintiffs allege that Defendants' scheme to deprive investors of material information artificially depressed the price of E-House ADS, and Plaintiffs were induced to sell shares at less than fair value, resulting in economic loss "equal to the fair value of the shares minus the price that . . . Plaintiffs and members of the Class received when they sold their E-House ADS during the Class Period." ¶ 170. Plaintiffs allege that the fair value of the ADS exceeded the $6.85 price paid to investors at the time of the Merger, because the more recent parallel projections implied a higher valuation. ¶ 171. Plaintiffs allege that, based on the valuation of EJ Core at $1.2 billion, the per share value per ADS should have been between $12.30 and $12.90. *Id.*

### E. Procedural Background

On April 9, 2020, Plaintiffs commenced this action. Doc. 1. On August 12, 2020, the Court so ordered a stipulation appointing Altimeo and the Maso entities as Co-Lead Plaintiffs and their counsel as Lead Counsel for the putative class. Doc. 47. On October 13, 2020, Plaintiffs filed the FAC, and on January 19, 2021, Defendants moved to dismiss. Docs. 50, 62.

## II.   LEGAL STANDARD

### A. Rule 12(b)(6)

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true

and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

In determining the motion to dismiss, the Court may "consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015) (summary order) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). The Court may "take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" *Silsby*, 17 F. Supp. 3d at 354 (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991)).

### B.  Heightened Pleading Standard Under Rule 9(b) and the PSLRA

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-23 (2007).

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act

("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs*, 551 U.S. at 320–21). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'").

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)). Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174. In addition, the plaintiff "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re*

*Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA*, 553 F.3d at 196).

## III.   DISCUSSION

### A.  Plaintiffs' Section 10(b) Claims

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," while SEC Rule 10b-5, promulgated thereunder, creates liability for a person who makes "any untrue statement of a material fact or to omit[s] to state a material fact ... in connection with the purchase or sale of any security." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013).  "A statement may give rise to liability under § 10(b) if it is '(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading.'" *Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*, No. 19 Civ. 1654 (AJN), 2020 WL 6063539, at *5 (S.D.N.Y. Oct. 14, 2020) (citing *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, No. 16 Civ. 3068 (AJN), 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir. 2018)).

Rule 10b–5, promulgated to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999).  Under Rule 10b–5, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.* a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss.  *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 CIV. 3338 (ER), 2017 WL 3278930, at *10 (S.D.N.Y. Aug. 1, 2017) (citations omitted); *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).  Moreover, the plaintiff must meet the PSLRA requirements. *ECA*, 553 F.3d at 196.  Therefore, while the Court normally draws reasonable inferences in favor of a non-movant on a motion to dismiss, the PSLRA "'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter."  *Id.* (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 194 (2d Cir. 2008)).

As the *WuXi* court explained, "the 'fundamental purpose' of the [Exchange] Act [is to] implement[ ] a 'philosophy of full disclosure'; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute."  *WuXi*, 2020 WL 6063539, at *5 (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-78 (1977); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972)).  "Consistent with that purpose, '[a] complaint fails to state a § 10(b) claim when the alleged omission has actually been disclosed.'"  *Id.* (citing *Debora v. WPP Grp. PLC*, No. 91 Civ. 1775 (KTD), 1994 WL 177291, at *5 (S.D.N.Y. May 5, 1994)).

Defendants argue that Plaintiffs have not sufficiently alleged (1) actionable material misrepresentations or omissions; (2) an adequate inference of scienter; (3) economic loss causation; or (4) reliance for the tendering shareholders.  Because Plaintiffs have failed to allege actionable misrepresentations or omissions, the Court need only address Defendants' first argument.

### 1. *Material Misrepresentations or Omissions*

Plaintiffs allege material misrepresentations or omissions in connection with three categories of statements in the proxy materials:  (1) Defendants' use of the 2016 Management Projections and omission of the parallel projections; (2) statements pertaining to plans (or lack thereof) for subsequent transactions; (3) and statements that the Merger was fundamentally fair. ¶¶ 122-44.  The Court addresses each category of alleged misrepresentation in turn.

### a. *The Projection Statements*

Plaintiffs allege that Defendants' use of the 2016 Management Projections, included in the Final Proxy, and Duff & Phelps' use of these in drafting its April 2016 fairness opinion, was false and misleading, both because these projections were outdated and because Defendants did not disclose the existence of the more favorable parallel projections.  ¶¶ 142-44.  Defendants argue that the Proxy Materials were not outdated and included adequate cautionary language, that the existence of the parallel projections did not render the 2016 descriptions false or misleading, and that Plaintiffs have not alleged with the requisite particularity that the parallel projections properly superseded the 2016 Management Projections.  Doc. 63 at 8-12.  The Court agrees with Defendants that the projections included in the proxy materials—and the omission of the parallel projections—are not actionable.

The Second Circuit has held that "statements about a 'company's projections [are treated as] opinions rather than guarantees.'"  *ODS Cap. LLC v. JA Solar Holdings Co.,* No. 18 Civ. 12083 (ALC), 2020 WL 7028639, at *11 (S.D.N.Y. Nov. 30, 2020) (citing *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 480 (S.D.N.Y. 2018)).  To be actionable, "the representation must be one of existing fact, and not merely an expression of opinion, expectation or declaration of intention." *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 647-48 (S.D.N.Y. 2015) (citations omitted); *see also Greenberg v. Chrust*, 282 F. Supp. 2d 112, 121 (S.D.N.Y. 2003).  "An opinion statement is not actionable unless the speaker disbelieved the statement at the time it was made, the opinion contained one or more embedded factual statements that can be proven false, or the opinion implied facts that can be proven false." *In re*

*Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 202 (S.D.N.Y. 2020) (internal quotation marks and citations omitted).  However, "[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *Pehlivanian*, 153 F. Supp. 3d at 648 (S.D.N.Y. 2015) (citations omitted); *see also Gissin v. Endres*, 739 F. Supp. 2d 488, 502 (S.D.N.Y. 2010) ("[S]tatements are not protected where defendants had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality[.]").

Because forward-looking statements are appropriately analyzed as opinions, the framework from *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175 (2015), applies to the question of whether Plaintiffs have sufficiently pleaded actionable misstatements and omissions concerning the Management Projections.  In *Omnicare*, the Supreme Court established that opinions may be misleading if "(1) 'the speaker d[oes] not hold the belief . . . professed'; (2) the 'fact[s] [ ] supplied' in support of the belief professed are 'untrue'; or (3) the speaker 'omits information' that 'makes the statement misleading to a reasonable investor.'"  *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)).

Furthermore, forward-looking statements are sheltered by the PSLRA's safe harbor provision.  "Pursuant to the safe harbor, 'a defendant is not liable [for a forward-looking statement] if the forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading.'" *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 547-48 (S.D.N.Y. 2017) (quoting *Slayton*, 604 F.3d at 766).[8]

---

[8] Plaintiffs contend, without citation, that the PSLRA safe harbor does not apply to going-private transactions. ¶¶ 178-79.  However, numerous courts in this district have applied the safe harbor to cases concerning go-private transactions that are on all fours with the case at bar.  *See Qihoo*, 2020 WL 4734989, at *7; *ODS Capital LLC v. JA Solar Holdings Co. Ltd.*, No. 18 Civ. 12083 (ALC), 2020 WL 7028639, at *11 (S.D.N.Y. Nov. 30, 2020); *In re Shanda Games Limited Securities Litigation*, No. 18 Civ. 2463 (ALC), 2019 WL 11027710, at * 5 (S.D.N.Y. Sep. 30, 2019).

Statements are protected under the safe harbor if they satisfy any one of these three categories, since the statute is written in the disjunctive.  *Altimeo Asset Management v. Qihoo 360 Technology Co. Ltd.*, No. 19 Civ. 10067 (PAE), 2020 WL 4734989, at *7 (S.D.N.Y. Aug. 14, 2020).  While "meaningful cautionary language" concerning forward-looking statements shields a defendant from liability in a private action under federal securities laws, the language must not be mere "boilerplate" and must include "important factors that could realistically cause results to differ materially."  *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (citing *Slayton*, 604 F.3d at 771, 773; *In re Philip Morris Int'l Sec. Litig.*, 437 F. Supp. 3d 329, 356–57 (S.D.N.Y. Feb. 4, 2020)).  However, "[t]he safe harbor . . . does not protect material omissions."  *In re Salix Pharms., Ltd.*, No. 14 Civ. 8925 (KMW), 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016).

Reading the FAC in the light most favorable to Plaintiffs, with more concrete information, the omission of the parallel projections might establish that E-House management— which included three individual members of the Buyer Group—did not believe that the 2016 Management Projections were the most accurate projections, or may constitute the omission of information that would be misleading to a reasonable investor.  *See JA Solar*, 2020 WL 7028639, at *11 (finding that plaintiff had adequately pleaded that defendant company's 2015 and 2016 operating incoming reporting was "understated and misrepresented in the [p]roxy [m]aterials," where company's "projections for the fourth quarter were vastly different than what was provided," and "that the restructuring report JA Solar and Tonglian issued in connection with its relisting provided operating income for 2015 through 2017 that far exceeded what was reported in the Proxy Materials and SEC filings.").  However, Plaintiffs have not overcome the safe harbor provisions in that the Management Projections were accompanied by meaningful cautionary language.  Furthermore, Plaintiffs have not alleged with the requisite particularity

required by Rule 9(b) and the PSLRA that Defendants knew the Management Projections were false or misleading.

Plaintiffs' claim that the Management Projections were outdated fails because the Final Proxy included adequate cautionary language explaining the timing of when the projections were prepared and the purpose for which they were included.    Specifically, the Final Proxy disclosed that the projection prepared in January 2016 "do not take into account any circumstances or events occurring after the date they were prepared," including "any changes to our operations or strategy that may be implemented after the time the projections were prepared," Final Proxy at 38, and that the "financial projections are not a guarantee of performance," *id.*  The Final Proxy disclaimed that the Management Projections were included to deter investors from seeking an appraisal, stating that "[t]he financial projections included in this proxy statement are included solely to give shareholders access to certain information that was made available to the Committee's financial advisor and are not included for the purpose of influencing any shareholder to make any investment decision with respect to the Merger, including whether to seek appraisal" for their shares under Cayman Islands Companies law.  *Id.*  The Final Proxy also stated that the projections "in the view of the Company's management, [were] prepared on a reasonable basis, reflect[] the best currently available estimates and judgments, and present[], to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of the Company."  *Id.*[9]  Such cautionary language is adequate under the first prong of the safe harbor.  *See In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 533-34 (S.D.N.Y. 2021) (finding similar cautionary language, including "that the [projections] were not factual and should not be relied upon as being necessarily predictive of actual future results," that they were "not included to induce any shareholder to vote for the [t]ransaction but rather were

---

[9] In their opposition, Plaintiffs argue that Defendants' argument that they had disclaimed their duty to update fails because the Final Proxy represents that the 2016 Management Projections are the "best **currently** available." Doc. 68 at 8.  However, Defendants counter that the statement that the Projections are the best currently available must be read in context, including the fact that the Final Proxy made clear that the projections were made in January 2016. Final Proxy at 38.

disclosed because the [b]oard considered them in assessing the [t]ransaction, and that "if shareholders were to consider them at all, they should be careful to do so in conjunction with the other information in the [p]roxy," to be "ample, specific cautionary language insulat[ing] [d]efendants from liability under Section 14(a).") (citations omitted).

Plaintiffs further contend that the omission of the parallel projections in the proxy materials is actionable because "[t]he law is clear that projections are actionable in the merger context when the buyers privately used a better set of projections to value the company higher than what was disclosed in the proxy materials." Doc. 68 at 7. None of the cases that Plaintiffs cite is directly on point, and none are binding on this Court. Plaintiffs cite *Baum v. Harman Int'l Indus., Inc.* for the proposition that the proxy materials' omission of the parallel projections is actionable, analogizing to the *Baum* defendants' provision of better projections to potential buyers, and use of more pessimistic projections in connection with its fairness opinions. 408 F. Supp. 3d 70, 88-89 (D. Conn. 2019) ("Taken together, the facts alleged support a strong inference that defendants did not truly believe that the Management Projections contained more downside risk than upside potential.") However, plaintiff's claims in that action concerned defendants' opinion statements about the projections included in the proxy materials, rather than the projections themselves. Plaintiffs also cite to two district court cases from the Ninth Circuit, *Azar v. Blount Int'l, Inc.*, No. 3:16-CV-483-SI, 2017 WL 1055966 (D. Or. Mar. 20, 2017) and *In re Hot Topic, Inc. Sec. Litig.*, No. CV 13-02939 SJO (JCx), 2014 WL 7499375 (C.D. Cal. May 2, 2014). In both cases, plaintiffs alleged that defendants "worked with financial advisors to create more pessimistic financial projections to present to shareholders to justify a merger, while themselves relying on an older but allegedly more optimistic and more accurate set of projections." *Azar*, 2017 WL 1055966, at *8; *see also Hot Topic*, 2014 WL 7499375, at *10. However, both *Azar* and *Hot Topic* differ in a key way from Plaintiffs' allegations here: in those cases, plaintiffs alleged that defendants deliberately had created misleading forecasts *after* the original, more correct forecasts, in order to "affirmatively create[] an impression of a state of affairs that differs in a material way from the one that actually exist[s]." *Hot Topic*, 2014 WL

7499375, at *10 (citation omitted).  Finally, all the cases Plaintiffs cite addressed claims brought under Exchange Act § 14(a), rather than, as here, § 10(b).

Defendants argue that the existence of a later set of projections yielding different results does not necessarily render the earlier set of projections false or misleading, citing two cases— one from this district and one from the District of Delaware.  Doc. 63 at 10.    However, the cases that Defendants cite are also distinguishable.  Defendants rely on *Pehlivian,* wherein the court stated, in an analysis of scienter, that "the recklessness inquiry as to forward-looking projections focuses on whether the defendants knew at the time they made these projections that they were unrealistic or unlikely to come true."  153 F. Supp. 3d at 653-54.  However, here Plaintiffs' allegation is that Defendants *did* know at the time they signed the Final Proxy that the 2016 Management Projections were unrealistic, since they had access to the much more optimistic parallel projections based on the Company's performance in the first half of 2016.  The second case, *In re Keryx Biopharmaceuticals, Inc.*, 454 F. Supp. 3d 407, 415 (D. Del. 2020) is distinguishable because, in that case, plaintiffs had alleged that defendants' projections were outdated based on information they learned two weeks later that "rendered the Projections overstated and obsolete."  454 F. Supp. 3d at 414, *appeal dismissed*, No. 20-2019, 2020 WL 6737436 (3d Cir. Aug. 5, 2020) (internal quotation marks omitted).  Here, Plaintiffs allege the opposite:  that Defendants were aware of the parallel projections as early as June 2016, but still published the Final Proxy, dated July 1, 2016, with the outdated 2016 Management Projections.

However, it is true that "the existence of some additional, intermediary projection—if one even existed—does not automatically constitute a material fact, the omission of which makes a Proxy misleading."  *Bemis*, 512 F. Supp. 3d at 542 (citing *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor.").  Instead, the key question is whether "[w]hat was disclosed in the Proxy, however, was sufficient to give shareholders the information necessary to making an informed vote on the [t]ransaction."  *Id.* at 543 (citation omitted).

Defendants also make an argument that the Management Projections are not actionable because they were included solely to give shareholders access to information available to the Committee, rather than for the purposes of influencing investment decisions.  Doc. 63 at 9 (citing *Laborers Loc. No. 231 Pension Fund v. Cowan*, No. 20-1844, 2020 WL 7056070, at *4 (3d Cir. Dec. 2, 2020) (projections that are "disclaimed as being disclosed solely" to make information available are distinct from projections estimating future performance).  However, the Court need not decide the question of whether the *purpose*, rather than the content, of the Management Projections controls, because Plaintiffs' allegations—either that Defendants knew the Management Projections were misleading because they omitted the parallel projections, or that the omission of the parallel projections itself was material—are not pleaded with the particularity required by the PSLRA.

The FAC does not contain the requisite "detail as to the who, what, when, where, and how" of the parallel projections, *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 803–04 (2d Cir. 2000), instead relying on arguments by Senrigan and notes from the articled clerks[10] in the Cayman Islands proceedings.   Notably, the FAC does not allege *who* created the parallel projections, and on what basis—only that Zhou approved them, and that the accounting firm Price WaterhouseCoopers performed diligence on the parallel projections.  ¶ 104.  Furthermore, because the case settled after two days, there was no conclusion in that case as to the accuracy of the parallel projections.  ¶ 102.  The Court need not credit arguments of a third party's counsel in a totally separate proceeding.  *Caiafa v. Sea Containers Ltd.,* 525 F. Supp. 2d 398, 411 (S.D.N.Y.2007) ("[A]llegations about [defendant] contained in pleadings from an unrelated lawsuit . . . are inadmissible.")); *see also In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).  Furthermore, the

---

[10] At the trial, the Maso entities instructed two "articled clerks" from Walkers to attend and take notes.  In the Cayman Islands, articled clerks are attorneys-in-training who have completed their academic legal education and are completing the practical stages of their legal training.  ¶ 102 n.4.

Buyer Group was separate from the Company, and any later projections adopted by the Buyer Group or presentations made on the basis of those projections cannot necessarily be attributed to Board, the Committee, or E-House.  As Defendants note in their reply brief, "the mere fact that the Buyer Group made projections in the June/July timeframe does not render the Committee's January projections (or the accompanying disclosures in the Proxy) false or misleading," and "the Buyer Group's alleged confidence in the parallel projections, including any supposed 'guarantees' based on them, is irrelevant" to the "Committee's view of the 2016 Management Projections at the time of the Proxy. . ."  Doc. 69 at 3, 3 n.4.

Thus, Plaintiffs' have not adequately pleaded that the Management Projections, and the omission of the parallel projections, were false or misleading.

### b.  Subsequent Transaction Statements

Second, Plaintiffs allege that Defendants' statements in the proxy materials that the purpose of the Merger was to obtain the benefits of a privately held Company and that the Buyer Group did not consider alternative transaction structures and did not have any present plans or to change the Company's structure were materially false and misleading.  ¶¶ 130, 132, 136. Plaintiffs further allege that the statement that the Buyer Group *may* propose future plans or proposals to change the Company's structure, including relisting the Company or components of it on another stock exchange, was false and misleading because the Buyer Group in fact intended to do that from the outset.  ¶¶ 138-39.

Plaintiffs' argument fails.  As Defendants point out, Doc. 63 at 12-13, the statement about alternative transaction structures in context makes clear that the Buyer Group did not consider alternative transactions to the Merger, "because the Buyer Group believed the Merger was the most direct and effective way to enable the Buyer Group to acquire ownership and control of the Company."  Final Proxy at 61.

As for the statements about future plans for E-House, Plaintiffs state that "[t]he law is clear that it is false for defendants to deny the existence of plans for corporate transactions when such plans already existed," Doc. 68 at 9, citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and

*Buxbaum v. Deutsche Bank, A.G.*, 2000 WL 33912712, at *3 (S.D.N.Y. Mar. 7, 2000).
However, Plaintiffs' reliance on *Basic* overstates the Supreme Court's discussion on materiality
in the context of merger negotiations.  Instead, *Basic* instructs that "materiality is something to
be determined on the basis of the particular facts of each case."  485 U.S. at 238–39 (1988)
(citing *SEC v. Geon Industries, Inc.*, 531 F.2d 39, 47-48 (2d Cir. 1976)).

Furthermore, Plaintiffs' allegations that the statements explaining the reasons for the
Merger and the statements about the Buyer Group's plans (or lack thereof) to relist the Company
are an all fours with at least two similar cases brought by Altimeo in this district, both of which
involved companies incorporated in the Cayman Islands that went private and then relisted on
Asian stock exchanges:  *Qihoo*, 2020 WL 4734989, and *WuXi*, 2020 WL 6063539.

The *Qihoo* and *WuXi* courts determined that, because the defendant companies had
disclosed "'the possibility of relisting the Surviving Company or a substantial part of its business
on another internationally recognized stock exchange,'" the complaints could survive motions to
dismiss only if they plausibly alleged "'that defendants, at the time of the Merger, had already
adopted—but did not disclose to the public—an actual, concrete plan to relist in China.'"  *WuXi*,
2020 WL 6063539, at *5 (citing *Qihoo*, 2020 WL 4734989, at *9).  Here, as in those earlier
cases, the FAC on its face states that the proxy materials did in fact disclose the possibility of
relisting the Company or a component thereof on another stock exchange.  ¶ 138.

Thus, as in those cases, the question is whether Plaintiffs have alleged, with the
specificity required by Rule 9(b) and the PSLRA, that Defendants had an actual, concrete plan to
relist on the Hong Kong stock exchange as of the date of the Proxy Materials.  Plaintiffs have not
met that standard, and in fact marshal less evidence than in *Qihoo* and *Wuxi*.   Notably, in both of
those cases, plaintiffs had cited multiple news reports and confidential witnesses, which the
courts found insufficient to support a claim that the statements about not relisting were false or
misleading.  Here, Plaintiffs have not alleged the existence of any confidential witnesses.  The
lone news article Plaintiffs cite is a January 4, 2018 article in the *Beijing Commercial Daily*,
reporting that "an individual close to the Company explained that after the completion of the

27

delisting, E-House introduced a number of new investors and made other changes in order to start the relisting." ¶ 116.  For the same reasons stated in *Qihoo* and *WuXi*, this allegation is insufficient to support Plaintiffs' claims.  As the *Qihoo* court explained,

> where a complaint's allegations of a false or misleading statement rely on a news article, the relevant statements in the article must be properly attributed to meet Rule 9(b)'s particularity requirement. *See, e.g.*, *In re Vale S.A. Sec. Litig.*, No. 15 Civ. 9539 (GHW), 2017 WL 1102666, at *27–28 (S.D.N.Y. Mar. 23, 2017) (two *Wall Street Journal* articles did not satisfy Rule 9(b) where "[t]he statements in th[e] article[s] ... are attributed to 'Vale,' but no further information as to the source of the statements is provided in the article, and no further information about the source is alleged in the complaint"). Similarly, media reports that consist of generalized forecasting or factually unsourced speculation do not, without more, satisfy the PSLRA. *See Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300–01 (S.D.N.Y. 2010).

2020 WL 4734989, at *13.  Plaintiffs' citation to an article in the *Beijing Commercial Daily*, which was published about six months before the July 2018 relisting and describes only "an individual close to the Company," does not meet these standards.  Furthermore, "the allegations in [the] article[] . . . are far too conclusory, insufficiently particular, and devoid of details" to be equal to "the task required of plaintiffs to establish that defendants made false or misleading statements." *Id.* at *16 (citing *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) ("[N]ewspaper articles should be credited only to the extent that other factual allegations would be.").  An article published a year and a half after the Merger took place, and which provides no details about the supposed plan to relist, is insufficient to support the existence of a "concrete" plan to relist as would be required to render Defendants' statements about subsequent transactions false or misleading.

Finally, Plaintiffs contend that the July 2016 Presentation—cited in the Cayman Islands proceedings—reveals that the Buyer Group had pitched sales of stakes in EJ Core before shareholders voted on the Merger.  Doc. 68 at 10.  This is relevant, they argue, because the Buyer Group's relisting plan "was discussed in [the July 2016] presentation Defendants used to pitch new investors while the Merger was pending."  Doc. 68 at 11 (citing ¶ 109).  As

Defendants point out, this allegation also fails satisfy the requirements to state with particularity a "concrete and definite" plan to relist that existed before the publication of the Final Proxy, on July 1, 2016.  Doc. 69 at 4.  As the *WuXi* courts stated, such allegations "support[] only an inference that [the company] was considering" further transactions at the time of issuing the proxy materials and therefore fall "short of establishing that the proxy materials, which disclosed the possibility of relisting, were misleading."  *WuXi*, 2020 WL 6063539, at *5 (citing *Qihoo*, 2020 WL 4734989 at *16).

### c.  Fairness Statements

Plaintiffs' allegations about the fairness statements also fail.  Specifically, Plaintiffs allege that two statements are false:  that each member of the Buyer Group believed the Merger to be substantively and procedurally fair, and that the Board, acting upon the recommendation of the Committee, had determined it was fair and in the best interests of the Company and the shareholders for the Company to enter into the Merger agreement.  ¶¶ 125-28.  The bases for Plaintiffs' contention that the Merger was not fair, and that Defendants could not have believed it to be fair, are repetitive of, and hinge on, whether the Management Projections were false or misleading.  ¶¶ 126, 128.  The Court has already determined that Plaintiffs have not sufficiently alleged that the Management Projections were materially false or misleading.

As noted above, the *Omnicare* framework applies to opinion statements, and thus statements about fairness are only actionable if Plaintiffs can allege that the speaker does not believe them, that the facts in support were untrue, or if the speaker omits information, making the statement misleading to a reasonable investor.  Plaintiffs have not alleged that parties to the proxy materials did not believe the fairness statements, that the facts in support of these statements were untrue, or that they omitted information to make the fairness statements misleading.  *See In re Shanda Games Ltd. Sec. Litigation*, No. 18 Civ. 02463 (ALC), 2019 WL 11027710, at *6 (S.D.N.Y. Sept. 30, 2019), *adhered to on reconsideration sub nom. In re Shanda Ltd. Sec. Litig.*, No. 18 Civ. 02463 (ALC), 2020 WL 5813769 (S.D.N.Y. Sept. 30, 2020)

("Without more detail the Court cannot conclude that Shanda did not believe the figures were accurate or were unreasonable in believing the figures were accurate.")

"Under § 10(b), the perceived unfairness of a transaction is actionable only insofar as that unfairness stems from a failure of disclosure." *WuXi,* 2020 WL 6063539, at *6.  As in *WuXi,* here Plaintiffs have not stated any actionable failures to disclose.

 Moreover, although Plaintiffs cite *Mindbody* for the proposition that fairness statements may be misleading where defendants' statements misleadingly "implied [that they] had no non-public information that would materially affect [the] share price," *Mindbody*, 2020 WL 5751173, at *11-13, Doc. 68 at 14, here the share prices in fact increased upon the announcement of the Merger—from $6.28 to $6.55—and again upon issuances of the Final Proxy—from $6.47 to $6.55.  Doc. 64-2.[11]

### d.   Duty to Disclose

For the same reasons, Plaintiffs have not alleged that Defendants have breached any duty to disclose under either Cayman law or federal insider trading law.  *See In re Shanda Ltd. Sec. Litig. (Shanda II)*, No. 18 Civ. 02463, 2020 WL 5813769, at *4-5 (S.D.N.Y. Sept. 30, 2020) (finding that plaintiff's reliance on *Davis v. Scottish Re Grp. Ltd.*, 74 N.Y.S.3d 10, 12 (2018), the same case Plaintiffs cite in ¶ 146, did not support a duty under Cayman Islands law for Cayman Islands corporations to provide shareholders with "sufficient information" to understand the merger they are voting on, including a "meaningful valuation" of their shares.)

---

[11] The price of the ADS—and the fact that the prices rose upon completion of the Merger—show that Plaintiffs are unable to allege loss causation, an independent reason for the failure of their claims.  "Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharms.,* 544 U.S. at 342 (2005).  To plead loss causation, Plaintiffs must "link the defendant's purported material misstatements or omissions with the harm ultimately suffered." *JA Solar*, 2020 WL 7028639, at *14 (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008)).  If the relationship between the loss and the information concealed or misstated by the defendant is "sufficiently direct, loss causation is established, but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Id.* (quoting *Bristol Myers*, 586 F. Supp. 2d at 163)).  Here, as in *JA Solar*, Plaintiffs fail to allege loss causation, because the share prices increased fairly consistently between April 15, 2016, and the date when the Merger was consummated.  *Id.* at *15 ("JA Solar's ADS price rose when the Merger was announced; rose once the Preliminary Proxy Materials were released; remained roughly the same when the Amended Proxy Materials were released; and rose again when the Final Proxy Materials were released.")

*e.  Scheme Liability*

Because Plaintiffs have not pled actionable misstatements or omissions, their arguments for scheme liability under Rule 10b-5(a) and (c) also fail.

**B.  Section 13(e)and Rule 13e-3 Claims**

Defendants urge that Plaintiffs' § 13(e) claims fail for the same reasons, because they are based on the same alleged misrepresentations or omissions.  Doc. 63 at 23.  Defendants also argue that § 13(e) claims do not expressly provide a private right of action.  *Berg v. First Am. Bankshares, Inc.*, No. 83-3887, 1985 WL 2232, at *8 (D.D.C. Apr. 17, 1985), *aff'd*, 796 F.2d 489 (D.C. Cir. 1986) ( "The Court determines that Congress did not intend to provide a private right of action for money damages under this section.").  Plaintiffs argue, on the contrary, that many courts, including in this district, have recognized causes of action under § 13(e).  *See In re Initial Pub. Offering Sec. Litig.,* 241 F. Supp. 2d 281, 299 n.13 (S.D.N.Y. 2003) (recognizing § 13(e)(1), which prohibits fraud in connection with issuer's repurchase of its shares, as providing an implied right of action under the Exchange Act.)

As courts in this district have previously recognized, whether § 13(e) authorizes private suits remains an unsettled issue.  *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 246 n.35 (S.D.N.Y. 2000) (comparing *Fisher v. Plessey Co. Ltd.,* 82 Civ. 1183, 1983 WL 1328 (S.D.N.Y. June 22, 1983) (private right of action under § 13(e)) *with Berg v. First Am. Bankshares, Inc.,* 83 Civ. 3887, 1985 WL 2232 (D.D.C. Apr.17, 1985) (no private right of action under § 13(e)).  However, the Court need not decide at this juncture decide the issue of whether a private right of action applies.  Because Plaintiffs have not adequately alleged actionable misrepresentations, their § 13(e) claims fail as well.

**C.  Section 20A Insider Trading Claims**

Plaintiffs bring claims under § 10(b), Rule 10b-5, and § 20A against Defendant E-House and all members of the Buyer Group, with the exception of Defendant Chao, regarding insider trading.  As noted above, the Court has already determined that Plaintiffs have failed to allege any actionable misrepresentations or omissions.  Therefore, Plaintiffs' insider trading claims fail.

"Section 20A provides a cause of action against 'Any person who violates any provision of this chapter or the rules or regulations thereunder by . . . selling a security while in possession of material, nonpublic information[.]'" *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994) (quoting 15 U.S.C. § 78t-1(a)).  Thus, Section 20A claims require an independent underlying violation of the Exchange Act.  *Id.* at 703–04.  Because Plaintiffs have not established an underlying violation, their insider trading claims fail.

### D.  Section 20(a) Control Person Claims

Plaintiffs assert a claim for control person liability against the corporate officer defendants Shen, Chao, Xiang, Zhu, Zeng, Zhou, Li, and Jian, under § 20(a) of the Exchange Act.  "Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP,* 603 F.3d 144, 160 (2d Cir.2010).  Because Plaintiffs have not stated a claim for any primary violation, their claims for control person liability also fail.

### E.  Leave to Amend

Defendants request that the Court dismiss the FAC with prejudice.  Doc. 63 at 25.  In their opposition, Plaintiffs request leave to amend in the alternative.  Doc. 67 at 25.  Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to replead "when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).  The "usual practice" in this Circuit upon granting a motion to dismiss is to permit amendment of the complaint.  *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 446–47 (S.D.N.Y. 2014) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)).  Because it is possible that Plaintiffs can plead additional facts to remedy some of the deficiencies identified in this opinion without prejudice to Defendants, Plaintiffs are granted leave to amend.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189–90 (2d Cir. 2015) (finding the "district court exceeded the bounds of its discretion in denying Plaintiffs leave to amend their complaint" because an amended complaint "may cure the remaining defects" identified by the court).  Plaintiffs will not be given unlimited

opportunities to amend, however, as they are now on notice of the deficiencies in their pleadings. *See, e.g.*, *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 351 (S.D.N.Y. 1999) ("[W]here a plaintiff is on notice of deficiencies in an initial pleading and has had the opportunity to cure them by a first amendment, dismissal with prejudice is proper when a complaint previously has been amended.") (internal quotation marks and citations omitted).

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED.  Defendants' letter motion for oral argument is DENIED as moot.  Plaintiffs may file their Second Amended Complaint by October 20, 2021.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 62 and 70.

It is SO ORDERED.

Dated:   September 29, 2021
         New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.